GREEN | EVANS-SCHROEDER, PLLC
130 W. Cushing Street
Tucson, AZ 85718
Tel. (520) 882-8852
Fax (520) 882-8843

Matthew Green (Arizona Bar No. 020827)
Email: matt@arizonaimmigration.net

Jesse Evans-Schroeder (Arizona Bar No. 027434)
Email: jesse@arizonaimmigration.net

Ami Hutchinson (Arizona Bar No. 039150)
Email: ami@arizonaimmigration.net

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| A.M.A.S,[1]<br><br>Plaintiff,<br><br>v.<br>Markwayne Mullin, in his official capacity, Secretary of the Department of Homeland Security;<br><br>David Venturella, in his official capacity, Acting Director for U.S. Immigration and Customs Enforcement;<br><br>Todd Blanche, in his official capacity, U.S. Attorney General;<br><br>Marco Rubio, in his official capacity as Secretary of State; | Case No.:<br><br>**CIVIL COMPLAINT** |

[1] The Court previously granted Plaintiff's motion to proceed using his initials during the prior habeas proceeding. Docket 2:26-cv-02888, entry 7. Furthermore, pursuant to LRCiv 3.7, Plaintiff notifies the Court that the instant complaint is a related case. It was previous filed as a habeas action related to A.M.A.S.'s third country removal and both "involve at least some of the same plaintiffs and at least some of the same defendants."

U.S. Department of Homeland Security;

U.S. Department of State;

United States of America,

Defendants.

**INTRODUCTION**

1. On April 24, 2026, Plaintiff A.M.A.S. filed a petition for habeas corpus on before this Court.[2] Before the Court could rule on the petition, and the subsequently filed Temporary Restraining Order to prevent his third country removal without being afforded a reasonable fear interview, A.M.A.S. was forcibly removed to Equatorial Guinea on or about May 6, 2026, and was not afforded any opportunity to demonstrate a fear of removal to Equatorial Guinea, despite repeatedly requesting a reasonable fear interview. Ex. A (A.M.A.S. statement regarding his removal originally filed in the first habeas petition proceedings). Since arriving in Equatorial Guinea and being turned over by U.S. authorities to the custody of Equatorial Guinean authorities, A.M.A.S. has been heavily guarded by Equatorial Guinea authorities at a decommissioned hotel. Ex. B (Kate O'Donnell affidavit) at ¶4; *see also* Ex. C (collected news articles).

2. On May 12, 2026, the government responded to A.M.A.S.'s removal by submitting a declaration from Vu Cam, the "Acting Unit Chief (UC), Removal Management Division (RMD), RIO (Removal International Operations), Africa, Enforcement and Removal Operations (ERO), U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (DHS)[.]" 2:26-cv-02888, Docket entry 15-1 at ¶1. In that sworn declaration, Mr. Cam claimed that "Equatorial Guinea provided diplomatic assurances that the aliens removed from the United States pursuant to the Third Country Removal agreement will not be subjected to persecution or torture"

[2] Plaintiff hereby incorporates by reference the facts laid out in the initial habeas corpus petition. Docket No. 2:26-cv-02888.

and that the Department of State "determined that the diplomatic assurances were credible." *Id.* at ¶¶5-6. He also claimed that "ICE [sic] will followed the March 30, 2025 memorandum *Guidance Regarding Third Country Removals* to effectuate the Petitioner's removal." *Id.* at ¶8.[3]

3. Throughout his guarded confinement at the hotel, Equatorial Guinean authorities beat A.M.A.S., held him at gunpoint and threatened to kill him, and took away his phone and internet to prevent him from reporting the conditions within the country and the hotel. Ex. B and C. Instead, A.M.A.S. bravely relayed his story to reporters in order to advocate for himself and his fellow hostages. His last messages to Ms. O'Donnell indicated he intended to continue speaking out publicly about the treatment he, and his fellow hostages, experienced in Equatorial Guinea. Ex. B at ¶4, o.

4. On September 11, 2026, A.M.A.S.'s counsel was made aware that he was arrested. Ex. B at ¶5. Counsel for A.M.A.S., Kate O'Donnell, has heard firsthand accounts of the events surrounding A.M.A.S.'s arrest. Equatorial Guinean police placed hoods on both A.M.A.S. and a fellow hostage in the hotel, beat and tortured them in front of the other hostages, and threatened all that they would be killed if they continued to speak with reporters. Ex. B at ¶7. A.M.A.S. and the second hostage were then placed in an unknown prison where they were denied food and water. *Id.* Although the guards allowed A.M.A.S.

[3] Notably, however, Mr. Cam admitted that A.M.A.S.'s "placement on the manifest for this charter served as the travel document in the Petitioner's removal." *Id.* at ¶7. This corroborates A.M.A.S.'s statement indicating that his passport was not returned to him, and he was never served with any formal notification of the specific country identified for his third country removal. Ex. A.

to place a phone call to his sister asking for her to wire $500 to bribe the guards, she believed her brother did not sound like himself. Ex. B at ¶6.

5. As of today, September 15, 2026, A.M.A.S.'s counsel have not heard from him since 10, 2026. Ex. B at ¶4, o. The last proof of life communication from A.M.A.S. occurred when he called his sister on or about September 11 and 12, 2026. *Id.* at ¶6.

6. Defendants' acts (to wit: removal of A.M.A.S. to Equatorial Guinea without any individualized process or fear hearing, the transference of A.M.A.S. from U.S. government to Equatorial Guinean custody without any identity papers or lawful status in Equatorial Guinea, and their continued refusal to facilitate his return even in the face of his confinement, torture, and imprisonment in Equatorial Guinea) were unlawful. Plaintiff alleges that Defendants' actions delivered A.M.A.S. into a transfer chain whose foreseeable destination was either refoulement to Egypt; or his death at the hands of Equatorial Guinean authorities.

7. Plaintiff's individual civil action challenges the completed post-proceeding conduct described above and Defendants' current failure to take defendant-controlled corrective action. Plaintiff is not challenging his removal order, requesting habeas relief, or requesting the Court to order any foreign sovereign to do anything. Rather, Plaintiff seeks declaratory and injunctive relief against Defendants requiring reasonable Defendants-controlled measures to facilitate A.M.A.S.'s return, and restoration of the position he occupied prior to his unlawful removal. The alleged foreseeability is supported by Plaintiff's account of the Equatorial Guinean officials' conduct and statements. It is further reinforced by the public reporting, and eye-witness accounts that have been relayed

to both reporters and counsel. Based on these facts, Defendants knew or ought reasonably to have known that removal to Equatorial Guinea would operate as either an onward-transfer mechanism to Egypt, or A.M.A.S.'s confinement, torture and/or death.

## JURISDICTION

8. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1361 (mandamus); 5 U.S.C. §§ 702 and 706 (Administrative Procedure Act); 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act); and 28 U.S.C. § 1651 (All Writs Act). In addition, Plaintiff invokes 5 U.S.C. § 704 and seeks nonmonetary relief from agency action and official conduct. Jurisdiction is proper over a civil complaint pursuant to Art. 1 § 9, cl. 2 of the United States Constitution (the Suspension Clause); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1361 (mandamus); and 28 U.S.C. § 1651 (All Writs Act). This Court also has broad equitable powers to grant relief to remedy a constitutional violation. *See Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2000). Federal Rule of Civil Procedure ("FRCP") 65 provides the procedural vehicle for preliminary and permanent injunctive relief.

9. 8 U.S.C. § 1252(g) does not bar the instant action. By its own terms, 8 U.S.C. § 1252(g) applies only to claims *arising from the decision or action* of the Attorney General *to commence proceedings, adjudicate cases, or execute removal orders.* The Supreme Court has held that the provision is narrow and does not sweep in the universe of claims arising from deportation proceedings. *Reno v. Am-Arab Anti-Discrimination Comm.,* 525 U.S. 471, 482 (1999)

10. The Ninth Circuit has applied that principle to facts materially similar to the instant case. In *Ibarra-Perez v. U.S.,* 154 F.4th 989, 996-1001 (9th Cir. 2025) an FTCA action, the Ninth Circuit held that 8 U.S.C. § 1252(g) did not bar a challenge to ICE's post-proceeding decision to remove a noncitizen to a country not designated in the removal order without meaningful notice or an opportunity to present a fear-based claim. Indeed, the Ninth Circuit noted that: "Ibarra-Perez raises purely legal arguments in challenging his removal. He does not contend that ICE was categorically forbidden to remove him to Mexico. Rather, he contends that he had a right to meaningful notice and an opportunity to present a fear-based claim before he was removed to Mexico. ICE officials removed Ibarra-Perez to Mexico despite Ibarra-Perez's Form I-589, declaration, and testimony before the IJ, all of which indicated that he had good reason to fear returning to Mexico, and despite Ibarra-Perez having repeatedly told ICE officials that he so feared. Ibarra-Perez alleges that in removing him to Mexico, ICE officials violated the Due Process Clause of the Fifth Amendment, the Immigration and Nationality Act ("INA"), and international law." 154 F.4th at 997. The Ninth Circuit therefore, rejected the government's broad reading of 8 U.S.C. § 1252(g), and found it did not apply. *Id.* The Ninth Circuit further held that 8 U.S.C. §§ 1252(a)(5) and 1252(b)(9) did not apply because the challenged conduct occurred after the removal proceedings had concluded, and it explained that the contrary conclusion would leave post proceeding country-of-removal decisions without judicial review.154 F.4th at 999-1001.

11. A.M.A.S. was ordered removed to Egypt, and granted deferral of removal from that country. He was not ordered removed to Equatorial Guinea. He therefore does

not challenge the execution of a removal order, and 8 U.S.C. §1252(g) is inapplicable on its face.

12. Importantly, the country-selection and removal procedures challenged in the instant action occurred after A.M.A.S.'s removal proceedings had concluded, were not incorporated in the immigration judge's removal order, and could not have been litigated through an appeal to the Board or a petition for review because DHS expressly declined to appeal the immigration judge's grant of deferral of removal.

## VENUE

13. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are officers and agencies of the United States sued in their official capacities, a substantial part of the events giving rise to these claims occurred in this District, and because A.M.A.S.'s previous petition for habeas relief was filed in this Court, and dismissed without prejudice.

## THIS ACTION IS JUSTICIABLE

14. A.M.A.S.'s physical removal does not defeat this Court's jurisdiction or moot his claims.

15. The Ninth Circuit has long held that a removal accomplished unlawfully is not a departure at all for the purposes of the immigration laws. In *Mendez v. INS,* 563 F.2d 956, 958-59 (9th Cir. 1977), it held that a government-effected "departure" must be legally executed; a removal accomplished in derogation of procedural due process does not trigger the departure bar, and the Government cannot immunize its actions from

judicial review by physically removing the noncitizens. The court ordered the government to admit Mendez and restore his pre-removal status. *Id.* at 959.

16. In *Singh v. Waters,* 87 F.3d 346, 349-50 (9th Cir. 1996), the court applied *Mendez* where the government removed a noncitizen in violation of a stay and after conduct that deprived him of the assistance of counsel, holding that the deportation was unlawful and that the petition had not departed within the meaning of the statute.

17. Defendants removed A.M.A.S. to a country his removal order does not name, without notice and without any opportunity to be heard, and over his objections and repeated pleas to be afforded a reasonable fear interview. Under *Mendez and Singh,* that is not a lawful removal, and it is no bar to relief.

18. The relief A.M.A.S. seeks remains fully available, which is the dispositive question. The Supreme Court has held that a district court may required the government to facilitate the return of a person removed in violation of law and to ensure that his case is handled as it would have been had he not been improperly removed. *Noem v. Garcia,* 145 S.Ct. 1017, 1018 (2025) (per curiam).

19. Moreover, the Supreme Court has also recognized, in reliance on the government's own representations, that persons who are removed and later prevail can be afforded effective relief by facilitation of their return, along with the restoration of the immigration status they had upon removal. *Nken v. Holder,* 556 U.S. 418, 435 (2009). The Ninth Circuit has also adopted this understanding. *Leiva-Perez v. Holder,* 640 F.3d 962, 969 (9th Cir. 2011).

20. Defendants themselves maintain a written policy for effectuating this precise remedy. ICE Policy Directive 11061.1 § 3.1 defines facilitating a return to include issuing a Boarding Letter permitting commercial air travel, and where warranted, paroling the person into the United States at a port of entry. The remedy sought here is therefore neither novel nor administratively burdensome; it is evidence that the requested defendant-controlled relief is operationally available.

21. Notably, Defendants have already demonstrated that they can retrieve a person they have unlawfully removed from a foreign prison. *See, e.g., https://www.npr.org/2025/07/03/g-s1-75775/abrego-garcia-el-salvador-prison-beaten-torture.* Given that the government allegedly paid Equatorial Guinea $7.5 million for the "service" they provided, that should be the case here as well. Ex. C.

22. Being wrongfully removed from the United States is itself an injury in fact, and A.M.A.S. has standing to seek its redress.

**PARTIES**

23. Plaintiff A.M.A.S. is presently imprisoned under the custody of Equatorial Guinea, at the direction of the United States. DHS employees affirmatively transferred his custody from that of the United States to Equatorial Guinea without any identity documents, and with "diplomatic assurances" that were apparently less than credible. Indeed, DHS funded the transfer to Equatorial Guinea, and there is reporting that they paid Equatorial Guinea $7.5 million dollars in exchange for this "service." Exs. B & C.

24. The U.S. Department of Homeland Security is an agency of the United States within the meaning of 5 U.S.C. § 701(b)(1) and is a proper defendant to the claims arising under the Administrative Procedure Act.

25. Defendant Markwayne Mullin is the Secretary of the Department of Homeland Security ("DHS") and is responsible for overseeing the Department and its sub-agency, ICE, and has ultimate responsibility for the detention of noncitizens in civil immigration custody. Secretary Mullin is a legal custodian of Mr. Abdulaziz Soliman. He is named in his official capacity.

26. Defendant David Venturella is the Acting Director Performing the Duties of the Director for ICE. Respondent Lyons is responsible for ICE's policies, practices, and procedures, including those relating to the third country removal of noncitizens such as A.M.A.S.

27. Defendant Todd Blanche is the Attorney General of the United States. He is sued in his official capacity. He has authority over the Executive Office for Immigration Review and responsibility for the United States' obligations under the Convention Against Torture as implemented by the Foreign Affairs Reform and Restructuring Act ("FARRA").

28. Defendant Marco Rubio is the Secretary of State. He is sued in his official capacity. The Department of State issues travel documentation, conducts diplomatic communications with Equatorial Guinea, and is a necessary participant in facilitating A.M.A.S.'s return.

29. Defendant the United States of America is a proper defendant to the claims for declaratory relief and the claims arising under the APA.

**STATEMENT OF FACTS**

30. Petitioner, A.M.A.S.,[4] is a native and citizen of Egypt who was admitted to the United States on or about November 25, 1998 as an R-2 (child of religious worker) nonimmigrant for a temporary period. On February 5, 2021, A.M.A.S. became a Lawful Permanent Resident (LPR) of the United States. On October 26, 2023, A.M.A.S. was convicted of Aggravated Assault and Possession of a Synthetic Narcotic and sentenced to two-and-a-half (2.5) years imprisonment and two (2) years' probation.

31. On January 3, 2024, A.M.A.S. was placed in removal proceedings pursuant to an NTA alleging that A.M.A.S. was removable pursuant to INA § 237(a)(2)(B)(i), 8 U.S.C. § 1227(a)(2)(B)(i), as having violated a law or regulation relating to a controlled substance, and INA § 237(a)(2)(A)(ii), 8. U.S.C. § 1227(a)(2)(A)(ii), as having been convicted of two crimes involving moral turpitude (CIMT) not arising out of a single schedule of criminal misconduct. On August 26, 2024, Mr. Abdulaziz applied for deferral of removal under the Convention Against Torture (CAT), which the immigration judge (IJ) granted in a written decision following a merits hearing on October 1, 2025.

32. In her decision, the IJ found that A.M.A.S. "faces a clear probability of torture in Egypt" because of his sexuality and his recognizable and politically active family: "the record evidence in this case leaves little doubt that Respondent will be quickly

---

[4] Although A.M.A.S incorporates the facts set forth in his habeas petition, Plaintiff provides a brief summary here for completeness.

identified either initially as a homosexual man or as a member of his high-profile family by the Egyptian government and consequently subjected to harm rising to the level of torture, committed by the government of that country."

33. The parties were afforded thirty (30) days to file a notice of appeal of the IJ's decision to the Board of Immigration Appeals (BIA), requiring the Department of Homeland Security ("DHS") to do so by November 1, 2025. *Id*. DHS did not file an appeal, but A.M.A.S. remained in ICE detention, even after the six-month presumptively reasonable removal period had lapsed.

34. Rather than release A.M.A.S. from immigration detention once the six month presumptively reasonable removal period had run, Defendants facilitated his removal to Equatorial Guinea, without: any legal status, no identity paperwork, or any actual guarantees concerning his safety and freedom there once he arrived. Indeed, DHS officials directly transferred A.M.A.S. into the custody of Equatorial Guinea government officials.

35. For months, A.M.A.S. was imprisoned in a decommissioned hotel that was heavily guarded by armed Equatorial Guinean officers. Exs. B.& C. He was deprived of basic necessities such as toothpaste; beaten by guards for perceived transgressions, including speaking to the American press about the situation there and the pressure from authorities to return to his home country where he will almost certainly be tortured; denied access to a local lawyer who was willing and able to assist him; and finally culminating in him being held at gunpoint and threatened with death. *Id.* The guards regularly threatened A.M.A.S. with forced disappearance and death if he continued his refusal to

return to Egypt – a fate from which the United States, by law and treaty, was supposed to protect him from. *Id.*

36. On September 11, 2026, A.M.A.S. was imprisoned in Equatorial Guinea for speaking with reporters and releasing video footage of the guards holding him at gunpoint and threatening to kill him. Ex. B at ¶5. Before he was escorted to the secret prison, he was tortured in front of the other hostages as a warning for them not to speak to reporters. Ex. B at ¶7. Counsel does not know his present whereabouts or condition, but on information and belief, he is being held in a secret prison ten minutes from the decommissioned hotel. Ex. B at ¶6.

37. The United States government knew or should have known this would be the outcome of the third country removal to a country that has been ruled by a dictator since 1978, criminalizes A.M.A.S.'s sexual orientation, and where he and the others removed with him were transferred from United States government custody directly to armed Equatorial Guinea government officials even though they had no identity documents or valid lawful status. Moreover, the United States government actively removed A.M.A.S. to that country without any lawful status and identity documents, probably in the hopes that A.M.A.S., like the Ethiopian hostages refouled to Ethiopia last week, would be refouled to Egypt under pressure of death at the hands of the Equatorial Guinean authorities. Ex. C.

**<u>LEGAL FRAMEWORK</u>**

28. The United States ratified the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment in 1994. Article 3 prohibits

returning a person to a State where there are substantial grounds for believing he would be in danger of being subjected to torture.

29. Congress implemented that obligation in enacting FARRA in 1998, Pub. L. No. 105-277, div. G, § 2242, 112 Stat. 2681-822 (8 U.S.C. § 1231 note), which declares it the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture.

30. The implementing regulations provide two forms of protection. Withholding of removal under 8 C.F.R. § 1208.16(c) is unavailable to a person convicted of a particularly serious crime. Deferral of removal under 8 C.F.R. § 1208.17 is available to any person who establishes entitlement to protection, regardless of criminal history, because the obligation not to return a person to torture admits no exception.

31. A grant of deferral of removal remains in effect until terminated in accordance with 8 C.F.R. § 1208.17(d), which requires a motion by DHS supported by evidence not previously presented, notice to the citizen, and a hearing before an immigration judge. Defendants have never moved to terminate A.M.A.S.'s grant of deferral of removal.

33. 8 C.F.R. § 1208.17 affords noncitizens granted deferral of removal under the CAT various procedural safeguards. 8 C.F.R. § 1208.17(d). In order to terminate a grant of deferral of removal,[5] DHS must first "file a motion with the Immigration Court

---

[5] Plaintiff notes that Defendants had an opportunity to appeal the immigration judge's grant of CAT deferral to the Board, but declined to do so. Instead, the government secretly began preparations to send A.M.A.S. to Equatorial Guinea as early as October

having administrative control pursuant to [8 C.F.R.] § 1003.11 of this chapter to schedule a hearing to consider whether deferral of removal should be terminated." 8 C.F.R. § 1208.17(d)(1). The motion "shall be granted if it is accompanied by evidence that is relevant to the possibility that the alien would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing." *Id.*

34. Once DHS complies with those requirements, the immigration court must "provide notice to the alien . . . of the time, place, and date of the termination hearing." 8 C.F.R. § 1208.7(d)(2). The regulations provide that the notice "shall inform the alien that [they] may supplement the information in his or her initial application for withholding of removal under the [CAT] and shall provide that the alien must submit any such supplemental information within 10 calendar days of service of such notice[.]" *Id.*

35. At that juncture, the immigration court forwards a copy of the original application for relief, along with any supplemental information the noncitizen submitted, to the U.S. Department of State. *Id.* Finally, the immigration court holds a hearing where it makes a "*de novo* determination based on the record of proceeding and initial application in addition to any new evidence" as to whether the "alien is more likely than not to be tortured in the country to which removal has been deferred." 8 C.F.R. § 1208.7(d)(3).

---

2026. 2:26-cv-02888 doc. 15-1 at ¶¶ 4-5. Indeed, the government apparently signed the agreement with Equatorial Guinea before it established that it believed the diplomatic assurances to be "credible." *Id.*

Following the hearing, an immigration judge determined whether to terminate the grant of deferral of removal. 8 C.F.R. § 1208.7(d)(4).

36. As the Supreme Court has "long held" and recently reaffirmed, "'no person shall be' removed from the United States 'without opportunity, at some time, to be heard.'" *A.A.R.P. v. Trump,* 605 U.S. 91, 95 (2025) (quoting *The Japanese Immigrant Case,* 189 U.S. 86, 101 (1903)). "Due process requires notice that is 'reasonably calculated, under all the circumstances, to apprise interested parties' and that 'affords a reasonable time to make an appearance.'" *Id.* at 94-95 (cleaned up). Moreover, "[f]ailing to notify individuals who are subject to deportation that they have the right to apply for asylum in the United States and for withholding of deportation to the country to which they will be deported violates both [ICE] regulations and the constitutional right to due process." *Andriasian v. INS,* 180 F.3d 1033, 1041 (9th Cir. 1999).

37. There are also statutory limits on selecting a country of removal. 8 U.S.C. § 1231(b)(2). 8 U.S.C. § 1231(b)(2) prescribes an ordered hierarchy governing the country to which a person subject to a final order may be removed. It begins with the country the person designates and proceeds through the country of citizenship, the country of birth, and other enumerated alternatives, before permitting removal to any other country whose government will accept the person. The hierarchy is mandatory, and it is subject throughout to the prohibition on return to torture.

38. The Due Process Clause independently requires that a person facing removal to a country not previously designated receive notice of the intended destination and a

meaningful opportunity to present a claim that he would face persecution or torture there. Notice that does not afford a realistic opportunity to seek relief is no notice at all.

39. The required notice must be timely and meaningful. It must identify the proposed country with sufficient time and in a manner that permits the noncitizen to consult counsel and actually pursue available protection. A notice delivered only after transfer has begun, or a statement that a person may raise a fear claim later with an officer who is unavailable, supplies no meaningful opportunity at all. *See Andriasian v. INS*, 180 F.3d at 1041; *Aden v. Nielsen*, 409 F. Supp. 3d 998 (W.D. Wash. 2019).

40. The obligation not to return a person to torture extends to indirect return. A removal to an intermediate country that is undertaken with knowledge that the intermediate country will in turn deliver the person to the country of feared torture accomplishes by indirection what the law forbids directly.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violation of the Fifth Amendment: Procedural Due Process

41. A.M.A.S. re-alleges and incorporates by reference the paragraphs above.

42. The Due Process Clause of the Fifth Amendment applies to all persons within the United States, without regard to immigration status. *Zadvydas v. Davis,* 533 U.S. 678, 693 (2001). A.M.A.S. was within the United States or its custody at all times relevant to the conduct challenged in this Court.

43. A.M.A.S. possessed constitutionally protected liberty interests in his judicially conferred protection against return to torture; or his removal to a third country where he could (and has been) tortured without any reasonable fear proceedings.

44. Defendants deprived Plaintiff of those interests without any meaningful process. Defendants failed to give Plaintiff any of the following: (a) any meaningful notice that Equatorial Guinea was the intended destination, (b) any meaningfully opportunity to express a fear of removal to Equatorial Guinea, and (c) any meaningful individualized and country-specific screening process.

**SECOND CLAIM FOR RELIEF**

**Administrative Procedure Act – Removal in Excess of Statutory and Regulatory Authority (5 U.S.C. §§ 702, 704, 706; 8 U.S.C. § 1231(b)(2); FARRA § 2242; 8 C.F.R. §§ 1208.17, 1208.18)**

45. A.M.A.S. re-alleges and incorporates by reference the paragraphs above.

46. A.M.A.S.'s removal order directed his removal to Egypt and to no other country. No immigration judge and no other adjudicator ever designated Equatorial Guinea as a country of removal.

47. Defendants' removal of A.M.A.S. to Equatorial Guinea constituted final agency action for which there are no other adequate judicial remedies. Defendants failed to follow the country-selection procedure prescribed by 8 U.S.C. § 1231(b)(2), and failed to provide Plaintiff with any meaningful notice or any meaningful opportunity to be heard concerning removal to Equatorial Guinea. 5 U.S.C. § 704.

48. FARRA and its implementing regulations at 8 C.F.R. §§ 1208.17 and 108.18 prohibit Defendants from effectuating Plaintiff's involuntary return to a country where he would more likely than not be tortured. Plaintiff alleges that this prohibition governs indirect return, as well as direct return. Furthermore, Defendants knew or should have known that Plaintiff would be subject to refoulement or, failing that, confined and tortured by the Equatorial Guinea government for refusing to return to Egypt.

49. Plaintiff's Egypt-specific deferral of removal did not confer authority to remove him into a transfer chain designed or foreseeably likely to result in his return to Egypt, the country from which an immigration judge found that he was more likely than not to be tortured.

50. Defendants may not accomplish indirectly through an intermediary country what federal law and the Constitution prohibit them from accomplishing directly. Defendants may not evade A.M.A.S.'s Egypt-specific deferral by arranging, directing, financing, facilitating, encouraging, or acquiescing in a foreseeable onward transfer to Egypt via Equatorial Guinea, or any other intermediary. Defendants also are prohibited from sending A.M.A.S. to Equatorial Guinea where he has been imprisoned, persecuted, and now tortured.

51. Defendants' challenged actions were arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, contrary to constitutional right, in excess of statutory authority, and without observance of procedure required by law. 5 U.S.C.

§ 706(2)(A) – (D). Accordingly, Plaintiff is entitled to declaratory and equitable relief.

**THIRD CLAIM FOR RELIEF**

**Mandamus and Equitable Return-Facilitation Relief (28 U.S.C. § 1361; 5 U.S.C. § 706(1); ICE Policy Directive 11061.1)**

52. A.M.A.S. incorporates and realleges each preceding paragraph.

53. Plaintiff incorporates the final-agency-action in the preceding claim for relief. Plaintiff seeks, in the alternative, mandamus and equitable relief requiring Defendants to take the defendant-controlled steps necessary to remedy the consequences of their alleged unlawful removal.

54. This Count seeks forward-looking relief addressing the continuing consequences of the alleged unlawful removal.

55. Defendants maintain a written policy, ICE Policy Directive 11061.1, a true and correct copy of which is attached hereto as Exhibit ___, and incorporated herein by reference, governing facilitation of the return to the United States of persons whom ICE has removed. The Directive expressly disclaims the creation of any right or benefit enforceable by a private party, and A.M.A.S. does not plead it as an independent source of entitlement. It is pleaded as evidence that the relief he seeks is concrete, administratively established, and within Defendants' existing operational authority

56. Defendants owe A.M.A.S. a clear, non-discretionary duty to refrain from removing him in violation of the Constitution, the immigration statutes, and their

own regulations. Having done so, Defendants now must take the steps within their power to undo the violation. A.M.A.S. has no other adequate remedy. Mandamus is appropriate under 28 U.S.C. § 1361, and relief compelling agency action unlawfully withheld is appropriate under 5 U.S.C. § 706(1).

**PRAYER FOR RELIEF**

WHEREFORE, A.M.A.S. respectfully requests that this Court:

1) Assume jurisdiction over this matter;

2) Declare that Defendants' removal of Plaintiff to Equatorial Guinea violated the Due Process Clause of the Fifth Amendment, 8 U.S.C. § 1231(b)(2), FARRA §2242, 8 C.F.R. 1208.17, and the Administrative Procedure Act, 5 U.S.C. § 706;

3) Order Defendants to promptly take all reasonable defendant-controlled measures to facilitate Plaintiff's return to the United States, including communicating with appropriate governmental, transportation, consular, and other contacts; coordinating with Plaintiff's counsel; arranging or authorizing necessary travel documentation and transportation, and if warranted, parole upon Plaintiff's arrival at a port of entry.

4) Order that any subsequent adjudication concerning A.M.A.S.'s custody, protection, or removal be conducted *nunc pro tunc* to the time prior to his removal, as though the unlawful removal had never occurred.

5) Permanently enjoin Defendants, their officers, agents, servants, employees, and all persons acting in active concert or participation with them from taking any action to effectuate, procure, encourage, facilitate, fund, direct, or acquiesce in Plaintiff's transfer

or removal to Egypt, or any other country if Defendants know or reasonably should know that a further transfer to Egypt is contemplated or reasonably foreseeable.

6) Order Defendants to file, by no later than 2:00pm every day, and continuing daily until Plaintiff returns to the United States or the Court orders otherwise, a declaration or status report under penalty of perjury stating the actions taken, communications made or received, results obtained, and the next specific steps and timeline for return facilitation.

7) Order Defendants immediately to preserve all hardcopy and electronically stored information concerning Plaintiff's detention, country-selection process, transportation, charted and manifest records, removal, transfer, handoff location, monitoring, claimed diplomatic assurances, communications with any foreign government or official, and efforts to locate or facilitate Plaintiff's return, including all underlying forms, case notes, A-file material, audit trails, electronic entries, emails, messages, recordings, travel records, contracting records, and communications with governmental, consular, airline, charter, or intermediary personnel.

8) Permanently enjoin Defendants from taking retaliatory action against Plaintiff, his family, or his attorneys on account of their participation in this action, including the pursuit of relief or enforcement of this Court's orders;

9) Award A.M.A.S. his costs and reasonable attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable provision.

10) Retain jurisdiction to enforce and modify its orders.

11) Grant any other relief that the Court deems just and proper.

<u>/s/ *Jesse Evans-Schroeder*</u>
Jesse Evan-Schroeder