***A.M.A.S. v. Warden, et. al.***

**(Case No. TBD)**

**Civil Complaint**

**<u>Exhibit List</u>**

| | |
|---|---|
| Exhibit A. | Affidavit from A.M.A.S., Originally Filed With The Notice of Removal to Equatorial Guinea |
| Exhibit B. | Affidavit by Green Evans-Schroeder Attorney Katherine M. O'Donnell |
| Exhibit C. | News Articles About A.M.A.S. Detention in Equatorial Guinea, Violence Against Detainees, and A.M.A.S' Arrest |

# EXHIBIT A

**Jesse Evans-Schroeder**

| | |
|---|---|
| **From:** | Kate O'Donnell |
| **Sent:** | Thursday, April 30, 2026 7:49 AM |
| **To:** | Jesse Evans-Schroeder |
| **Cc:** | Aida Escobar; Karla Gomez; 7b5a1956b+matter1682199305@maildrop.clio.com |
| **Subject:** | ; written narrative of events |
| **Importance:** | High |

---

**From:** !
**Sent:** Thursday, April 30, 2026 7:03 AM
**To:** Kate O'Donnell <kate@arizonaimmigration.net>
**Subject:** Re: /

You don't often get email from . Learn why this is important

This message was sent from outside the company. Please do not click links, open attachments or respond to the requests unless you recognize the source of this email and know the content is safe.

Thursday morning I was moved from calexio and was told that I was going to Arizona. I got to Arizona and stayed there for 3 told and was told nothing about why I was there when I would ask.
Sunday night the moved me again and when I asked an officer on the bus where I was going she told me I was going to California but I ended up in Louisiana. I stayed in Louisiana for about 16-17 hours and wasn't told why I was there either.
Monday morning they pulled me out and this is when I was able to speak to ice officers. I asked them where I was going and the informed me that I'm going to Guinea. I expressed to them that I already filed my hebeas and was assigned a judge and also informed them that my lawyer had filed an emergency hearing for unlawful movement in both states of Arizona and Louisiana. They proceeded to check and told me there was nothing in the system and that my deportation was to still move along.
I then expressed to them that I cannot go to Guinea based on the same merits I won my case for Egypt and expressed to them my fear of going to Guinea and was told by the ice officers that all that doesn't matter and that I'm still going to Guinea. I then asked them that I would like a credible fear interview and was told that wouldn't be happening.
I explained to them that my due process was being violated and that I have the right for a credible fear interview and have a right to present my fear and evidence before a judge. They said that all that doesn't matter and I am still getting deported. I expressed my fears to them more than 3 times and each time they said that I'm wasting my time and that I still had to leave.
I then refused to leave and proceeded to sit on the ground and 4 ice officers came and picked me up by my arms and legs while I was shackled and threw me on the bus and was told that I would be physically wrapped and put on the plane if I tried resisting one more time.
When I got to the plane I asked them to see my travel documents that they were able to obtain for me and

they told me that I would be receiving all of that in Guinea.

When I got to Guinea and was exiting the plan people who I assume work for the Guinean government asked me for my passport and I informed one I did not come with one. I then asked them what I'm doing in Guinea and they told me that this was just merely a transit until I can be sent back to my country. There was also this American woman present who I assumed worked for the US because she was crossing off our names from a list and I asked here how I was able to be deported and how I entered this country with no travel documents and she said that that was very strange and she didn't know how that happened. And she said that I would be taken to a hotel and would have to wait there until I speak with my embassy and get my passport to be able to return to my country. And then they took us to the hotel where were unable to leave or go anywhere so essentially in another detention in a different country.

My biggest concerns are that my due process was violated in America and I was forcibly deported to a country I explicitly expressed my fears of going to without being given the chance to argue my claim. Also, if Guinean authorities know that this is merely a transit then the US also knows it's merely a transit and that would make it illegal for them to send me here knowing that Guinea was simply going to send me back to my country because essentially that would be like America being the one sending me back to my country through a 3rd party or middle man

I was never served with any deportation paperwork like everyone else which also states how long I'm to be banned from returning and never signed any deportation paperwork that mentioned anything about Guinea and now I'm detained in a foreign country essentially as a ghost because I have no identification or documents that prove who I am

# EXHIBIT B

# AFFIDAVIT OF KATHERINE M. O'DONNELL

I, Katherine M. O'Donnell, hereby declare as follows:

1. I have personal knowledge of the matters stated in this Affidavit (unless otherwise stated), and they are true and correct to the best of my knowledge.
2. I am an attorney licensed to practice in the state of New Mexico. I am employed full-time as an Associate Attorney with the law firm Green Evans-Schroeder, PLLC which represents A.M.A.S. who was, until Friday September 11, 2026, detained at the decommissioned Hotel Bamy in Malabo, Equatorial Guinea.
3. On September 11 A.M.A.S. and another detainee from Eritrea, hereafter S.B., were arrested in what witnesses have described as torture. In a September 11 voice message that I heard, S.B. stated that he and A.M.A.S. were being held at an unknown location about 10 minutes from the hotel without food and water. Local lawyers continue to search for them.
4. To my knowledge, no charges have been filed, though a reason given for the arrest was for having "broken a mirror." As is detailed below, however, the arrest appears to be the most recent effort to silence A.M.A.S. who has given numerous interviews with international journalists about the dangerous and violent conditions in which he and dozens of other people deported from the United States have been held.
5. I was in contact with A.M.A.S. via WhatsApp since his removal to Equatorial Guinea in late April 2026 until a day before his September 11, 2026 arrest. From the time he arrived in Equatorial Guinea, A.M.A.S. sent me frequent updates about the dangerous and abusive conditions in Hotel Bamy, which I summarize here:
    a. Those detained at the hotel are subjected to frequent verbal abuse, beatings, and death threats from hotel staff and armed police stationed at the hotel. One such

frequently made threat is, “we could just kill you and bury you across the street and nobody would ever find you”;

b. In or around May 2026, an individual detained in the hotel had a mental health crisis and hotel staff dragged him out to a balcony and tried to convince him to jump off and kill himself;

c. Individuals detained at the hotel are denied basic hygiene products such as toothpaste and toilet paper. Food is reduced or withheld as a form of punishment for perceived infractions. Cell phones were repeatedly confiscated and Wi-Fi shut off to prevent detainees talking to their lawyers, their family, and journalists. See below for further details;

d. Between April 2026 and September 1, 2026, A.M.A.S. sent periodic updates about individuals detained with him being refouled to the countries from which they had been granted protection under Withholding of Removal and/or the Convention Against Torture (CAT). Detainees were often told that they were a problem for Equatorial Guinea and that they would “go home” soon. Most recently, on September 1, 2026, a group of Ethiopian citizens were refouled; A.M.A.S. shared a video of a detainee interpreting (Spanish to English) for an official who asked them, “do you want to go to your country or do you want to go to the jail?” and another video of the Ethiopian detainees being forced to pack up their things before being refouled;

e. On July 2, 2026, in response to a complaint filed on behalf of A.M.A.S. and thirteen (13) other individuals at the hotel (named as “the Victims”), the African Commission on Human and Peoples’ Rights served the President of Equatorial

Guinea, H.E. Teodoro Oblang Nguema Mbasogo with a "Request for provisional measures" which demanded that Equatorial Guinea adopt measures to "(i) refrain from deporting, transferring, or relocating the Victims in any way against their will, pending the Commission's decision on this communication; and (ii) ensure that no Victim is expelled to a country where they risk the death penalty, torture, or cruel, inhuman, or degrading treatment.";

f. On or around July 1, 2026, A.M.A.S. said in a text message that he and the people detained with him were informed that someone in the hotel who was not a detainee had Ebola. A.M.A.S. texted videos of people in hazmat suits walking around the interior of the hotel. They "brought boxes of masks, gloves, and equipment to try to keep it under control." A nurse confirmed that the individual had tested positive for the disease. The individual was housed on the second floor of the hotel, and the detainees were housed on the third floor of the hotel. A.M.A.S. sent a text message on July 3, 2026, stating that they had "to pass his floor everyday [sic] to get [their] food and to get anything from the lobby." On July 9, 2026, A.M.A.S. sent a text message stating that a second person, female, who tested positive for Ebola had been quarantined at the hotel with the detainees;

g. Throughout the month of July 2026, individuals detained at the hotel, including A.M.A.S. began to give interviews to international journalists about the dire conditions in the hotel, the beatings and verbal abuse, and the fact that Ebola-positive individuals were being housed at the hotel;

h. In or around mid-to-late July 2026, the verbal abuse and death threats became worse, the food rations became smaller, and access to sanitary products became

even more restricted; because of the timing, A.M.A.S. believed that this was in retaliation for the detainees' participation in the complaint to the African Commission and the interviews that they were giving to journalists. Conditions and treatment continued to grow more dangerous and more violent from July on.

i. On August 1, 2026, A.M.A.S. sent text messages stating that around 11 or 11:30pm the night before, "6 officers wearing ski masks and guns" tried to enter his room and when he didn't allow this, "they physically took me out of my room and took me downstairs where I saw the rest of the people handcuffed as well. They kept grabbing me by the neck and kicking my feet from underneath me to try to take me down[.]" A.M.A.S. was one of five (5) detainees who "were dragged from our rooms and handcuffed and physically assaulted and they pointed guns at us[.]" They were dragged downstairs to the lobby where the other 27 detainees were gathered. A.M.A.S. stated that the five people targeted were the ones who had been most vocal about the violence and abuse continuously inflicted upon them. The former Director of Police, Juan Santiago, told the detainees that they needed to stop spreading "fake news" to journalists and their families about Ebola in Equatorial Guinea and that they 'we are too comfortable here and need to go back to our countries[.]" The next day, armed police told A.M.A.S. "that if they see or hear anything about what happened last night online that there will be extreme measures taken[.]"

j. On Friday, August 21, 2026, A.M.A.S. shared videos and sent text messages stating, "More people were cuffed and assaulted yesterday and we were all threatened to leave this country and go back to our countries[.]" This assault came after a new

group of detainees arrived on a U.S. deportation flight originally sent to Liberia. Two of the new arrivals gave interviews to the Spanish language news outlets Univisión and Telemundo. A.M.A.S. wrote that as they were being beaten, police told them that it was for "speaking out against what was going on" and that they "need to leave this country as soon as possible and they don't want us here and how easy it would be for them to kill us and bury us in a field."

k. On Saturday, August 29, 2026, A.M.A.S. texted to say that things were "escalat[ing] day to day" and that police had been confiscating detainees' phones and shutting off the Wi-Fi so that they could not speak with their lawyers or journalists. On two occasions A.M.A.S. had been forced to pay up to 150,000 [roughly $18 USD] to get his phone back. That same day, the 39 individuals detained at the hotel began a hunger strike "because of the mistreatment, assaults, and the terrible living conditions" and to "demand immediate assistance to get us out of this country." Two days later, the former Director of Police, Juan Santiago, promised the detainees that things would change and most of them called off the strike. The next day, as described above, a group of Ethiopian citizens were refouled, despite having Withholding or CAT protection.

l. On Saturday, September 5, 2026, I received videos and text messages from A.M.A.S. and another individual whom Green Evans-Schroeder is representing, hereafter P.G.L., who had arrived as part of the Liberia flight and who had just obtained a cell phone. The videos showed police aiming military style guns at A.M.A.S. and another detainee who was trying to shield A.M.A.S., while a plainclothes female officer was screaming, "shoot him!" A.M.A.S. stated that this

female officer often encourages the armed police officers at that hotel to abuse and threaten the detainees with guns. A.M.A.S. texted, "I'm genuinely tired and afraid for my life Kate ... I want to leave ... I can't take it anymore ... I want to go home, Kate ... I can't do this anymore[.]"

m. Over several hours of phone conversations with A.M.A.S. and P.G.L. on September 5, I learned that the incident resulted from a detainee requesting that his phone be returned to him – it having been confiscated for two weeks. A.M.A.S. and the other individuals detained at the hotel accompanied them to the hotel lobby to make the request.

n. A number of international news outlets picked up the story and published the video of the police officer being commanded to shoot A.M.A.S. On September 8, 2026, Reuters published that video along with a video interview with A.M.A.S. in which he described the incident in which officers told him to get on his knees with his hands up and held him there for 10-15 minutes.

o. On Wednesday, September 9, A.M.A.S. and P.G.L. sent me voice texts back-to-back from A.M.A.S. phone in which they said, that "a bunch of police" were at the hotel and were confiscating everyone's phones. They had confiscated P.G.L.'s phone already and were about to confiscate A.M.A.S.' phone. Later that morning, A.M.A.S called me briefly to say that he had managed to hide his phone and convince the armed officer who interrogated him that he didn't have a phone. His voice was extremely tense – I had never heard him sound like that before – and he said that he was afraid for his life. Someone began knocking on the door while we

were talking, and he said that he would call me back "in 10 minutes." I didn't hear from him for the rest of the day.

p. On Thursday, September 10, 2026, A.M.A.S. sent me text messages saying that the Wi-Fi had been shut off and that he had limited data but wanted to get messages out. We chatted briefly about the news stories that had been published, and A.M.A.S. stated that while confiscating phones on September 9, the former Director of Police, Juan Santiago, showed A.M.A.S. the video of his interview with Reuters and of him being threatened at gunpoint. Juan Santiago told him that this was the reason that all phones were being confiscated. A.M.A.S. then repeated what had become a refrain of his over the course of our many conversations: that he knew that speaking to journalists about the dangerous and violent conditions in which he and his fellows were being held and about the refoulements put him in danger, but that this was not only about him – he was doing this for everyone who had been detained there, and that he was going to keep speaking out.

6. On Friday, September 11, 2026, I received a text message from attorney Meredyth Yoon, Litigation Director of Asian Americans Advancing Justice, one of the organizations that filed the complaint with the African Commission, informing me that A.M.A.S. and S.B. had been arrested and were being held incommunicado in an unknown location.

7. Between September 11 and September 12, 2026, A.M.A.S.' sister in the United States forwarded me voice messages that S.B. sent her from another inmates' phone in which he stated that he and A.M.A.S. are being held in separate units in a jail about 10 minutes from the hotel and that they are being denied food and water. S.B. and A.M.A.S. had managed to pass a couple of messages to each other through guards. A.M.A.S. also sent voice

messages to his sister asking her to wire $500 to the person who receives Western Union money for the detainees at the hotel – possibly for food, possibly to bribe guards to continue to pass messages. A.M.A.S.' sister stated that A.M.A.S. sent a voice message to their mother to tell her that he was "okay," but that he didn't sound okay.

8. At around 2:30am in Equatorial Guinea on Sunday, September 13, 2026, two individuals detained at the hotel called me and stated that they were terrified for their lives. They stated that they had paid police or staff at the hotel to take food and water to A.M.A.S. and S.B., but that they didn't know where they were or if the food and water ever arrived. They said that they were hiding to make the call and that they were risking their lives just to talk to me. They also narrated the details of A.M.A.S. and S.B.'s arrest; one of the individuals, hereafter M.N. passed the same details to Ms. Yoon. This is a summary from all conversations:

    a. Most phones have been confiscated. People detained at the hotel describe their experience as a nightmare. They describe A.M.A.S and S.B.'s arrest as "kidnap," and their treatment during the arrest as torture. They were tied with rope with bags over their heads, with Equatorial Guinea police beat them on their heads, backs, and ribs with the officers' elbows, knees, and guns.

    b. At some point on September 11, A.M.A.S. and S.B. were brought back to the hotel apparently for police to look for a phone. They were bent over at the waist, as if they had been bent over for hours. As police beat them, A.M.A.S. and S.B. screamed, "ouch, this hurts!" and officers yelled, "where is the phone, where is the phone?" Officers forced A.M.A.S. and S.B. down the stairs while they were still

tied up with bags over their heads. The officer pushed one of them down the stairs and then used the rope to pull him back up.

c. Witnesses said it is the worst thing they have ever seen and that it reminds them of images from the US War in Iraq. Every time one witness closes their eyes, they see A.M.A.S. and S.B. being tortured.

d. Authorities have told the remaining 29 U.S. deportees at the Hotel Bamy that they may never see A.M.A.S. and S.B. again. The individuals we spoke to fear that A.M.A.S. and S.B. are being tortured in jail. Every day, police break into people's rooms and search for phones to prevent them from reporting abuse to lawyers and journalists. The detainees we spoke with understand they are risking their lives by speaking out but believe they face an even greater risk if the situation in Malabo is allowed to continue. They hope that a judge or Congress will do something to stop these horrific third country agreements. They say they don't know if they will wake up tomorrow.

9. As of today, September 15, 2026, we do not know where A.M.A.S. and S.B. are or what has happened to them. My sources inside the hotel have stopped responding to WhatsApp messages. I don't know whether their phone was confiscated or if they are safe. S.B. has stopped responding to WhatsApp messages. My other sources outside the hotel have received no updates. Since phones were confiscated on September 9, 2026, I have lost all contact with P.G.L., Green Evans-Schroeder's other client detained at Hotel Bamy.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Katherine M. O'Donnell

09/15/2026

Date

# EXHIBIT C

https://tucson.com/news/local/border/article_c92af28c-a8f2-4795-abd3-e72e0f94c24e.html

TOP STORY | EDITOR'S PICK | TOPICAL

# Arizona man languishes in African hotel after third-country deportation

**Emily Bregel**

Aug 2, 2026

Prefer us on Google

A 30-year-old man who grew up in Phoenix has spent the last three months confined in a decommissioned hotel in Equatorial Guinea, after ICE deported him there without warning.

Armed guards patrol the grounds of the Bamy Hotel, where Ahmed Soliman — whose family moved to Arizona from Egypt when he was 4 — has been imprisoned since late April, despite having committed no crime in the African nation.

He fears at any moment he'll be returned to his home country, where a U.S. immigration judge agreed last fall he'd likely face torture and death, due to his family's politics and his identity as a gay man.

Soliman said he's one of 17 deportees from the U.S. confined in the hotel-turned-prison, where living conditions are inhumane and deteriorating.

"Things have been gradually, day-by-day getting worse," he said in a phone interview with the Arizona Daily Star.

2. **Three Arizona Wildcats listed as 'out' on first Big 12 availability report**
3. **5 takeaways from Arizona football's 28-17 loss to No. 15 BYU | Michael Lev**
4. **These new Arizona laws took effect this weekend**

---

Equatorial Guinea is among dozens of countries that have signed often-opaque "third-country removal" agreements with the Trump administration to accept U.S. deportees who can't be deported to their home countries.

But too often, those third countries send the deportees back home anyway, a violation of international law, immigration attorneys say.

Soliman said ICE told him shortly before he was forcibly put onto an airplane that he was being deported to Equatorial Guinea, where rights advocates say homosexuality is de facto criminalized.

Soliman's attorneys argue his sudden removal — without notice or a fear-screening, and while he still had a pending habeas corpus petition before U.S. District Court in Arizona — was unlawful and put Soliman's life at risk.

The treatment he's received by the U.S. government is "unconscionable," his immigration attorney said.

"More likely than not, if he has to return to Egypt he will be tortured and killed because of his identity," said Kate O'Donnell, attorney with Tucson law firm Green Evans-Schroeder.

Bamy Hotel, on an island off the coast of central-west Africa, is now also holding a man with Ebola in

quarantine one floor below the deportees, Soliman said. None of the deportees have received protective gear, he said.

Ahmed Soliman, now 30, is pictured on the Brooklyn Bridge in 2019. Soliman, whose family moved from Egypt to Arizona when he was 4, has been detained at a decommissioned hotel in Equatorial Guinea for three months, since ICE deported him there April 28 without notice. He said he's intent on speaking out about the injustices he and other deportees at the hotel are facing, despite the risks to his personal safety.

Courtesy of Ahmed Soliman

Local officials dealing with the Ebola patient "came in with haz-mat suits. That put us all in unease," he said. "You would never do this in a public hotel. They have no regard for us, for our health, for our safety."

The Associated Press has also **reported** Ebola patients are in quarantine at Bamy Hotel, citing accounts from deportees who spoke on the condition of anonymity, fearing retaliation.

Soliman told the Star he's intent on speaking out about the injustices he and other deportees at the hotel are facing, despite the risks to his personal safety.

"I'm at a point in life right now where I will do everything in my power to fight," he said. "I'm doing this for the 17 people that live here, as well. It's not just me."

ICE spokesman Fernando Burgos did not respond to the Star's questions about the conditions in which Soliman and other deportees are being held in Equatorial Guinea.

"Once an alien leaves the United States, ICE is no longer responsible for tracking their location or activities outside the country," Burgos said in an emailed statement.

The Star contacted Equatorial Guinea's Embassy in Washington, D.C., and a staff member said Ambassador Crisantos Obama Ondo would respond to the Star's questions, sent by email July 29.

On July 31, an embassy staffer said the ambassador was on vacation and couldn't answer the questions, which asked about the confinement conditions for U.S. deportees and allegations that Equatorial Guinea has returned U.S. deportees to their home countries.

## Imprisoned in a hotel

In the hotel, Soliman said deportees are treated like prisoners. They're provided with three basic meals, and soap and toilet paper, but everything else they must purchase on their own, using money sent by their families via Western Union.

People who take the deportees' money to make purchases on their behalf often steal some of the funds, he said.

"Since I've been here, there's no hygiene products except soap. No toothpaste, no change of clothes," he said. "We have to hand-wash our clothes in our room and hang them on the balcony. Nothing is provided to us in this hotel except the food."

The hotel is owned by the country's long-running president, Teodoro Obiang Nguema Mbasogo, who has led Equatorial Guinea's authoritarian government for more than four decades. The U.S. State Department has chronicled human rights abuses and corruption in the oil-rich country.

In recent weeks, deportees at the hotel have not even been receiving the soap and toilet paper they were getting previously, Soliman said.



Ahmed Soliman, who grew up in Phoenix, shared his view from inside the decommissioned Bamy Hotel in Malabo, Equatorial Guinea, where he's been imprisoned since ICE deported him there, without warning, on April 28. Armed guards patrol outside the hotel, where Soliman said he and 16 other deportees from the U.S. are being confined, despite having not committed any crimes in the country.

Courtesy of Ahmed Soliman

Soliman believes the withholding of hygiene products is in retaliation for the public attention to the hotel arrangement, after a rights group filed a case in June against Equatorial Guinea before the African Commission on Human and Peoples' Rights.

The filing asks the African Commission to force Equatorial Guinea to stop further deportations of U.S. deportees back to their home countries, in violation of U.S.-granted protections, and to improve detention conditions, the Associated Press **reported**.

Worst of all for the deportees languishing at Bamy Hotel, there's no end date to their imprisonment, since no one there is serving a sentence for a crime, Soliman said.

## 'Refoulement'

In its second term, the Trump administration has signed more than 30 agreements with foreign governments to accept U.S. deportees from other countries. Thousands have been deported from the U.S. to countries other than their own.

In a secretive agreement with Equatorial Guinea, the U.S. agreed to pay the central African nation $7.5 million in exchange for the country receiving deportees from the United States. At least 32 people, with no ties to the country, have been deported there under the deal.

Both ICE and the U.S. State Department refused to provide the Star with a copy of the deportation agreement with Equatorial Guinea, or share any details about the agreement.

Several U.S. deportees whom Soliman met at the hotel have already been returned to their home countries, despite protections granted to them in the U.S. that prohibited their deportation home, he said.

An immigration judge granted Soliman protection from removal to Egypt under the U.N.'s Conventions Against Torture, or CAT, in October 2025.

“Everyone in this hotel either has CAT or withholding of removal,” he said.

In granting Soliman protection under CAT, the immigration judge agreed Soliman cannot be deported back to his home country of Egypt, because he would face torture or death there due to his identity as a gay man and due to his family’s political activity there when he was a child.

Soliman’s father was a prominent Muslim scholar who began receiving threats from government officials for speaking out against the military-backed regime of then-President Hosni Mubarak, according to his September 2025 application for CAT protection.

Soliman “has spent nearly his entire life in the United States, a country in which, should he be given the chance, he may yet find peace and acceptance,” his CAT application said. “Should he be returned to Egypt, however, a country in which he has not lived since he was four years old and whose language he does not speak, not only will he never find peace and acceptance, but he will certainly be tortured and killed because of who he is.”

Returning someone to a country where they face persecution or death is called *refoulement*, and is a violation of international law.

“Under international human rights law, the principle of non-refoulement guarantees that no one should be returned to a country where they would face torture, cruel, inhuman or degrading treatment or punishment and other irreparable harm,” according to the United Nations.

Critics say the U.S. has been complicit in “chain refoulement,” in which the U.S. deports someone to a third country, which then deports the individual to their home country.

ICE’s Burgos denied that the U.S. engages in refoulement.

"ICE complies with all U.S. and international legal obligations, including the principle of non-refoulement, and does not remove individuals to countries where they are likely to face torture."

Immigration attorneys say that's false.

In a May filing with U.S. District Court in Arizona, Soliman's attorneys argued his life was in danger due to ICE's having deported him to Equatorial Guinea without notice and without a fear screening.

"The very real risk of refoulement to Egypt, and of persecution or torture in Equatorial Guinea calls into question the legality of the government's actions," said in the filing in Soliman's habeas corpus petition, which was still pending at the time he was deported.

Since Soliman was already out of U.S. custody by then, the case was dismissed.

## 'Necessary tool'

ICE's Burgos said third-country removal agreements are "a necessary tool to protect the American people."

"Third-country removal agreements allow ICE to remove individuals who cannot be returned to their home countries due to court orders, ensuring public safety and due process," he said in a statement. "These agreements are essential for removing individuals convicted of serious crimes who would otherwise remain in the United States."



Ahmed Soliman, pictured in Glendale in 2020, grew up in Phoenix after his family moved from Egypt to Arizona when he was 4. He's been detained at a hotel in Equatorial Guinea for three months, since ICE deported him there April 28 without notice.

Courtesy of Ahmed Soliman

Soliman said his legal troubles in his 20s stemmed from self-hatred, which led to addiction.

Homosexuality was not accepted in his religious family, and he had no one to confide in and no way to express his emotions, Soliman said.

He started using recreational drugs in high school and at 21, he tried fentanyl and became addicted, leading to several citations.

"I was a young, dumb kid," he said. "I grew up with a loving family. … But also growing up in an Arab household, where you don't talk about your emotions. I didn't know how to process what was going on inside of me. I felt like something was wrong with me."

He caused a car accident in 2021, while driving under the influence of fentanyl, and was convicted of narcotics possession and aggravated assault in 2023. He spent two years in prison.

Upon his release from prison in 2025, he was taken into ICE custody, where he was transferred between ICE detention centers in Arizona and California over the next six months.

By April, Soliman was still in ICE detention, and his attorneys filed a habeas corpus petition in U.S. District Court in Arizona, challenging the legality of his continued detention.

Soliman's lawyers filed an emergency motion on April 27, when they realized ICE was taking steps to deport him, seeking a temporary restraining order.

"Petitioner has expressed a fear of removal to a third country, yet he has not been provided notice of any such removal nor afforded any opportunity to seek fear-based protection," the motion said.

Judge John C. Hinderaker denied the temporary restraining order, but granted a motion to expedite the proceedings.

Within 24 hours, ICE had put Soliman on a plane to Equatorial Guinea.

## Third-country removals

The Trump administration has escalated its third-country removals this year, and is increasingly failing to provide detainees with notice, or a chance to make a fear claim, attorneys say.



An armed guard patrols outside the Bamy Hotel in Equatorial Guinea, where Ahmed Soliman has been imprisoned since ICE deported there in April. Soliman, 30, fears Equatorial Guinea will soon deport him back to Egypt, where he faces threats to his life. Soliman grew up in Phoenix, doesn't speak Arabic and hasn't been to Egypt since his family left when he was 4.

Courtesy of Ahmed Soliman

Ariel G. Ruiz Soto, senior policy analyst for the nonpartisan Migration Policy Institute, said the removal strategy is more about instilling fear in immigrants than about logging high numbers of third-country removals.

DHS hopes that fear will persuade immigrants to accept a deportation to their home country, instead of risking ending up in an unknown country, Ruiz Soto said.

“The most important underlying motive … is essentially to reduce the number of people who are in the immigration court system by pressuring people to abandon their asylum cases, or their potential defense to a deportation,” he said. “The idea here is that these (third-country) agreements in general are not about scale; they're about strategy and tactics, on the U.S. perspective.”

Countries accepting those agreements have their own motivations, he said.

"Many African countries have been interested in trying to do those agreements in exchange for reductions in economic sanctions, to secure humanitarian assistance and in other cases, to simply avoid visa restrictions," he said. Countries that sign the agreements "don't often think of the consequences that they would essentially inherit from the United States," including the bureaucratic challenges in deporting those people elsewhere.

Mexico's third-country removal agreement with the U.S. has largely "flown under the radar," as controversial agreements with African countries like Eswatini have received more attention.

About 18,000 non-Mexicans have been deported to Mexico under its agreement with the U.S., most of them from Cuba, Ruiz Soto said.

Mexico has a robust asylum system compared to other Latin American countries, but it's still struggling with the number of asylum seekers there now, and is largely leaving deportees to figure it out on their own, he said.

In Equatorial Guinea, there is no asylum.

The secretive agreements give the public little insight into whether either country has formalized obligations to keep safe the people deported, experts say.

"We need to be asking a lot more questions of the receiving countries, on why they are receiving migrants, under what conditions and what's their long-term strategy of how to keep people safe. Often times that's the part we know the least about," Ruiz Soto said.

## No fear screening

In late April, Soliman was suddenly transferred from ICE detention in Arizona to a Louisiana facility that's known as a deportation hub.

After his arrival he asked an ICE officer, “This is my third time being transferred. What’s going on with me?”

“She looks at the list, saw my name and said, ‘Oh yeah, you’re going to Equatorial Guinea,’” he recalled. Soliman said his attorney had prepared him for a situation like this.

“Right away I told them, ‘I can’t go to that country. I’m afraid for my life. I want my credible fear interview.’ They said, ‘It’s too late for that. You’re getting on that fight,’” he recalled.

Soliman said he sat down, in an act of passive resistance, as his lawyers had advised him to do. But several men carried him onto the plane. He was shackled at the wrists and ankles, with his hands locked to a chain around his waist, and remained shackled for the 30 hours of travel.

Asked about the lack of notice for Soliman — which his lawyers say violated his due-process rights under the U.S. Constitution — an ICE spokesman denied the accusation in its emailed statement.

“Before removal to a third country, ICE provides individuals with notification forms and conducts medical clearances. ICE policy requires officials to refer any fear claims to U.S. Citizenship and Immigration Services for evaluation,” ICE’s Burgos said. “While ICE does not comment on specific allegations, it remains committed to upholding due process rights under the U.S. Constitution.”

ICE said it could not provide evidence supporting the claim, which contradicts Soliman’s account, as well as a DHS attorney’s sworn statements in Soliman’s habeas corpus case.

In a May 6 order, the U.S. District Court judge said DHS “must” address Soliman’s allegations it did not provide him with a fear screening before deporting him to Equatorial Guinea.

In its response, DHS said a fear screening was not required, arguing the court was obligated to trust in the "diplomatic assurances" Equatorial Guinea provided to DHS, promising "that nobody removed to that country from the United States will be tortured."

DHS would not provide those specific "diplomatic assurances" to the court, arguing they are not subject to judicial review.

Third Country Deportation Watch, a project of Refugees International and Human Rights First, said many of those deported to Equatorial Guinea have since been repatriated to countries where their lives are at risk.

"… It is clear that general diplomatic assurances of compliance with treaty obligations secured for these third country agreements cannot be relied upon to ensure non-refoulement," the watchdog group wrote.

Soliman's attorneys maintain his due process rights were violated in his unlawful deportation.

But there's no legal recourse for him at this time; **litigation** over the issue is still playing out in an appeals court.

"His treatment and the violation of his rights is emblematic of a larger pattern that we are seeing countrywide," O'Donnell said. "What is important to remember is, this is a young man who is motivated to turn his life around, and he has a family who is in pieces because of what has happened to him.

"He's not a danger to his community, he is very motivated to change things in his life. And now he is on an island stuck somewhere because of multiple violations of his rights."

For Soliman, it's hard to even think about not returning to the United States. But at this point, he's hoping to at least avoid deportation to a country where his life would be at risk.

His fear is growing, as he's watched others in the hotel get sent back to their home countries, despite the protections granted them by U.S. immigration judges.

"If they can do it to them, what's stopping them from doing it to me? It's just a matter of time," he said.

Contact reporter Emily Bregel at **ebregel@tucson.com**. On X, formerly Twitter: @EmilyBregel

**By Emily Bregel**

**Border reporter**

TOP STORY EDITOR'S PICK TOPICAL

# Six key points about an Arizona man's deportation to Equatorial Guinea

**Emily Bregel**
Aug 3, 2026

Prefer us on Google

A Phoenix man has been imprisoned for three months in a decommissioned hotel in Equatorial Guinea, after U.S. Immigration and Customs Enforcement deported him there on April 28 without notice or a fear screening, the Arizona Daily Star **reported** Aug. 2.

Here are six things to know about the story:

- Ahmed Soliman, who grew up in Phoenix, said he's one of 17 deportees from the U.S. confined in the hotel-turned-prison in Equatorial Guinea, where he said living conditions are inhumane and deteriorating. Armed guards patrol the grounds of the Bamy Hotel, where Soliman — whose family moved to Arizona from Egypt when he was 4 — has been imprisoned since late April,

despite having committed no crime in the African nation.

- Soliman fears at any moment he'll be returned to his home country, where a U.S. immigration judge agreed last fall he'd likely face torture and death, due to his family's politics and his identity as a gay man.

Ahmed Soliman, now 30, is pictured on the Brooklyn Bridge in 2019. Soliman, whose family moved from Egypt to Arizona when he was 4, has been detained at a decommissioned hotel in Equatorial Guinea for three months, since ICE deported him there April 28 without notice. He said he's intent on speaking out about the injustices he and other deportees at the hotel are facing, despite the risks to his personal safety.

Courtesy of Ahmed Soliman

- Equatorial Guinea is among dozens of countries that have signed often-opaque "third-country removal" agreements with the Trump administration to accept U.S. deportees who can't be deported to their home countries. But too often, those third countries send the deportees back home anyway, a violation of international law, attorneys say.
- U.S. deportees at Bamy Hotel get minimal hygiene products and three basic meals a day, but must purchase everything else, Soliman said. Recently, the imprisoned deportees haven't even been receiving the soap and toilet paper they were getting before, Soliman said. He believes the withholding of hygiene products amounts to retaliation, after a rights group filed a case against Equatorial Guinea, before the African Commission on Human and Peoples' Rights, decrying the treatment of deportees at the hotel.
- The hotel is now also holding a man with Ebola in quarantine one floor below the deportees, Soliman said. None of the deportees have received protective gear, he said: "You would never do this in a public hotel. They have no regard for us, for our health, for our safety."
- "Once an alien leaves the United States, ICE is no longer responsible for tracking their location or activities outside the country," ICE spokesman Fernando Burgos said in an email to the Star. The Embassy of Equatorial Guinea in the U.S. did not respond to the Star's questions about Soliman's claims. Equatorial Guinea's agreement with the U.S. State Department — which neither ICE nor the State Department would share with the Star — gave the African nation $7.5 million in exchange for accepting U.S. deportees.

Contact reporter Emily Bregel at **ebregel@tucson.com**. On X, formerly Twitter: @EmilyBregel

**By Emily Bregel**

**Border reporter**

https://tucson.com/news/local/border/article_4d6d17da-28e2-49b9-87a6-7f99349e9a37.html

ALERT TOP STORY EDITOR'S PICK TOPICAL

# U.S. deportees assaulted, threatened at gunpoint in Equatorial Guinea, three say

**Emily Bregel**
Aug 8, 2026

Prefer us on Google

Conditions are deteriorating to dangerous levels at a decommissioned hotel in Equatorial Guinea, where dozens of immigrants have been imprisoned since the U.S. deported them to the African nation, without warning or due process, the immigrants and their attorneys say.

Three people deported from the U.S. to Equatorial Guinea — including a Phoenix man whose family fled Egypt when he was 4 — told the Arizona Daily Star their lives are in danger at the hotel. All agreed to have their full names published,

despite the risks to their safety in speaking out.

In a recent late-night incident, all three say they were dragged from their rooms at gunpoint, handcuffed, assaulted and threatened by armed men guarding the decommissioned Hotel Bamy.

"They said if we leave the hotel grounds, they will shoot us and bury us across the street," said Peta-Gaye Chambers, 35, whose parents brought her to the U.S. from Jamaica when she was 5. A U.S. immigration judge granted Chambers "withholding of removal" to her home country of Jamaica in 2013, agreeing she'd face persecution there.

**People are also reading...**

1. **These new Arizona laws took effect this weekend**
2. **Three Arizona Wildcats listed as 'out' on first Big 12 availability report**
3. **Student found dead at Marana High**
4. **5 takeaways from Arizona football's 28-17 loss to No. 15 BYU | Michael Lev**

In June, U.S. Immigration and Customs Enforcement deported her without notice to Equatorial Guinea, a place where she has no ties. When she and another woman initially refused to board the deportation flight, an ICE officer threatened to put them in full-body straitjackets for the entire 18-hour flight to Africa, both women told the Star.

Hotel Bamy in Malabo, in Equatorial Guinea, where dozens of immigrants with no ties to that African nation have been imprisoned since the U.S. deported them there.

Google Maps

Equatorial Guinea security officials have also threatened the U.S. deportees held at the hotel, warning they'd soon be returned to their home countries, despite the protections granted all of them by U.S. immigration judges. That's according to Chambers; Jamaican national Natalie Holmes, 51; and Ahmed Soliman, 30, a Phoenix man who **has been imprisoned** at Hotel Bamy for more than three months.

The three immigrants say those threats are retaliation for their communications with attorneys and the news media, for attempting to record incidents at the hotel on their phones and for pushing back against violations of their rights and international law.

In June, international right groups filed a lawsuit, now pending before the African Commission on Human and Peoples' Rights, that demands Equatorial Guinea improve detention conditions at the hotel and provide assurances the people held there won't be returned to their home countries, where they face torture or persecution.

At least 17 of the 40 deportees who have been held at the hotel have already been wrongly deported to their home countries, an international-law violation known as "refoulement," said Meredyth Yoon, one of the lawyers who filed the lawsuit on behalf of 14 detainees at the hotel, including Soliman, of Phoenix.

While the lawsuit demands improved detention conditions, the indefinite detention of the deportees is also unlawful, attorneys say.



Jamaican national Natalie Holmes, 51, shared a photo of herself during her baptism in Florida in 2016. Holmes, who is now an ordained pastor, was deported to Equatorial Guinea in June without notice, and while her habeas corpus petition was still pending, she said.

Courtesy of Natalie Holmes

"Generally if someone is going to be held against their will, there has to be some reason behind it, and it has not been stated in the case of anyone (at Hotel Bamy) what's the basis of their confinement," Yoon said. "They remain there against their will."

ICE spokesman Fernando X. Burgos has said the agency bears no responsibility for what happens to deportees it sends to third countries.

"Once an alien leaves the United States, ICE is no longer responsible for tracking their location or activities outside the country," Burgos said in a July 27 emailed statement to the Star. He referred the Star to the U.S. State Department, which

signed the secretive agreement to give Equatorial Guinea $7.5 million to receive deportees from the U.S. The State Department did not respond to the Star's questions.

Yoon said the U.S. does bear responsibility for what happens to people it sends to foreign countries against their will.

"The U.S. is the cause of everyone’s current situation (at Hotel Bamy) and has a duty to ensure people they've deported into this situation are not being mistreated and that their rights are being respected," she said.

Attorneys have received no assistance from the U.S. Embassy near the hotel, she said.

"They are just totally unresponsive and yet at the same time, the (hotel) guards are telling people the U.S. government is responsible for what happens to them" at Hotel Bamy, she said. "Both governments are pointing fingers at each other."

## Held at gunpoint

Conditions at the hotel have been worsening. Late at night on Friday, July 31, dozens of armed men wearing ski masks — supposedly police officers — swarmed the hotel and dragged five deportees out of their hotel rooms at gunpoint, the Star's sources said.

The traumatizing experience left detainees fearing for their lives, they said.

Chambers, Holmes and Soilman are three of the 27 people deported from the U.S. who are currently detained at the hotel.

The deportees hope that once the public understands the abuse and injustices they're enduring, someone will help them. That hope is worth the risks they face from speaking out, they say.

"My life is already in danger so I'd rather speak out and risk my life for something I believe in, rather than sit idly and watch my life being taken away from me," Soliman said.

"I want the public to know," said Holmes, an ordained pastor, who was deported alongside Chambers in June.

Holmes said the tendons in her hands were damaged from being handcuffed too tightly by the armed men at the hotel July 31, and she's still experiencing pain in her wrists a week later.

That night, Holmes went downstairs to investigate after hearing Chambers scream, she said. One of the armed men "shoved me really hard, then shoved me again," Holmes said. "He said, 'Put cuffs on her.'"

Nearby, the armed men repeatedly kicked Soliman's legs, in an attempt to bring him to the ground, after they saw him trying to record the incident on his phone, all three detainees said.

Another man was choked and thrown against the wall, then handcuffed and held on the ground for an hour, Soliman said.

"They were telling us things like, we're getting too comfortable in this hotel, they don't want us in this country, and 'There's a reason America didn't even want you guys,'" he recalled.

"They're telling us that as if we have a choice, as if I'm sitting here with a passport enjoying my time in this awful hotel," said Soliman, who said he was deported without any travel documents.

The deportees were violently dragged down four flights of stairs, cuffed and eventually taken outside where police vans were waiting. They were told they were going to prison, for unclear reasons, before being released later that night, the deportees said.

The men wielding high-powered weapons smelled strongly of alcohol that night, and they appear to be intoxicated on a daily basis, all three deportees told the Star.

"The way they were acting, this is not the way police officers are supposed to act. You have a gun, and you're stone drunk," Holmes said. "For you to come manhandle us like this, we're not used to that. We grew up in the United States. That's where all our family is."

Ahmed Soliman, now 30, is pictured on the Brooklyn Bridge in 2019. Soliman, whose family moved from Egypt to Arizona when he was 4, has been detained at a decommissioned hotel in Equatorial Guinea for three months, since ICE deported him there April 28 without notice. He said he's intent on speaking out about the injustices he and other deportees at the hotel are facing, despite the risks to his personal safety.

Courtesy of Ahmed Soliman

She's been shocked by the inhumane treatment she received both in Equatorial Guinea and while in ICE custody in the U.S., where she said it feels like there's no longer rule of law.

"I feel we're in Nazi Germany," said Holmes, whom ICE deported while her habeas corpus petition was still pending in Florida. "If you can just get up and move people that federal judges say are not to be moved, you're a one-man dictatorship."

As a pastor, she's sickened by the way U.S. government officials claim to be Christians, while treating vulnerable people with cruelty.

"They all are screaming 'Christianity,' but real Christians would never do that," she said. "Jesus Christ never did this to anybody, and neither did his followers."

# Third-country removals

The Star **reported** Aug. 2 on Soliman's continued imprisonment in the African nation, and on the Trump administration's embrace of secretive third-country removal agreements.

The agreements, now in place with dozens of nations, allow the U.S. to deport people who can't be returned to their home countries, due to protections granted by U.S. immigration judges, by finding a third country to accept them.

But those third countries often end up sending those people back to their home countries anyway, making the U.S. a participant in "chain refoulement," a violation of international law, human rights advocates say.

Soliman grew up in Phoenix after his family moved there when he was 4 years old. Soliman was granted protection under the United Nations' Convention Against Torture, after a U.S. immigration judge agreed in October 2025 he'd face torture and death in Egypt, due to his family's politics and his identity as a gay man.

But with his life increasingly threatened in Equatorial Guinea — and U.S. officials insisting they bear no responsibility for those conditions — Soliman said he's approaching a point where he'd rather return to Egypt. He emphasized that at this point he has not agreed to be returned to Egypt, where he faces grave risks to his life.

But if death appears imminent in Equatorial Guinea, "I'd rather die in my country than die in a stranger's country," he said.

"They've threatened our lives, just not verbally. When you have armed people pointing guns at us, that's a threat," he said. "In the States, that's aggravated assault."

The conditions at the Equatorial Guinea hotel are intended to scare detainees into wanting to return to their home countries, said attorney Yoon, litigation director of Asian Americans Advancing Justice in Atlanta.

Since November, the U.S. has deported about 40 people to Equatorial Guinea who have no ties there, Yoon said. There are currently 27 immigrants from the U.S. detained at the hotel, after DHS deported 10 more people there at the end of July, Yoon said.

Natalie Holmes, now 51, is pictured during her ordination as a Christian pastor in 2022 in Florida. Holmes said she has been horrified by her treatment in ICE custody, and in Equatorial Guinea, where the U.S. deported her in June, despite her having no ties there.

Courtesy of Natalie Holmes

On July 29, the Star sent detailed questions to Equatorial Guinea's embassy in Washington, D.C.; a staffer said Ambassador Crisantos Obama Ondo would answer the questions. On July 31, someone at the embassy replied to the Star's questions to say the ambassador was "on vacation."

The Star has since followed up with several emails; the Embassy has not responded.

## Forced onto plane, detainees say

Soliman, Chambers and Holmes all had habeas corpus petitions pending in U.S. District Court when they were deported without warning to Equatorial Guinea.

None received advance notice, or the opportunity for a fear screening, and all were coerced, or physically forced, into boarding the deportation flight to Africa, they say. In a court filing in Soliman's habeas corpus petition, after his removal, DHS acknowledged not providing Soliman with a fear screening, claiming it was not

required and that the federal judge was obligated to trust in "diplomatic assurances" provided by Equatorial Guinea in its agreement with the State Department.

The DHS attorney could not provide the judge with those "diplomatic assurances," which supposedly ensured Soliman would be treated humanely in the African nation, the court records show.

The "diplomatic assurances" supposedly contained in the agreement are "a lie," Chambers said.

Ahmed Soliman, who grew up in Phoenix, shared his view from inside the decommissioned Bamy Hotel in Malabo, Equatorial Guinea, where he's been imprisoned since ICE deported him there on April 28. Armed guards patrol outside the hotel, where Soliman said he and 16 other deportees from the U.S. are being confined, despite having not committed any crimes in the country.

Courtesy of Ahmed Soliman

"We're living a nightmare," she said. "No one that came here had due process, we never had any chance to show we had fear for our life. All we've had since we've been here has been threats."

Soliman said several men carried him onto the plane, after he sat down and demanded a fear screening, as his Tucson-based attorneys had advised him to do, he said.

Chambers and Holmes were deported together. They both described inhumane treatment by ICE officers while detained, and in the days leading up to their deportation from a Louisiana facility.

Natalie Holmes, 51, is pictured preaching at a 2022 prayer meeting in Pembroke Pines, Florida, after her ordination as a pastor. Holmes, who was born in Jamaica and grew up in the U.S., was deported to Equatorial Guinea without the opportunity for a fear

screening, in June. She's been imprisoned in a decommissioned hotel with dozens of other U.S. detainees ever since.

Courtesy of Natalie Holmes

ICE officers did not allow detainees to get off buses to use the bathroom during transfers between ICE facilities, Holmes said. The officers repeatedly told detainees just to pee on themselves, she said.

One day before the deportation, detainees were kept on a bus the entire day without food or water, Holmes said. While handcuffed, Holmes was unable to attend to herself after she began menstruating heavily, she said.

"I had no way of cleaning myself. They wouldn't even unlock my hands so I could use them to put on a pad," she said.

Holmes said she and other deportees were forced to remain upright for 72 hours, unable to lay down or sleep, in the days leading up to the flight to Africa, on June 17.

Later, on the international flight, Holmes' ankles became so swollen that her ankle cuffs were cutting into her skin and her legs became numb, due to having been upright for so long. A nurse forced ICE officials to allow her to lie down across three seats on the plane at that point, she said.

In separate phone interviews with the Star, Holmes and Chambers each described in detail the moments leading up to boarding the deportation flight against their will. Both said they were shocked to learn they were destined for Africa, where neither have any connections.

Each asked for a fear screening, and then refused to get on the plane. An ICE officer said if they didn't board voluntarily, they'd be handcuffed and restrained in a device the women described as a straitjacket, which the officer laid out on the ground. They'd be restrained from head to toe, allowing them to be forcibly carried onto the plane, they said.

The ICE officer told the women they would have to remain in the straitjacket, and would have to "piss and shit on yourself," for the entire 18.5-hour flight to Africa, both women said, recalling the officer's exact words.

Because of that threat, they agreed to get on the plane. The officer seemed disappointed he wouldn't get to put them in the straitjacket, Holmes said.

"I couldn't believe this thing was happening in America," Holmes said, breaking into tears for the first time in the 80-minute phone interview.

Attorney Yoon said what Holmes and Chambers described echoes accounts from others deported from the Alexandria, Louisiana ICE facility, a deportation hub.

Yoon represented two clients who were handcuffed and confined in the straitjacket, one during a deportation flight to Equatorial Guinea in January 2026, and another for his deportation to Ghana in September 2025. She's interviewed several others who were deported in the straitjacket last year.

"Some clients have described it as being like a coffin, or full-body straitjacket," Yoon said.

On Aug. 5, the Star submitted detailed questions to ICE and the U.S. Department of Homeland Security about Holmes' and Chambers' allegations.

In an unattributed Aug. 6 email, DHS ignored the Star's questions and shared boilerplate language about detention standards in ICE facilities.

The only new information provided was a description of Holmes' criminal history from more than 15 years ago, for which she already served her time in prison. Holmes, who became an ordained pastor in 2022, spent four years in a Florida prison following a 2009 conviction for identity theft and fraud, after she used someone else's birth certificate to obtain legal documents in the U.S.

Since then, "I do street ministry, I feed the poor, I help the homeless, I don't take money from the government," said Holmes, who also ran a skin-care business and worked as a home-health aide. "I work, and I give what I earn to people who need it."

Holmes, whose mother is a U.S. citizen, attended annual check-ins with ICE, until she was detained at the last one, she said.

## Limited access to counsel

The detainees at the hotel in Equatorial Guinea say they've been prevented from contacting legal counsel. An attorney tried to visit Soliman last week at the hotel, but was turned away. Soliman shared video of hotel staff refusing to let the attorney meet with Soliman, then escorting the attorney outside and recording his license plate number, to ensure he couldn't return, Soliman said.

Yoon affirmed Soliman's account.

"Since incident last Friday (July 31), guards have taken steps to block access to counsel and have told individuals they're not allowed to meet with lawyers anymore," she said. "Multiple people were threatened that if they spoke out about the incident, the assault they were subjected to last Friday, that there would be consequences. ... Clearly, it's retaliation for not only insisting their rights be respected, but for telling other people this is happening."

Chambers said she feels like she's living in a horror movie, a combination of the films "Hotel Rwanda" and "Get Out."

"Our life is at risk each and every day," she said. "We don't know what to expect when we wake up. We're not protected at all."




Get your morning recap of today's local news and read the full stories here: tucne.ws/morning

Contact reporter Emily Bregel at **ebregel@tucson.com**. On X, formerly Twitter: @EmilyBregel

**By Emily Bregel**

**Border reporter**

الشرق الأوسط
صحيفة العرب الأولى

US Deportees Face Escalating Police Violence, Intimidation in Eq.Guinea




Handout picture released by Guatemalan Migration Institute shows Guatemalan migrants descending from an US military plane after being deported from US at the Guatemalan Air Force Base in Guatemala City on January 24, 2025. Guatemalan Migration Institute via AFP

The masked police officers burst into Ahmed Soliman's hotel room in Equatorial Guinea and dragged him and two dozen other US deportees outside, guns drawn, to deliver a message: go home.

"I have police officers yanking on my neck, trying to throw me on the ground, I have officers elbowing me in my back," Soliman, 30, told AFP of the incident, which occurred two weeks ago.

"Machine guns pointed at our faces, all this just so that they can tell us they're tired of us here in this country," he recalled, saying he and four others were handcuffed and hit by police, in an incident confirmed by two other deportees.

Authorities are ratcheting up pressure on deportees held at the hotel, which has become a dumping ground for expelled US immigrants, including Soliman, who arrived in April, said AFP.

The deportees say they're facing verbal and physical abuse from police, meagre rations and constantly being pushed to return home.

The authoritarian petro-state in central Africa has become a key transit point in President Donald Trump's immigration crackdown, which involves shipping people that the United States can't legally send home to "third countries" like Equatorial Guinea instead.

As their stay at the hotel, under watch from armed guards, drags on for months, authorities are getting impatient, deportees told AFP. A local lawyer also confirmed that deportees are facing pressure to return to their home countries.

"Anytime a problem happens, anytime we're asking for our rights for something, they say, 'Hey, if you don't like it, go back to your country,'" Soliman, who had lived in the United States since he was three and fears returning to his native Egypt because he is gay, told AFP.

The deportees cannot claim asylum in Equatorial Guinea.

But they say they can't leave, because they fear for their lives in their home countries -- and because they were deported without passports.

Soliman said authorities are pressuring him to accept a government-issued travel document instead.

Washington has expelled at least 50 people, mostly Africans, to Equatorial Guinea since November.

Twenty-seven remain in the hotel as Equatorial Guinea has deported people to their home countries, or onward to "fourth" countries.

- 'They're trying to intimidate you' -

At the hotel, the deportees are held on the premises by armed guards.

"They threaten you each and every day," said another deportee, who gave her first name, Petagaye, and has been held in the hotel since June.

"They tell you, 'oh, you need to go back to your country'. Or they tell you, 'oh, just kill yourself, because America don't care'," the 35-year-old said.

Deportees used to be able to walk around the hotel grounds, and sometimes get a police escort to a nearby corner store -- often in exchange for a few dollars -- but that too has seen a crackdown, a deportee who gave the name Him, a pseudonym, told AFP.

"They're trying to intimidate you," said Him, who fled what is now Eritrea during that country's war for independence from Ethiopia, and arrived in the United States as a refugee when he was 13.

"Even though you know you could go back and get killed, even though you ran away from a country and proved it in a federal court of law that we can't go back," said Him, 47.

Neither the US State Department nor Equatorial Guinea's national security minister responded to a request for comment.

- Ebola scare -

In July, deportees were sent into a panic when a guard told them an Ebola patient was being housed in the hotel.

Videos shared with AFP showed men in hazmat suits walking through the building.

Authorities have not commented on the incident and Equatorial Guinea has not reported any Ebola cases.

The three deportees interviewed by AFP had been in the United States since they were children, and spoke with American accents.

All three had won deportation protections preventing them from being sent to their home countries after judges found their lives would be in danger.

Under previous administrations, people with such protections, though legally weaker than asylum, have been allowed to legally work and live in the United States.

The Trump administration has argued that it can still deport people with such protections, as long as it doesn't send them to their home country.

A lawsuit was filed in June at the African Commission on Human and Peoples' Rights, the continent's top human rights body, to try to halt US deportations to Equatorial Guinea.

For now, the deportations continue: 10 more people arrived on July 30, US and local lawyers said.

Learn more about LSEG



# Migrants flown to Equatorial Guinea after resisting Liberia deportation under Trump deal, sources say

By **Robbie Corey-Boulet**

August 21, 2026 10:59 AM MST · Updated August 21, 2026

Aa



**[1/3]** Security guards stand outside a building in Marshall, a small beach town near Roberts International Airport, as deportees from the United States arrive in Liberia, August 20, 2026. REUTERS/Carielle... Purchase Licensing Rights **Read more**

**Summary**

- Five deportees resisted getting off plane in Liberia, sources say
- Liberia has agreed to take up to 1,200 deportees over 12 months
- More than 30 deportees currently held in Equatorial Guinea
- Washington has defended deportation deals as lawful

DAKAR, Aug 21 (Reuters) - Five people who the U.S. attempted to deport to Liberia this week resisted getting off the plane and were instead transported to Equatorial Guinea, another African country to which the Trump administration is removing migrants it cannot legally send home, two sources familiar with the matter told Reuters.

The incident represents an early snag in Washington's plan to send up to 1,200 so-called third-country deportees to Liberia, one of the largest such deals it has struck in Africa despite criticism from immigrants' rights advocates.

The Reuters Daily Briefing newsletter provides all the news you need to start your day. Sign up here.

Third-country deportees have, in most cases, obtained legal protection against repatriation after U.S. immigration judges ruled they risked torture or other abuses in their home countries.

Liberia announced on Tuesday that it had agreed to receive deportees and that the first group of 20 would arrive on Thursday. But a Liberian official, speaking on condition of anonymity because of the sensitivity of the matter, told Reuters on Friday that only 15 deportees disembarked.

At least five others - three Cuban men, one Brazilian man and one Cameroonian woman - refused to get off the plane in Liberia, according to three sources familiar with the incident, one of whom was a Honduran deportee on the flight.

Authorities then told them they would be flown to the U.S., but the plane instead headed to Malabo, in Equatorial Guinea, where the five were forced to disembark against their will, two of the sources said.

Liberia's information ministry did not respond to a request for comment on Friday.

The five deportees are now being held with more than 30 other migrants who the Trump administration had previously sent to Equatorial Guinea under a deal that, like others in Africa, has been denounced by human rights groups and advocates who say many of the deportees are ultimately repatriated.

The State Department on Friday said it remained "unwavering in our commitment to end illegal and mass immigration and bolster America's border security".

A spokesperson for the Department of Homeland Security said all the migrants "were deported to a safe third country", adding, "If a judge finds an illegal alien has no right to be in this country, we are going to remove them. Period".

**40 DEPORTEES HELD IN EQUATORIAL GUINEA, SOURCES SAY**

The plane carrying the deportees arrived in Monrovia at 12:45 p.m. (1245 GMT) on Thursday after taking off from Louisiana and stopping in Dakar, Senegal, according to the ICE Flight Monitor managed by Human Rights First.

It then departed for Malabo arriving at 8:50 p.m. (1950 GMT), according to the ICE Flight Monitor.

There are now 40 deportees detained at a decommissioned hotel in Malabo, according to Ahmed Soliman, an Egyptian migrant who arrived there four months ago.

Conditions at the hotel are grim, characterized by "inadequate medical care", "severe psychological distress" and denial of legal assistance, according to a statement published last month by five rights groups, including Asian Americans Advancing Justice-Atlanta and EG Justice.

"The Trump Administration is using these deportation agreements to shuffle people around to different countries like objects," said Meredyth Yoon, litigation director for Asian Americans Advancing Justice-Atlanta.

Equatorial Guinea's government did not respond to a request for comment on Friday.

Additional reporting by Jessica Donati and Alphonso Toweh; Editing by Alex Richardson

Feedback

Our Standards: **The Thomson Reuters Trust Principles.**

Suggested Topics:

**Africa** **Constitutional Law** **Human Rights**

Purchase Licensing Rights



**Robbie Corey-Boulet**
Thomson Reuters

Robbie Corey-Boulet is the bureau chief for West and Central Africa, based in Dakar and reporting on 23 countries. He has worked as a journalist for more than 15 years including as a freelancer in West Africa and as a correspondent and bureau chief for Agence France-Presse in Addis Ababa and Riyadh. Reach him at robbie.corey-boulet@thomsonreuters.com.

AMERICA AND THE WORLD

# ‘Shoot Him!’: Police Threaten Third-Country Nationals Imprisoned in African Hotel

‘I’m fighting for my life,’ said Ahmed Soliman after the latest in a string of abusive incidents in Equatorial Guinea, where ICE expelled him five months ago.



BY **GILLIAN BROCKELL**
SEPTEMBER 9, 2026




Photo illustration by The American Prospect. Sources: PeterHermesFurian/iStockphoto; screenshot.




'Shoot Him!': Police Threaten Third-Country Nationals Imprisoned in African Hotel

About 10 Minutes

1x

Everlit

A police officer aimed a loaded assault rifle at unarmed immigrants expelled to Equatorial Guinea by the Trump administration in a chaotic incident on September 3 in which the officer's supervisor ordered him to shoot, multiple cellphone videos show. It was the latest in a string of abusive incidents against the immigrants, none of whom had any previous ties to Equatorial Guinea and are now imprisoned in a hotel in the country's isolated island of Malabo.

The immigrants, whose birth countries span from Honduras to Eritrea, have endured beatings, death threats, and denial of food, are afraid for their lives, and desperately want to leave, one of them told the *Prospect* the day after the incident, but because Immigration and Customs Enforcement flew them to Equatorial Guinea without any identification, they have no idea when, how, or even if they'll ever be released.

***More from Gillian Brockell***

"I'm fighting for my life," said Ahmed Soliman, a 30-year-old man who has been trapped at the hotel since April and can be seen in the videos with his hands up and a weapon pointed at him.

Reuters was the **first to report** on the situation in Malabo. Hours after the *Prospect*'s story published, Soliman's lawyers said he told them police in the hotel were confiscating phones and have since lost contact with him.

The latest incident began on August 31, when Soliman and the 38 other third-country nationals imprisoned there at the time began a hunger strike to demand they be given travel documents, Soliman said. A day and a half later, on September 1, they were visited by a high-ranking official known to them as "the Director," who convinced a majority of the group he would meet their demands if they called off the strike, which they did.

Because Soliman has been there for longer than all but one of the immigrant detainees, he said he knew the Director wouldn't keep his word. Within hours, eight Ethiopians in their

group were taken away and forcibly repatriated, despite some or all of them having legal protections barring their deportation there, he said. **Flight data** supports this claim.

> **Read more about ICE flights**

Officers then confiscated some of the remaining immigrants' cellphones—a common punishment, Soliman said, since it separates them from their only lifelines to the outside world.

On Thursday, a Cuban national went outside to demand the return of his phone from police officers stationed on the hotel's front driveway. The interaction became heated, and Soliman said he went outside and started to film, prompting police to take his phone as well. Officers then pointed their guns at him, forcing him back inside, where still more officers trained their weapons on him.

In cellphone videos taken several minutes into the incident and shared with the *Prospect*, Soliman can be seen dressed in a white shirt and pants, kneeling with his empty hands raised in the air. A man in a black T-shirt stands between Soliman and the armed officers with his arms outstretched, as a woman's voice shouts, "Shoot him! Shoot him!" One of the officers bends down on one knee and aims his assault rifle at the men. Other female-sounding voices can be heard shouting, "No no no!" and "What are you doing?"

Police Threaten Third-Country Nationals Imprisoned in African Hotel
The American Prospect

Watch on

Soliman said the man in the black T-shirt was a Cuban national who had arrived two weeks earlier and who had stepped in front of the officers "trying to shield me," Soliman said. The woman shouting "shoot him," he said, was a plainclothes police supervisor who had been a constant instigator of cruel treatment throughout his imprisonment. The other two shouts came from a Cameroonian woman and a Jamaican woman, he said.

The conflict ended when the Director arrived and "calmed everyone down," Soliman said. He was given his phone back, but others are still having theirs withheld. His U.S.-based attorneys, who had contacted me when they couldn't reach him and another client of theirs for several days, soon sent me the videos of the incident and connected me with Soliman.

Soliman told me he was scared of the retaliation he expected with the release of the videos, but that he was "willing to be scared," because "now there's video of them breaking their so-called diplomatic assurances."

In federal court filings, the Trump administration has claimed third-country removals to Equatorial Guinea are legal due to "diplomatic assurances" from the local government that third-country nationals would not be tortured. But unlike other so-called "safe third country" agreements, the Trump administration has refused to release details of the agreement with Equatorial Guinea, either to the court or the general public.

In February, Senate Democrats **released a report** saying the State Department had paid Equatorial Guinea $7.5 million to take third-country nationals, from a humanitarian fund meant for refugee assistance. Equatorial Guinea is one of the most corrupt countries on the planet, according to **Transparency International**, in which its authoritarian leader, in power since 1979, and his circle of friends personally benefit from the nation's vast oil reserves and punish anyone who opposes them.

At least 63 third-country nationals have been sent to Equatorial Guinea on six ICE flights since November 24, 2025, according to flight data and information I've compiled on the **Third-Country Removal Tracker**. Of 29 people expelled on the first two flights, Soliman said only one remained; the rest had been refouled to their countries of origin.

Soliman was born in Egypt but came to the United States with his family when he was four. Growing up in the Phoenix area in a conservative Muslim family was difficult, he told the ***Arizona Daily Star*** last month, because when he realized he was gay, he didn't know how to process his feelings or tell his family. He turned to drugs, and in 2021 he caused an accident while driving under the influence. He was sentenced to two years in prison and was ready to turn his life around upon his release in 2023. Instead, he was taken into ICE custody.

His attorneys eventually won protections against deportation to Egypt under the Convention Against Torture, due to his sexuality and because he comes from a prominent political family that has been persecuted by the current regime. Due to his distinct last name, if he were forced back to Egypt it is unlikely he would even make it out of the airport before being detained by authorities, his attorney, Kate O'Donnell, told me. Several of his relatives have been imprisoned and tortured or disappeared.

In April, Soliman was suddenly moved to Alexandria, Louisiana, despite having a pending habeas petition in Arizona that should have barred his transfer. He had no idea he was going to be removed to Equatorial Guinea until he was being pushed across the tarmac toward the waiting airplane, he said. His requests for a credible fear interview and to speak to his attorneys were ignored, and during the 30-hour trip to Malabo, which he described as "treacherous," federal agents refused to show him his travel documents, before eventually admitting they didn't have any paperwork for him at all, he told me.

"I came here as a ghost," he said.



A view of the Bamy Hotel, where deported migrants are being held, in Malabo, Equatorial Guinea, April 22, 2026. Monika Pronczuk/AP Photo.

ICE and the embassy for Equatorial Guinea in Washington did not respond to requests for comment. Representatives for the State Department and the Department of Homeland Security who did not identify themselves declined to respond to the allegations in the story, instead sending general statements that they will use all “legal” and “lawful” means to remove people from the country.

DHS followed up with this: “When an individual is no longer in ICE custody then ICE will no longer be responsible for them. This is common sense.” This is a fascinating dodge, because regardless of whether or not it’s common sense, it isn’t lawful. Both U.S. and international law prohibit removing someone to a country where they may face persecution or torture, or deporting someone to a country that will deport them to another place where they may face persecution or torture. That is why Soliman has been so focused on proving Equatorial Guinea’s “diplomatic assurances” are worthless.

At first, his imprisonment at the hotel was tolerable, more boring than anything else, but things began to change in July after a consortium of attorneys and human rights groups **filed lawsuits** against Equatorial Guinea in international courts on his and the others' behalf. Meals started getting smaller. Staff refused to give the detainees more toilet paper, soap, and toothbrushes.

Soliman said he was beaten for the first time at the end of July, after talking to the *Arizona Daily Star*. His phone was taken away for the first time, and officers threatened him and others that they could be killed and buried out back, and no one would ever find their bodies. That had become "a pretty common threat," he said.

There was another round of beatings and phone confiscations three weeks ago after Spanish-speaking immigrants in the group talked to **Telemundo** and **Univision**.

"The way we came here makes a lot of us feel like, yeah, we were smuggled. Our lives were played with for monetary purposes," he said. "It's just disheartening because we don't know what the end goal is here."

After this latest round of abuse, after having an assault rifle pointed at him, he said he feels more resolve than ever to speak out.

"I'm done being scared. I'm ready to leave," he said, before pausing to admit, "Yeah, I'm scared, but I'm willing to be scared. I'm fighting for my life."

*This article has been updated.*

---

© 2026 The American Prospect, Inc. | All Rights Reserved
Powered by Newspack

Learn more about LSEG

Reuters

My News

EXCLUSIVE

# Equatorial Guinea police pull guns on migrants deported by Trump, witnesses say

By **Robbie Corey-Boulet**

September 8, 2026 8:31 AM MST · Updated September 8, 2026

Aa

Feedback

## Summary

Equatorial Guinea among several African nations accepting U.S. third-country deportees

Saturday altercation stemmed from dispute over access to mobile phones, witnesses say

Lawyers say deportees held in Malabo face security risks

Trump administration has defended third-country deportation as lawful

DAKAR, Sept 8 (Reuters) - Police in Equatorial Guinea pulled firearms on migrants deported there from the United States, according to three witnesses and video footage shared with Reuters, intensifying concerns about the treatment and safety of people sent to the Central African nation under a U.S. deportation programme.

Deportees have complained of inadequate medical care, denial of legal assistance and "severe psychological distress" while being held at a hotel in Equatorial Guinea's former capital, Malabo.

The Reuters Daily Briefing newsletter provides all the news you need to start your day. Sign up here.

The altercation on Saturday began as a dispute over access to mobile phones but quickly escalated, with men wearing shirts bearing the words "National Police" pointing what appeared to be semi-automatic assault rifles at deportees inside the entrance to the hotel. One migrant appeared to be kneeling on the ground while others screamed nearby.

Reuters reviewed the footage but could not independently verify the events that preceded the confrontation.

The Trump administration has since last year struck multiple agreements with African governments to accept migrants who it cannot legally return to their home countries. Many of those deported under the so-called third-country arrangements had previously won protection from U.S. immigration judges, who found they could face torture or other abuses if repatriated.

Feedback

Washington has defended the third-country deals as lawful and said deportations are carried out in accordance with U.S. immigration law. Equatorial Guinea has not publicly detailed the terms under which it is housing the deportees.

Rights groups and advocates have said the arrangements are opaque and that some deportees are ultimately returned to the countries they originally fled.

Lawyers representing some of the deportees said the confrontation underscored concerns about their safety.

"Once again, evidence demonstrates that deporting people to Equatorial Guinea is putting their lives in danger. I hope that someone will not be seriously injured or killed," said Meredyth Yoon, litigation director for Asian Americans Advancing Justice-Atlanta, a legal advocacy group.

The Trump administration is "utilizing all lawful options" to carry out deportations, said a spokesperson for the U.S. Department of Homeland Security. "When an individual is no longer in ICE custody then ICE will no longer be responsible for them. This is common sense," the spokesperson said, referring to Immigration and Customs Enforcement.

A State Department spokesperson said the U.S. government would "use all legal means to remove those with no right to remain in our country."

Feedback

A police officer points a firearm at a migrant deported by the United States to Equatorial Guinea at Hotel Bamy in Malabo, Equatorial Guinea, September 5, 2026, in this screengrab from video.... Purchase Licensing Rights **Read more**

The government of Equatorial Guinea did not respond to requests for comment.

**'THEY COCKED THEIR GUNS... TELLING ME TO GET ON MY KNEES'**

There are currently 31 deportees being held at the hotel in Malabo, according to Yoon and two members of the group of deportees.

Last month, five people whom the U.S. attempted to deport to Liberia resisted getting off the plane and were subsequently transported to Equatorial Guinea instead.

One member of that group, a Cuban man, approached police officers at the hotel on Saturday morning to request the return of his confiscated mobile phone so that he could contact relatives and a lawyer, the two witnesses said.

The officers ignored his request, and another deportee, an Egyptian man named Ahmed Soliman, began filming the exchange on his phone.

Within 30 seconds, "I was rushed at by multiple officers, me and a few other people that were outside with us. That is when they started assaulting us, grabbing my neck, my shirt, trying to dig the phone out of my pocket," Soliman told Reuters.

"They cocked their guns, took it off of safety, pointed their guns at me telling me to get on my knees, with my hands up... I had to remain in that position for 10-15 minutes while there was chaos going on in the hotel."

Feedback

The situation was defused when the hotel's director arrived and "calmed everyone down", allowing the deportees to return to their rooms, Soliman said.

A total of 53 people were deported to Equatorial Guinea under the third-country deportation deal between November 2025 and July, according to Third Country Deportation Watch, a tracker managed by Refugees International and Human Rights First.

They come from 11 African countries as well as Georgia, Jamaica, Brazil and Cuba, according to the tracker.

Three deportees told Reuters they had been encouraged to return to their home countries despite fears of torture and other abuses, and said they had not been presented with alternative options. Reuters could not independently verify the claim.

Reporting by Robbie Corey-Boulet; Additional reporting by Edward James Carron; Editing by Ros Russell

Our Standards: **The Thomson Reuters Trust Principles.**

Suggested Topics:

Africa Constitutional Law Human Rights

Purchase Licensing Rights

**Robbie Corey-Boulet**
Thomson Reuters

Robbie Corey-Boulet is the bureau chief for West and Central Africa, based in Dakar and reporting on 23 countries. He has worked as a journalist for more than 15 years including as a freelancer in West Africa and as a correspondent and bureau chief for Agence France-Presse in Addis Ababa and Riyadh. Reach him at robbie.corey-boulet@thomsonreuters.com.

Feedback

## Read Next

Business

**Billionaire Dangote launches oil refinery 'people's IPO', Africa's biggest**

September 14, 2026

Learn more about LSEG

# Deportee in Equatorial Guinea who criticised police tactics taken into custody, lawyer says

By **Robbie Corey-Boulet**

September 11, 2026 10:30 AM MST · Updated September 11, 2026

Aa

Feedback

Reuters Subscribe





A police officer points a firearm at a migrant deported by the United States to Equatorial Guinea at Hotel Bamy in Malabo, Equatorial Guinea, September 5, 2026, in this screengrab from video.... Purchase Licensing Rights **Read more**

DAKAR, Sept 11 (Reuters) - An Egyptian man who was deported from the United States to Equatorial Guinea, and who has spoken out against alleged rough treatment by security forces there, has been taken into police custody and is being held incommunicado, his lawyer said on Friday.

Police in Equatorial Guinea pulled guns on Ahmed Soliman and other migrants during an altercation last Saturday, according to three witnesses and video footage shared with Reuters, intensifying concerns over the safety of migrants who have been sent there.

Feedback

The Reuters Daily Briefing newsletter provides all the news you need to start your day. Sign up here.

Later in the week, security forces returned to the Hotel Bamy, where the migrants are being held, and seized their phones, said Kate O'Donnell, an immigration attorney at a U.S.-based law firm that has been representing Soliman.

Security forces cited the Reuters story as the reason for seizing the phones, according to messages from Soliman to O'Donnell that O'Donnell shared with Reuters.

On Friday, security forces took Soliman into custody, removing him from the hotel, O'Donnell said. A coalition of human rights organisations and lawyers representing the deportees said a second member of the group was also arrested.

Equatorial Guinea's government and its embassy in Washington have not responded to questions about the incident on Saturday or subsequent questions about Soliman's whereabouts.

Soliman "knew that he was putting his neck out there by talking to reporters," O'Donnell said, adding that his decision to do so involved a lot of "soul-searching" and consideration of potential repercussions.

"He has wanted to tell the world about what has been happening to them."

## U.S. REACHES MULTIPLE DEPORTATION DEALS ACROSS AFRICA

The Trump administration has since last year struck multiple agreements with African governments to accept migrants who it cannot legally return to their home countries. Many of those deported under the so-called third-country arrangements had previously won protection from U.S. immigration judges, who found they could face torture or other abuses if repatriated.

Washington has defended the third-country deals as lawful and said deportations are carried out in accordance with U.S. immigration law.

Rights groups and advocates have said the arrangements are opaque and that some deportees are ultimately returned to the countries they originally fled.

"We demand the EG (Equatorial Guinea) authorities immediately confirm the whereabouts and safety of our clients, who have been subjected to police violence and are now being held incommunicado," said a coalition of human rights groups.

The coalition in June filed a complaint against Equatorial Guinea at the African Commission on Human and Peoples' Rights over its agreement with Washington to accept third-country deportees.

Reporting by Robbie Corey-Boulet; Editing by Hugh Lawson

Our Standards: **The Thomson Reuters Trust Principles.**

Suggested Topics:

Africa

Human Rights

Purchase Licensing Rights

Feedback



**Robbie Corey-Boulet**

Thomson Reuters

Robbie Corey-Boulet is the bureau chief for West and Central Africa, based in Dakar and reporting on 23 countries. He has worked as a journalist for more than 15 years including as a freelancer in West Africa and as a correspondent and bureau chief for Agence France-Presse in Addis Ababa and Riyadh. Reach him at robbie.corey-boulet@thomsonreuters.com.

## Read Next

Business

**Billionaire Dangote launches oil refinery 'people's IPO', Africa's biggest**

23 hours ago



Africa

**From schoolyard sweets trader to Africa's richest man, Dangote eyes his biggest deal yet**

11 hours ago



Africa

**Angola delivers another big rate cut as inflation falls to single digits**

12 mins ago



Africa

**Two US government officials injured in accidental shooting by Eswatini forces**

1 hour ago

Feedback

AMERICA AND THE WORLD

# Immigrant Trump Sent to African Hotel Prison Arrested After Speaking With Media, Lawyers Say

Ahmed Soliman's attorneys fear he may have been sent to one of Equatorial Guinea's notorious torture prisons.



BY **GILLIAN BROCKELL**
SEPTEMBER 11, 2026




Ahmed Soliman on the Brooklyn Bridge in 2019. Sources: Photo courtesy of Kate O'Donnell; Miltiadis Fragkidis/Unsplash.

Listen to this article:
Immigrant Trump Sent to African Hotel Prison Arrested After Speaking With Media, Lawyers Say
About 6 Minutes

1x

Everlit

Ahmed Soliman, a 30-year-old gay immigrant from Egypt who had lived in Arizona since he was a child, was arrested by police in Equatorial Guinea Friday, days after speaking to reporters about police abuse, his lawyers said. Soliman, who spent nearly all of his life in the United States, had been imprisoned in a hotel on the island city of Malabo since April, where he was flown on an Immigration and Customs Enforcement charter flight as part of the Trump administration's third-country removal program.

"From the information we have, it looks like retaliation. It's unclear what laws, if any, he's actually broken," said Kate O'Donnell, one of his U.S. attorneys, in a phone interview with the *Prospect* Friday morning. She said they had contacted the United Nations High Commissioner for Refugees, and that local attorneys were looking for him in local jails but had not found him yet.

***More from Gillian Brockell***

"I'm just terrified as to what is happening to him right now, when nobody's watching," O'Donnell said.

Soliman had done interviews and shared videos with international media, including **Reuters** and **the *Prospect***, about an incident on September 3 in which a police officer pointed an assault rifle at him and two other immigrants imprisoned at the hotel, while the officer's supervisor shouted, "Shoot him!"

Watch on

After the stories were published, Soliman and a Brazilian man who is also represented by O'Donnell's law firm sent text messages saying authorities were going room to room confiscating the phones of the approximately 30 third-country nationals currently imprisoned at the hotel.

Soliman managed to hide his phone and briefly called O'Donnell late Wednesday.

"He was really tense, I'd never heard him sound like that before," she said. "Someone started knocking on the door, and he said, 'I gotta go, I'll call you back in ten minutes.'"

She didn't hear from him again until Thursday, when he texted her that authorities at the hotel had beaten all of them and cut off internet access. In his last messages to her, he told her to keep talking to the media, regardless of the retaliation he was facing.

"I can't let the fire die down now. I need to keep adding fuel and I understand the risks for me and am willing to," he wrote in a message shared with the *Prospect*.

Early Friday, O'Donnell heard from Meredyth Yoon, litigation director at **Asian Americans Advancing Justice**, who has become an advocate for dozens of third-country nationals

expelled to African countries since last year. Yoon told O'Donnell she'd learned Soliman had just been arrested, and that the other immigrants had cuts and bruises and "were pretty shaken up."

The authoritarian government of Equatorial Guinea maintains prisons on Malabo notorious for torture and disappearances, according to **Amnesty International**. O'Donnell said she is particularly afraid Soliman's sexuality could be used against him, because homosexuality is **de facto criminalized** in the country.

Soliman came to the United States from Egypt with his family when he was four, after his father, a prominent Muslim scholar, was persecuted by the government. He grew up in Arizona, where he said he turned to drugs and alcohol as a young man to deal with feelings of shame and confusion about his sexuality. He lost his immigration status after a 2021 conviction for causing an accident while driving under the influence. Upon his release from prison in 2023, he was taken into ICE custody.

His attorneys had won court protections barring his deportation to Egypt, due to his sexuality and the still-serious threat to his family, but had not yet secured his release from ICE detention. In April, he was forced onto a charter flight and taken to Equatorial Guinea. Soliman and his attorneys say he wasn't told where he was going until he was being carried onto the plane, that he requested and was denied a credible fear interview, and that he was removed without identification—not even a temporary travel document.

"I came here as a ghost," he told me over the phone on Sunday.

> **'Shoot Him!': Police Threaten Third-Country Nationals Imprisoned in African Hotel**

The Trump administration has subjected more than 23,000 immigrants to so-called third-country deportation in his second term, according to **Refugees International and Human Rights First**. Immigration rights groups have challenged the legality of these removals in federal court and **expect a decision** any day now. At least 63 men and women have been expelled to Equatorial Guinea on six ICE charter flights since last November, according to the flight data and other information I've compiled on the **Third-Country Removal Tracker**. More than half have been deported to their countries of origin, despite all having U.S. court protections prohibiting this.

ICE and the State Department did not respond to a request for comment. A representative for DHS who did not identify themselves copy-pasted the same message they sent for the story two days ago, which included this: “When an individual is no longer in ICE custody, then ICE will no longer be responsible for them.”

O’Donnell said that of the 30 immigrants at the hotel, about eight of them grew up in the United States, and because of that, “they were the ones who were most vocal … they were the ones that were demanding that their rights be respected.”

She thought about that again this morning, she said.

“Everything about the way Ahmed and his fellows have been treated, from the time that they were—in Ahmed’s case, physically picked up off the ground when he was asking for his fear interview, invoking his rights under international and domestic law—everything that has happened to them has been in violation of the rights that Ahmed and others and all of us grow up believing that we have,” she said.

She said she hoped every American would feel “deep outrage” about the way Soliman and the others sent to Equatorial Guinea were being treated and demand their elected officials uphold their rights.

“This is the line,” she said. “This is beyond the pale.”

*This article has been updated.*

---

© 2026 The American Prospect, Inc. | All Rights Reserved
Powered by Newspack

ALERT TOP STORY EDITOR'S PICK TOPICAL

# Arrest of Arizona man deported to Africa called retaliation for speaking out

**Emily Bregel**
Sep 13, 2026

Prefer us on Google

After more than four months imprisoned at a decommissioned hotel in Equatorial Guinea, a deported Phoenix man was arrested there Friday, in what attorneys are calling retaliation for his speaking out about abusive, dangerous conditions for dozens of U.S. deportees also detained at the hotel.

Ahmed Soliman, whose family came to Phoenix after fleeing Egypt when he was 4, was being held incommunicado in police custody as of Friday night, said Kate O'Donnell, an attorney with Tucson law firm Green Evans-Schroeder, which is representing Soliman.

"Ahmed understands his rights and he has been speaking out," she said Friday. "This is the latest thing they have done to try to silence him."

In the days before his arrest, Soliman, 30, told the Arizona Daily Star he and others had repeatedly been threatened at gunpoint, most recently on Sept. 5, and that he was reaching the point of despair.


## People are also reading…

1. Marana to review school alarm system after student's death
2. Student found dead at Marana High
3. Tucson real estate brokerage drops agent after viral flight video

4 **These new Arizona laws took effect this weekend**

Soliman said in the most recent incident, he was forced to his knees as police pointed firearms at him, demanding he turn over his phone. But another guard had already seized the device, after catching Soliman recording an interaction between a police officer and another U.S. deportee at the Hotel Bamy, in Malabo, Equatorial Guinea.

Soliman shared videos of the Sept. 5 incident with the Star and with Reuters, in which Soliman is seen on his knees with his hands in the air, as people scream around him.

"How is this not global news yet?" Soliman wrote to the Star in a message with the videos. "I'm genuinely tired and afraid for my life. I can't take it anymore. I want to go home."

The Star has been reporting on **Soliman** and other migrants' imprisonment at the Hotel Bamy in Equatorial Guinea, where lawyers say detention **conditions are worsening**, and the violence against detained migrants is escalating.

None of the 29 U.S. deportees currently detained at the hotel have any ties to Equatorial Guinea, and all had been granted protection against return to their home countries, attorneys say. None of the deportees at Hotel Bamy have been charged with a crime in Equatorial Guinea, which received $7.5 million from the U.S. in exchange for accepting deportees.

Ahmed Soliman, pictured in Glendale in 2020, grew up in Phoenix after his family moved from Egypt to Arizona when he was 4. He's been detained at a hotel in Equatorial Guinea since ICE deported him there April 28 without due process. He said he's intent on

But at least 17 people who were held at the hotel have already been returned to their home countries, a violation of international law known as "refoulement," attorneys say.

speaking out about the injustices he and other deportees at the hotel are facing, despite the risks to his personal safety.

Provided by Ahmed Soliman

In June, international rights groups filed a lawsuit before the African Commission on Human and Peoples' Rights, demanding Equatorial Guinea improve conditions at the hotel and provide assurances the people held there won't be returned to their home countries.

Soliman was "targeted" by Equatorial Guinea officials because of his determination to publicize the dire conditions in the hotel, where he's been held since late April, said Meredyth Yoon, litigation director of Asian Americans Advancing Justice in Atlanta. She's one of the lawyers who filed the lawsuit on behalf of 14 detainees at the hotel, including Soliman.

"Ahmed was arrested in retaliation for speaking out about conditions at the hotel and standing up for his rights," Yoon said. "He knows the risks. He's just very determined that his story gets out there."

Jamaican national Peta-Gaye Chambers, 35, had lived in the U.S. since she was 5 before she was deported to Equatorial Guinea in June. Chambers said she was also threatened during the Sept. 5 incident.

"That was very traumatic," she wrote to the Star after sharing videos of the incident. "The safety was off. The guard had no remorse."

## Communication cut off

Soliman said he'd been using his phone to record a police officer who was ignoring another detainee's pleas to have his phone returned, on Sept. 5.

"When I got inside and was told to get on my knees, the female officer in front of me kept yelling at me to give her my phone or else the officer would shoot me," Soliman said. "I kept telling her I didn’t have my phone, and they already took it, but she wouldn’t believe me."

Guards at the hotel routinely cut off internet access, or confiscate detainees' phones, after they learn detainees have talked with journalists or lawyers. That's left those detained at the hotel cut off from their families and access to legal counsel, deportees told the Star.

Security officials referenced a Reuters report on Soliman's allegations as the reason for confiscating everyone's phones on Wednesday, O'Donnell said.

Soliman and other detainees who witnessed the Sept. 5 confrontation said it's one of many terrifying experiences they've had at the Hotel Bamy, since U.S. Immigration and Customs Enforcement deported them to Equatorial Guinea without warning.

The Star has been unable to reach any sources at the hotel since the phones were seized Wednesday. (One source was able to quickly send a voice memo saying armed guards were confiscating phones, before that person's phone was apparently taken.)

Among those now being held incommunicado is Brazilian national Pietro Graza de Lima, who was previously detained at Eloy Detention Center in Arizona. He arrived at Hotel Bamy in August, after he was deported there without a credible-fear screening, Graza de Lima told the Star in a Sept. 8 interview.

Graza de Lima is gay and, like Soliman, faces real danger in Equatorial Guinea, where homosexuality is de facto criminalized, lawyers say.

The presence of armed guards is a constant threat in the hotel, Graza de Lima said.

"Why do they have guys with big guns in the hotel?" he said, speaking in English, which is not his first language. "This is not a hotel. It's a detention center."

Graza de Lima was a professor of Portuguese literature in his home country, said his attorney Dana Camilleri, senior attorney at Green Evans-Schroeder. He fled to the U.S. after corrupt Brazilian officials shot him multiple times in a failed assassination attempt, she said.

In immigration court in March, he was awarded protection against return to Brazil under the Convention Against Torture, Camilleri said. Afterward, ICE kept him detained at Eloy, as officials looked for a third country that could receive him.

Lawyers filed a habeas petition for Graza de Lima, but before it was adjudicated in U.S. District Court, ICE deported him without notice or a fear screening, in violation of due process and U.S. statutory and treaty obligations, Camilleri said.

The Star has been unable to reach Graza de Lima since his phone was seized.

## No response from officials

The Trump administration has signed third-country removal agreements with at least 35 nations, including 14 in Africa, which agreed to receive U.S. deportees who can't be returned home, according to **Third Country Deportation Watch**.

In a secretive agreement with Equatorial Guinea, the U.S. agreed to pay the central African nation $7.5



Brazilian national Pietro Graza de Lima said he's been held for weeks at the Hotel Bamy in Equatorial Guinea after the U.S. deported him there in August, despite him having no ties to the country. Graza de Lima was granted protection against return to his home country in March, after an immigration judge agreed he'd risk death or torture there, his attorney told the Arizona Daily Star.

Provided by Pietro Graza de Lima

million in exchange for the country receiving deportees from the United States.

Human rights advocates say that by denying migrants a credible-fear screening prior to deportation to a foreign nation, ICE is violating critical due process that aims to ensure people are safe in the countries to which they're deported.

The Department of Homeland Security, ICE's parent agency, argues that as long as a country has provided "diplomatic assurances" to the U.S. State Department that deportees will be treated humanely, a fear screening isn't necessary.

Equatorial Guinea officials have not explained the basis for imprisoning U.S. deportees at the hotel.

In July, the Embassy of Equatorial Guinea acknowledged receiving the Star's questions about the alleged abuse of deportees held at the Hotel Bamy, but has not answered the questions. The Star has submitted questions several times since then, most recently on Sept. 8, with no response.

U.S. Immigration and Customs Enforcement spokesman Fernando X. Burgos has said the agency bears no responsibility for what happens to deportees it sends to third countries.

"Once an alien leaves the United States, ICE is no longer responsible for tracking their location or activities outside the country," Burgos said in a July 27 statement.

Attorney Camilleri said that's false, and that deporting people to countries where they face violence is an abdication of the U.S. responsibility to people in its custody.

"As has been demonstrated many times over, these are intentionally not safe third countries," Camilleri said. "In terms of our laws and treaty obligations, we are not supposed to transfer custody of people under our protection to places where we know they will be tortured, which is what the government has done here, pretty obviously."

Burgos referred the Star to the U.S. State Department, which signed the U.S. removal agreement with Equatorial Guinea. But the State Department has refused to answer the Star's questions on the agreement or to acknowledge the inhumane detention conditions at Hotel Bamy.

In a Friday email, an unnamed State Department spokesperson shared a vague statement in response to the Star's questions.

"The U.S. government will use all legal means to remove those with no right to remain in our country," the statement said in full.

## Grijalva advocating for Soliman

After reading the Star's reporting on Hotel Bamy, U.S. Rep. Adelita Grijalva, D-Arizona, said her office reached out to the Embassy of Equatorial Guinea about Soliman's case, but has not received a response.

"I am very afraid for people like Ahmed. They have zero recourse because they've been deported to a country that is now governed by an oppressive, authoritarian regime," Grijalva said in a Friday interview with the Star. "The U.S. is essentially putting these people in literal life-or-death situations, and acting as if it's fine because they're not here" in the U.S.

Grijalva said the U.S. government must ensure people deported to third countries from the U.S. are going to safe places.

"Why are we sending $7.5 million, in this specific case, to this country to take people? What is the actual point? And how is it making our country safer?" she said. "The Trump administration is trying to tiptoe around the U.S. and international law. It's still illegal, it's still shameful."

Grijalva's office plans to follow up with the embassy and the U.S. State Department.

A spokesperson for U.S. Sen. Mark Kelly's office said they've also reached out to the U.S. State Department about Soliman's case, but have received no response.

U.S. officials have all been trying to avoid accountability for what the country is doing to vulnerable migrants, Camilleri said.

The State Department isn't answering questions, and DHS is "washing its hands" of migrants after they've been deported, she said.

"Everyone is just pointing fingers at each other, like that stupid Spiderman meme," she said.

## Pressure to return to unsafe homelands

Deportees and their attorneys say Equatorial Guinea officials have been threatening and abusing the deportees intentionally, so they will become desperate enough to return to their home countries, despite the life-threatening risks they all face there, attorneys say.

"They keep shutting off the internet to try to get all of them to stop talking to reporters and their families," O'Donnell said. "The threats are becoming really violent. ... They say, 'We could just kill you and bury your body and nobody would ever find you.'"

Chambers said Sept. 2 that a guard told her she would go to jail if she didn't agree to get on a plane back to her home country. That's despite a U.S. immigration judge granting Chambers "withholding of removal" to her home country of Jamaica in 2013, agreeing she'd face persecution there.

In another late-night incident, on July 31, Chambers and several other detainees told the Star that guards violently pulled them from their rooms, handcuffed them and threatened them at gunpoint.

"They said if we leave the hotel grounds, they will shoot us and bury us across the street," Chambers **told the Star** in August.

Before his phone was seized, Graza de Lima said he cannot return to Brazil where both he, and his family still living there, would be at risk of death.

But being imprisoned at the hotel in an unknown country, where the treatment of detainees is worsening, is unsustainable, he said.

"We don’t have toilet paper, we don’t have soap, the food is bad. They try to make it very hard," he said.

In speaking out about conditions at the hotel, "I am risking my life," Graza de Lima said. "They told everybody, 'We don't talk about this. If you make an interview, it's bad for you.'"

Camilleri said the hotel's inhumane detention conditions are intentional.

"The pressure to return to their home countries and be tortured there is immense," she said. At Hotel Bamy, "Pietro was still using a toothbrush he got at Eloy, because none of them are being afforded toothbrushes or toothpaste. They take away the toothpaste as punishment."

Natalie Holmes, an ordained pastor who was deported to Equatorial Guinea alongside Chambers in June, said that her U.S.-based family is "heartbroken" at her continued detention at the hotel. No one knows how to help her, Holmes told the Star in an Aug. 31 interview.

Ahmed Soliman, who grew up in Phoenix, shared his view from inside the decommissioned Bamy Hotel in Malabo, Equatorial Guinea, where he’s been

"They can't understand and they keep asking me, 'How did this happen?' I just don't have answers," she said. "My life is in shambles. ... There's just too much. I'm so tired. I hardly sleep."

imprisoned since ICE deported him there on April 28. Armed guards patrol outside the hotel, where Soliman said he and more than 20 other deportees from the U.S. are being confined, despite having not committed any crimes in the country.

Ahmed Soliman

In a **statement** published Friday afternoon, a coalition of human rights groups and lawyers demanded the government of Equatorial Guinea confirm the safety and whereabouts of Soliman, and another U.S. deportee taken into police custody Friday.

The coalition also called on Equatorial Guinea officials to restore detainees' access to communication with their families and attorneys, and to ensure unrestricted access to legal representation, medical care and protection from "violence, threats, intimidation and retaliation."

The group is also calling on the U.S. State Department to "reassess" Equatorial Guinea's "diplomatic assurances" that deportees will be treated humanely there, and to halt any further deportations to the country.

Contact reporter Emily Bregel at **ebregel@tucson.com**. On X, formerly Twitter: @EmilyBregel

**By Emily Bregel**

**Border reporter**

https://tucson.com/news/local/border/article_7d870ef1-80ba-4c5a-81df-adbd9f4ad64a.html

TOP STORY EDITOR'S PICK TOPICAL WEB ONLY

# Six key points on the ‘retaliatory’ arrest of a Phoenix man deported to Africa

**Emily Bregel**
Sep 15, 2026

Prefer us on Google

The Arizona Daily Star has been **reporting** on the plight of **dozens of people** imprisoned at a decommissioned hotel in Equatorial Guinea, including one man who grew up in Phoenix, after the U.S. deported them there without notice.

None of the deportees have any ties to Equatorial Guinea. All have been granted protection against deportation to their home countries.




In this screenshot from a Sept. 5 video shared with the Arizona Daily Star, Ahmed Soliman, who grew up in Phoenix, is seen on his knees, in a white shirt as a kneeling police officer aims a firearm at him and another deportee. Soliman said police were demanding his phone, after he was caught recording them, but Soliman's phone had already been seized at this point, he said.

Emily Bregel

Here's the **latest** on what lawyers call a dangerous situation at Hotel Bamy in Equatorial Guinea, where violence against U.S. deportees imprisoned there has been escalating:


## People are also reading...

1 **What is the prettiest town in Arizona? What Architectural Digest says**

2 **Analysis: These 9 TUSD schools are at highest risk of merging or closing**

3 **Student found dead at Marana High**

4 **Tucson real estate brokerage drops agent after viral flight video**

- On Friday, Sept. 11, Ahmed Soliman — whose family **moved to Phoenix** from Egypt when he was 4 — was arrested at the Hotel Bamy, in what his lawyers call retaliation for his speaking to the news media about abusive, dangerous conditions at the hotel. "How is this not global news yet?" he wrote to the Star, before his arrest and before his phone was confiscated by local authorities. "I'm genuinely tired and afraid for my life. I can't take it anymore. I want to go home."



Ahmed Soliman, pictured in Glendale in 2020, grew up in Phoenix after his family moved from Egypt to Arizona when he was 4. He's been detained at a hotel in Equatorial Guinea since ICE deported him there April 28 without due process. He said he's intent on speaking out about the injustices he and other deportees at the hotel are facing, despite the risks to his personal safety.

Provided by Ahmed Soliman

- One week prior to his arrest, Soliman had shared a **video** of himself and another deportee being held at gunpoint on Sept. 5 in the lobby of the Hotel Bamy, as police demanded their phones, Soliman told the Star. On Sept. 9, a few days after Reuters published a report on the video, armed guards suddenly confiscated all deportees' phones. Lawyers told the Star the seizure of all phones was in retaliation for Soliman sharing the Sept. 5 video with journalists. Soliman and another deportee were taken into police custody two days after the phones were seized. They were being held incommunicado at an unknown location, as of Friday night, lawyers said.

- At the Hotel Bamy, U.S. deportees' phones have been repeatedly seized, or the internet has been disconnected, after guards discovered the deportees have talked with journalists or attorneys about the conditions they're being held in, deportees and their lawyers have told the Star.

- The government of Equatorial Guinea has not explained why the people deported there are imprisoned at the hotel, despite having committed no crime in the country. The central African nation received $7.5 million from the U.S., in exchange for accepting third-country deportations of people who can't be returned to their home countries.

- U.S. Immigration and Customs Enforcement spokesman Fernando X. Burgos said the agency bears no responsibility for what happens to deportees after they leave U.S. custody. The agency continues to deport people to Equatorial Guinea and other unsafe nations, in violation of the Constitution’s due process guarantees and in violation of U.S. statutory and treaty obligations, human rights advocates say.

- U.S. Rep. Adelita Grijalva, D-Arizona, **said Friday** that ICE’s continued deportation of migrants to unsafe countries without due process is “illegal” and “shameful.” She’s reached out to the Embassy of Equatorial Guinea on behalf of Soliman, but so far has not received a response. The Embassy has also ignored the Star’s repeated requests for comment. Grijalva said she’ll also reach out to the U.S. State Department, which signed the third-country removal agreement with Equatorial Guinea. Since July, the State Department has ignored the Star’s questions on the agreement and on the treatment of people ICE has deported to Equatorial Guinea. The office of U.S. Sen. Mark Kelly, D-Arizona, said it also reached out to the State Department, without response.

Contact reporter Emily Bregel at **ebregel@tucson.com**. On X, formerly Twitter: @EmilyBregel

**By Emily Bregel**

**Border reporter**

# Coalition Raises Alarm Over Arrests, Escalating Violence and Loss of Contact with U.S.-Deported Detainees in Equatorial Guinea

**IMMEDIATE RELEASE**

September 11, 2026

**CONTACT**
Asian Americans Advancing Justice-Atlanta - media@advancingjustice-atlanta.org
Global Strategic Litigation Council - laura@global-council.org
Equatorial Guinea Justice - tutu@egjustice.org (+1 (615) 479-0207)
Institute for Human Rights and Development in Africa - mjallow@ihrda.org
Pan African Lawyers Union - mhoza@lawyersofafrica.org

**Atlanta, GA -** A coalition of human rights organizations and lawyers representing people deported from the United States to Equatorial Guinea is raising the alarm about the arbitrary arrest of two individuals who were being held at the Hotel Bamy which took place today. The coalition is urgently seeking confirmation of their whereabouts and safety.

The coalition received information from US attorney Kate O'Donnell, that two detainees, including Ahmed Soliman, had been arrested by police officers following police breaking into and searching individuals' rooms. At the time of this release, the coalition has not received confirmation of where the two arrested individuals have been taken or of their current condition. Those detained at Hotel Bamy are now effectively held incommunicado.

Today's arrests are the third incident of escalating abuse in just over a week, marking a sharp deterioration in the conditions of detainees held at Hotel Bamy in Malabo.

On 1 September, four Ethiopian nationals were forcibly removed from the hotel to be returned to their country of origin, where they fear persecution, torture, or death. Each of these deported had been previously granted protection from deportation to their country of origin by a United States Immigration Judge. The Equatorial Guinea authorities told them to 'go back to their home country' or to 'prison'. The individuals were also sent to Ethiopia despite the Provisional Measures issued by the African Commission. The Coalition has since lost touch with the people removed from Equatorial Guinea.

Later on 5 September, the Coalition were informed that guards had entered detainees' rooms, searched them and confiscated their mobile phones. There were also reports that some detainees were beaten during the incident.

The confiscation of mobile phones has severely disrupted communication between detainees and their lawyers. It means that the Coalition lawyers are not able to establish the whereabouts and wellbeing of their clients held at the hotel, raising serious concerns about access to legal representation, protection against further mistreatment and possible removal from Equatorial Guinea.

The coalition believes the escalating brutality may be retaliation for detainees speaking out in the media about custodial abuse. The incidents are occurring despite emergency protection orders ("Provisional Measures") issued by the African Commission on Human and Peoples' Rights to prevent removal of individuals facing irreparable harm, amid ongoing proceedings before the Commission concerning those detained in Equatorial Guinea. The coalition has raised concerns about non-compliance with those measures and is urging the Commission to take immediate steps to ensure Equatorial Guinea complies with its obligations.

These developments follow a series of increasingly serious reports concerning the treatment of people detained at Hotel Bamy since the United States began deporting third-country nationals there in November 2025. Previous incidents reported to the coalition have included allegations of officers pointing firearms at detainees, including that an officer cocked a semi-automatic firearm and pointed it at a detainee while the detainee was handcuffed, as well as assaults, threats, intimidation and restrictions on detainees' ability to communicate with their lawyers, loved ones, and the outside world. Earlier reports documented poor detention conditions and significant health risks among those held at the hotel, including concerns regarding access to medical care, medication, denial of food, water, hygiene supplies, and other basic necessities.

*"We are deeply concerned by the rapidly deteriorating situation at Hotel Bamy, particularly the confiscation of phones that is now preventing lawyers from maintaining reliable contact with their clients," said* ***Esther Muigai-Mnaro, Program Manager at Pan African Lawyers Union (PALU).*** *"We*

*urgently need confirmation of the whereabouts and safety of the two detainees who were taken from the hotel on 11 September. When people are deprived of communication with their lawyers and their whereabouts cannot be reliably established, the risks of arbitrary detention and mistreatment become particularly acute."*

*"In the past week alone, Equatorial Guinean police have descended on individuals detained at Hotel Bamy three times with threats, violence, and now, forcible arrests, holding the two people arrested in an unknown location," said* ***Meredyth Yoon, Litigation Director at Asian Americans Advancing Justice-Atlanta****. "These events are a sharp escalation of what we have witnessed for the past ten months at Hotel Bamy as migrants deported by the United States continue to face inhumane and degrading treatment. We urgently call on all international human rights actors to intervene to ensure that the rights of those who were arrested and who remain at Hotel Bamy are protected, and call on the United States to immediately halt all third-country deportations to Equatorial Guinea where migrants face detention, abuse, and chain refoulement."*

The coalition calls on the Government of Equatorial Guinea to:

- **i**mmediately confirm the whereabouts and safety of the two detainees removed from Hotel Bamy on 11 September 2026;
- restore detainees' access to means of communication necessary to maintain contact with their families and lawyers;
- ensure that all detainees have prompt, confidential and unrestricted access to legal representation;
- ensure that detainees are protected from violence, threats, intimidation and retaliation;
- provide immediate access to necessary medical care, medication and other basic necessities; and
- comply fully with the provisional measures adopted by the African Commission on Human and Peoples' Rights.

The coalition additionally calls on the United States Embassy and State Department to engage with the Government of Equatorial Guinea to reassess the diplomatic assurances of treatment compliant with international law for those deported to Equatorial Guinea, and to halt any further removals to Equatorial Guinea.

The coalition has also raised the latest concerns with relevant international actors, including the United Nations system, and continues to seek urgent intervention to protect the individuals concerned.

The coalition stresses that individuals must not face further harm, intimidation or retaliation as a consequence of communicating information about their conditions or exercising their right to seek legal assistance and protection.

Asian Americans Advancing Justice-Atlanta (Advancing Justice-Atlanta) is the first nonprofit legal advocacy organization dedicated to protecting the civil rights of Asian Americans, Native Hawaiians, Pacific Islanders (AANHPI) and Arab, Middle Eastern, Muslim, and South Asian (AMEMSA) communities in Georgia and the Southeast.

Statement

## Civil Rights Groups Urge Supreme Court to Block USPS Rule Threatening Mail-in Ballots Weeks Before Midterm Elections

Charity Navigator
FOUR-STAR

Platinum
Transparency
2026
Candid.

Copyright © 2025 Asian Americans Advancing Justice-Atlanta

**Private Policy**
No mobile information will be shared with third parties/affiliates for marketing/promotional purposes. All other categories exclude text messaging originator opt-in data and consent; this information will not be shared with any third parties. Message and Data Rates may apply. You can STOP messaging by sending STOP and get more help by sending HELP.

# AT WHAT COST?

## Inside the Trump Administration's Secret Deportation Deals



SENATE FOREIGN RELATIONS COMMITTEE
MINORITY REPORT | FEBRUARY 2026

UNITED STATES SENATE

COMMITTEE ON FOREIGN RELATIONS

# Letter of Transmittal

COMMITTEE ON FOREIGN RELATIONS

*February 13, 2026*

## Dear Reader:

For decades, the enforcement of U.S. immigration law has required coordination with foreign governments. But it has never before played such a central and transactional role in American foreign policy.

This report finds that the Trump Administration has expanded and institutionalized a system in which the United States urges or coerces countries to accept migrants who are not their citizens, often through arrangements that are costly, wasteful and poorly monitored. Deporting migrants to countries they have no connection to—once a rare tool used only in exceptional circumstances—has become a routine instrument of diplomacy. This report finds that this shift has had three central consequences:

First, the Administration's use of third country deportations is coming at great taxpayer cost. The United States has spent tens of millions of dollars to move a relatively small number of individuals to third countries, some of whom, after being flown thousands of miles, are then flown back to their home country, again on U.S.-funded flights. In many cases, migrants could have been returned directly to their countries of origin, avoiding unnecessary flights and additional costs. Instead, taxpayers are funding a global deportation network that is little more than an expensive deterrent with no measurable benefit.

Second, the Administration is conducting questionable deals by making direct payments primarily to corrupt and unstable foreign governments with track records of public corruption, human rights abuses and human trafficking, relying on assurances that these countries will comply with certain obligations. Yet there is no evidence the State Department is monitoring how U.S. funds are used, tracking the treatment of deportees or enforcing the terms of these agreements. In some cases, U.S. officials have been instructed not to follow up at all. This is not disciplined enforcement; it is outsourcing responsibility to governments the United States itself does not trust.

Third, the Administration is not being transparent with Congress or the American people about the extent of its deal-making with foreign governments that agree to take in migrants, including what additional pressures and sweeteners it may be applying or offering up. Even where there are formal agreements with countries, questions remain about whether the Administration has made side deals or is providing other forms of U.S. assistance or favorable treatment. While distinct from third country deportations, the Administration has shown that in pursuit of its deportation agenda, it is even willing to cut deals with adversarial

governments like Iran. Under secretive arrangements, the Administration has forcibly deported Iranians, including vulnerable individuals such as religious minorities and political dissidents. There is no transparency around the full terms of these arrangements with foreign governments and whether these deals have come at the expense of advancing more pressing U.S. national security interests.

Taken together, these practices reflect a troubling shift in how the United States is exercising power. Deportation is being used as a bargaining chip. U.S. diplomacy is being conducted through secret cash payments and quiet concessions. Countries are being pressured with threats of tariffs, visa bans or cuts to assistance. Millions of taxpayer dollars are being spent without meaningful oversight or accountability. And speed and deterrence are being prioritized over due process and respect for human rights.

At a time when the Administration is already straining its relationships with longstanding allies, it is building transactional relationships with corrupt and adversarial regimes—not around shared interests or strategic goals, but opaque deals that do not serve American taxpayers or American security.

As Members of the Senate Foreign Relations Committee, we believe Congress has a responsibility to understand how U.S. foreign policy is being conducted, how taxpayer funds are being used and whether the Administration's actions strengthen or undermine American interests.

This report documents a growing system of third country deportations that is expensive, wasteful and increasingly detached from the principles of transparency and accountability that should govern U.S. diplomacy.

We hope this report will prompt serious scrutiny of a policy that now operates largely in the dark, and that it will serve as a basis for restoring basic standards of oversight, discipline and responsibility to an area of U.S. foreign policy that currently lacks all three.

Sincerely,

**Jeanne Shaheen**
*Ranking Member, Senate Committee on Foreign Relations*

**Chris Coons**
*United States Senator*

**Chris Murphy**
*United States Senator*

**Tim Kaine**
*United States Senator*

**Jeff Merkley**
*United States Senator*

**Cory Booker**
*United States Senator*

**Chris Van Hollen**
*United States Senator*

**Tammy Duckworth**
*United States Senator*

**Jacky Rosen**
*United States Senator*

# Table of Contents

Executive Summary ....................................................................... 4

Costly Operations with No Measurable Impact ................................................ 6

Unnecessary Use of Third Country Deportations at Taxpayer Expense ................ 9

No Oversight of U.S Funds to Foreign Governments ........................................ 15

*Equatorial Guinea ....................................................................... 16*

*El Salvador ............................................................................... 18*

Failure to Monitor and Enforce Agreements with Foreign Governments ........... 19

Secret Deal-Making that Does Not Serve American Interests............................. 22

Circumventing U.S. Immigration Law .......................................................... 27

Conclusion ................................................................................... 29

# Executive Summary

Over the past year, the Trump Administration has dramatically expanded the use of third country deportations—in which it deports migrants to countries that are not their own—transforming a narrow and rarely used practice into a standing system of global removals.

Through a growing web of bilateral arrangements, the United States is convincing foreign governments to take in people with no connection to their country, largely through financial payments or pressure. In some cases, the Administration is sending migrants thousands of miles only for them to later be returned to their home country at additional taxpayer expense. The Administration justifies these deals as necessary because home countries refuse to accept their nationals, but evidence contradicts these claims. In practice, third country deportations have produced little measurable benefit while imposing significant financial and diplomatic costs on the United States.

The Administration has pursued these arrangements through opaque negotiations, including with corrupt governments, without meaningful oversight or accountability. Tens of millions of dollars in taxpayer funds have been sent to foreign governments, yet Congress and the public have few details on the terms of these deals, how funds are being used or what the United States is offering in return.

This Senate Foreign Relations Committee Minority report documents the Trump Administration's expanding use of third country deportations. It is based on a review of agreements through January 2026, staff travel to relevant countries and meetings and communication with current U.S. officials, foreign government officials, human rights organizations, deportees and attorneys.[1]

1 This report covers agreements and reported third country deportations through January 31, 2026. The State Department is actively pressing dozens of other countries to enter into similar agreements.

This report identifies six central ways in which the Administration's use of third country deportations has undermined U.S. interests:

- **EXPENSIVE AND INEFFECTIVE OPERATIONS:** The Administration has spent tens of millions of dollars to move a relatively small number of migrants to third countries, in some cases paying more than one million dollars per person, with little measurable impact on its deportation agenda.

- **NEEDLESSLY WASTING TAXPAYER FUNDS:** In many cases, migrants could have been returned directly to their home countries, avoiding costly third country deportations. As of January 2026, more than eighty percent of the migrants sent to third countries paid by the United States to take them in have already returned to their country of origin or are in the process of doing so. In some cases, the U.S. paid to fly migrants to third countries only to later pay again for them to fly to their home country.

- **PROVIDING MONEY TO CORRUPT GOVERNMENTS WITHOUT OVERSIGHT:** The United States has sent more than thirty-two million dollars to foreign governments in direct connection with third country deportation deals, including those with records of corruption, human rights abuses and human trafficking, without monitoring how the money is used or whether taxpayer funds are being used to facilitate corruption, human rights abuses or human trafficking. It is unclear how much additional U.S. funding is being redirected to indirectly support these deals.

- **FAILURE TO MONITOR AND ENFORCE AGREEMENTS:** The State Department is not tracking foreign government compliance with diplomatic assurances or enforcing agreement terms, even where evidence suggests foreign governments are violating their commitments. In at least one country, U.S. officials told Committee Minority staff that Trump Administration officials instructed them not to follow up on how deportees were being treated.

- **SECRET DEALS THAT DO NOT SERVE AMERICAN INTERESTS:** Third country deportation agreements have become a central feature of U.S. bilateral relations, involving cash payments, political concessions and coercion, without transparency about the full extent of what the United States is giving in return or the pressures it is exerting. In addition, the Administration is making secret deals with adversarial regimes such as Iran, to accept their nationals back.

- **CIRCUMVENTING U.S. IMMIGRATION LAW:** Evidence suggests the Trump Administration is using third countries to carry out removals that U.S. law would otherwise prohibit, such as sending protected individuals onward to countries where they may face persecution or torture.

# Costly Operations with No Measurable Impact

The total costs of the Trump Administration's third country deportations through January 2026 are unknown but are likely upward of $40 million.[2] To incentivize countries to enter into third country deportation deals with the United States, the Trump Administration has provided more than $32 million directly to five countries:

**Equatorial Guinea** ($7.5 million), **Rwanda** ($7.5 million), **El Salvador** ($4.76 million), **Eswatini** ($5.1 million) and **Palau** ($7.5 million).[3] Much of the funds were provided as lump sum payments, often before any third country nationals arrived.[4]

The Trump Administration has paid high costs to fly migrants from the United States to third countries, frequently using military aircraft that can cost more than $32,000 per hour, even for flights carrying only a small number of migrants.[5] For example, flights carrying the 51 individuals sent to Rwanda, Eswatini and Equatorial Guinea over the past seven months cost an estimated $2.5 million.[6] In total, the Trump Administration spent an estimated more than $7.2 million on third country deportation flights as of January 2026 to at least ten countries, with actual costs likely far higher.[7]

---

2 The United States has provided at least $32.3 million to five foreign governments in direct connection to agreements to accept third country nationals, spent at least $7.2 million on flights to move migrants to at least ten third countries and spent $307,000 to house deportees on a U.S. military base in Djibouti. The $40 million does not include costs of hours spent on the tarmac for aircraft, costs of aircraft refueling, funding provided to pay to repatriate individuals from a third country, financial support to house some third country nationals in hotels or funding to organizations that may provide short-term assistance to deportees. For additional details on costs, *see infra* notes 3, 7 and 25.

3 Data for Equatorial Guinea, Fiscal Year 2026, USASpending.gov; Press Release, Senator Shaheen, "Ranking Member Shaheen Calls for Answers from Secretary Rubio on $7.5 Million in Taxpayer Funds Sent to Equatorial Guinea for Third Country Removals," Nov. 10, 2025; Memorandum of Understanding Between the Government of the United States of America and the Government of the Republic of Rwanda Concerning the Removal of Third Country Nationals, Signed June 2025, available through the State Department's FOIA Library on Qualifying Non-Binding Instruments; Agreement Between the Government of the United States of America and the Government of El Salvador, Ex. 1, No. 1:25-cv-01774-JEB (D.D.C., Mar. 22, 2025); Memorandum of Understanding Between the Government of the United States of America and the Government of Eswatini Concerning the Removal of Third Country Nationals, U.S.-Eswatini, May, 2025, available through the State Department's FOIA Library on Qualifying Non-Binding Instruments; Ephrat Livni, "Palau Agrees to Take Up to 75 Migrants from the U.S.," *The New York Times*, Dec. 24, 2025; Minority Committee staff meetings with foreign officials, July to Dec. 2025.

4 *See* Data for Equatorial Guinea, Fiscal Year 2026, USASpending.gov; Press Release, Senator Shaheen, "Ranking Member Shaheen Calls for Answers from Secretary Rubio on $7.5 Million in Taxpayer Funds Sent to Equatorial Guinea for Third Country Removals," Nov. 10, 2025; Ephrat Livni, "Palau Agrees to Take Up to 75 Migrants from the U.S.," The New York Times, Dec. 24, 2025; Agreement Between the Government of the United States of America and the Government of El Salvador, Ex. 1, No. 1:25-cv-01774-JEB (D.D.C., Mar. 22, 2025); Minority Committee staff communication and meetings with U.S. and foreign officials, July to Dec. 2025.

5 Human Rights First, ICE Flight Monitor: November 2025 Monthly Report, at 11 (Dec. 2025); U.S. Transportation Command and Air Mobility Command, FY26, Charter Guidance and Rates for Special Assignment Airlift Missions, Joint Exercise Transportation Program, and Contingency Missions for the Transportation Working Capital Fund, at 14, Table 2, "Non-DoD U.S. Government, Charter Hourly Rates and Minimum Activity Rates for Aircraft on TWCF Missions."

6 *See infra* notes 7 and 10. This estimated cost is only for the third country deportation flights to Rwanda, Eswatini and Equatorial Guinea.

7 This cost encapsulates third country deportation flights to more than 10 countries throughout 2025 and Jan. 2026. Estimated flight costs based on calculations using roundtrip in-air flight times and publicly available cost per hour data for the type of aircraft. Estimated costs do not include time charged for aircraft while on the tarmac, refueling costs or crew costs. Type of aircraft used and estimated length of in-air flight times based on analysis of Human Rights First ICE Flight Monitor data available at https://humanrightsfirst.org/ice-flight-monitor/ and on X, *see e.g.*, ICE Flight Monitor, @ICEFlightM, "ICE Flight Monitor tracked the deportation flight on a military plane that took 14 third-country nationals to Ghana. The flight left Alexandria, LA on Friday, Sept. 5, refueled in St. Croix before landing in Accra, Ghana. Individuals on board were in straitjackets for 16 straight hours and were not told where they were going until several hours into the flight," Sept. 18, 2025, https://x.com/ICEFlightM/status/1968682997042778172. Costs for military aircraft found at: U.S. Transportation Command and Air Mobility Command, FY26, Charter Guidance and Rates for Special Assignment Airlift Missions, Joint Exercise Transportation Program, and Contingency Missions for the Transportation Working Capital Fund, at 14, Table 2, "Non-DoD U.S. Government, Charter Hourly Rates and Minimum Activity Rates for Aircraft on TWCF Missions." Cost for non-military aircraft found at: U.S. General Services Administration,

Despite spending tens of millions in taxpayer dollars, to date, the United States has moved relatively small numbers of third country nationals. As of January 2026, the five countries that the Trump Administration collectively paid more than $32 million to take in migrants have only received approximately 300 third country nationals from the United States,[8] the majority of whom have already been returned or are set to return to their home country.[9] Of the 300 third country nationals, approximately 250 were Venezuelans sent to El Salvador in March 2025; the total number of third country nationals received by the other four countries was just 51. As of January 2026, the numbers of third country nationals received by the countries the United States had paid were: Rwanda (7), Eswatini (15) Equatorial Guinea (29), Palau (0) and El Salvador (approx. 250).[10] This means that, to date, the Trump Administration has paid at least one country more than $1 million per third country national received.

*To date, the Trump Administration has paid at least one country **more than $1 million per third country national** received.*

"Federal Supply Service Authorized Federal Supply Schedule Price List," (Nov. 20, 2022 to Nov. 19, 2027), available at: https://www.gsaadvantage.gov/ref_text/GS33F017AA/0ZAHLF.3V0UG3_GS-33F-017AA_GS33F017AA.PDF.

8 See breakdown of number of third country nationals at bottom of paragraph; *see infra* note 10.

9 *See* Julie Turkewitz and Hamed Aleaziz, "Prisoner Swap Frees Americans in Venezuela for Migrants in El Salvador," *The New York Times*, Jul. 18, 2025; Isa Cardona and Max Saltman, "South Sudan Repatriates Mexican Man Deported From US," *CNN*, Sept. 7, 2025; Natasha Booty, "Eswatini Says It Has Repatriated US Deportee to Jamaica," Sept. 23, 2025; Press Release, Government of the Kingdom of Eswatini, "More Third Country Nationals Expected to Arrive in the Country From the United States of America," Oct. 5, 2025, available at: https://x.com/EswatiniGovern1/status/1974909942466593081/photo/1; Daphne Psaledakis and George Obulutsa, "Rwanda Received Migrants Deported From the US Earlier This Month," *Reuters*, Aug. 28, 2025; Minority Committee staff communication with current U.S. officials and outside experts, Aug. 2025 to Jan. 2026.

10 Daphne Psaledakis and George Obulutsa, "Rwanda Received Migrants Deported from the US Earlier This Month," Reuters, Aug, 28, 2025; "Eswatini Receives 10 Third-Country Nationals from US," *CNN*, Oct. 6, 2025; Robbie Corey-Boulet and Emmanuel Bruce, "Ghana Took in Trump's Deported West Africans. Then It Forced Them Home," *Reuters*, Jan. 17, 2026; ICE Flight Monitor, @ICEFlightM, "UPDATE: The ICE deportation flight (OAE3991) just landed in Equatorial Guinea, likely removing third-country nationals. The flight originated in Alexandria, LA and stopped in Senegal (likely to refuel), Liberia, Ghana, and Nigeria.," Jan. 22, 2026, https://x.com/iceflightm/status/2014382068508037375?s=43; Prianka Srinivasan, "Palau Lawmakers Vote to Block Controversial Trump Deal to Resettle Migrants From US," *The Guardian*, Jan. 29, 2026; Luke Garrett, "U.S. Deports Hundreds of Venezuelans to El Salvador, Despite Court Order," *NPR*, Mar. 16, 2025. Confirmed through Minority Committee communication with advocates, human rights organizations, and foreign officials, Aug. 2025 to Jan. 2026.

The below chart details the cost of third country deportations as of January 2026 to the five countries the Trump Administration has provided payments to in exchange for agreeing to accept third country nationals:

| Country | Payment to Foreign Government | Estimated Cost of Flights[11] | Number of Third Country Nationals[12] | Estimated Cost Per Migrant |
|---|---|---|---|---|
| El Salvador | $4.76M | $428,821 | ~ 250 | $20,755 |
| Rwanda | $7.5M | $601,864 | 7 | $1.1M |
| Eswatini | $5.1M | $1.1 M | 15 | $413,333 |
| Equatorial Guinea | $7.5M | $681,670 | 29 | $282,126 |
| Palau | $7.5M | No flights | 0 | N/A |

11 See *supra* note 7 for method of cost calculations and resources used.

12 As of January 31, 2026.

# Unnecessary Use of Third Country Deportations at Taxpayer Expense

The Trump Administration has insisted it must take the extraordinary measure of sending migrants to third countries because their home countries will not take them back.

The Department of Homeland Security has repeatedly stated that third country deportations allow them to remove individuals "so uniquely barbaric that their own countries won't take them back."[13] Yet, a review of third country deportations through January 2026 contradicts the Administration's claims, revealing that many people could have been sent to back their home country if the Administration had followed typical U.S. removal proceedings, saving U.S. taxpayers unnecessary costs.

## *The U.S. Government Paid for This*




The Trump Administration sent a Jamaican national to Eswatini—at an estimated cost of more than $181,000. Weeks later, that individual was flown more than 7,000 miles back to Jamaica on a series of U.S.-funded flights.

13 *See e.g.*, Press Release, Department of Homeland Security, DHS Releases Statement on Major Victory for Trump Administration and the American People on Deporting Criminal Illegal Aliens to Third Countries, June 23, 2025.; Tricia McLaughlin, @TriciaOhio, "NEW: a safe third country deportation flight to Eswatini in Southern Africa has landed— This flight took individuals so uniquely barbaric that their home countries refused to take them back," July 15, 2025, https://x.com/TriciaOhio/status/1945274627976200206.

The home governments of several migrants sent to third countries accepted them back within weeks or months of them being flown to a third country.[14]

Migrants have been removed from the United States to a third country despite having final removal orders to be sent back to their country of origin.[15] Many could have been sent directly to their country of origin, but the Trump Administration did not contact their home government or give governments sufficient notice to process documentation for their nationals.[16] Instead, the Trump Administration is often flying these migrants thousands of miles away on costly flights.

As a result, the Trump Administration has, in some cases, paid twice for migrants' travel—once to remove them to a third country and then again to fly them to their home country.[17] As a current U.S. official privately told Committee Minority staff: "The Trump Administration is sometimes paying the country to take people, flying them there and then paying to take them to their home country. It doesn't make sense."[18] The Administration will likely pay for additional migrants in third countries to return to their home countries.[19]

> *"The Trump Administration is sometimes paying the country to take people, flying them there and then paying to take them to their home country. It doesn't make sense."*
>
> – Current U.S. Official, Communication with Committee Minority staff, Dec. 2025

---

14 *See, e.g.*, Isa Cardona and Max Saltman, "South Sudan Repatriates Mexican Man Deported From US," CNN, Sept. 7, 2025; Natasha Booty, "Eswatini Says It Has Repatriated US Deportee to Jamaica," BBC, Sept. 23, 2025; Minority Committee staff communication with advocates and outside experts, Sept. 2025 to Jan. 2026.

15 A "removal order" is a determination made by an immigration judge or DHS officer authorizing a noncitizen's removal from the United States. Generally, a "final order of removal" refers to an order of removal issued by an immigration judge that has become final based on a decision made by a Board of Immigration Appeals or upon other specified circumstances as set forth in federal regulations. *See, e.g.* Decl. of Anwen Hughes at 1 and 3, *D.V.D. v. U.S. Department of Homeland Security (DHS)*, No. 25-cv-10676, Doc. 233-5 (D. Mass. Sept. 13, 2025); Decl. of Mia Unger, at 1, 3, *D.V.D. v. DHS*, Doc. 233-6 (D. Mass. Dec. 8, 2025) (Unger Declaration); Minority Committee staff communication with advocates, Sept. 2025 to Jan. 2026.

16 *See, e.g.*, Hughes Declaration at 1; Decl. of Tin Thanh Nguyen at 9, *D.V.D. v. DHS*, No. 25-cv-10676, Doc. 233-1 (D. Mass. Nov. 13, 2025) (Nguyen Declaration); "Sheinbaum Addresses Case of Mexican Deported to Africa by US: Thursday's Mañanera Recapped," *Mexico News Daily*, May 22, 2025, https://mexiconewsdaily.com/politics/sheinbaum-addresses-case-of-mexican-deported-to-africa-by-us-thursdays-mananera-recapped/;

Hon. Kamina J Smith, @kaminajsmith, "The Ministry of Foreign Affairs and Foreign Trade is aware of reports in the public domain, of the transfer of individuals purportedly including a Jamaican national, to Eswatini. The Ministry has initiated enquiries with the US authorities to ascertain the veracity of the reported inclusion of a Jamaican in the transfer. The Government has not refused the return of any of our nationals to Jamaica, and accordingly, if the reports are confirmed, will continue its engagements with the US on the arrangements necessary to facilitate the individual's return to Jamaica. We will keep the public updated as soon as further verified information is obtained," July 16, 2025, https://x.com/kaminajsmith/status/1945677928752148770; Minority Committee staff communication with advocates and deportees, Sept. 2025 to Nov. 2025.

17 *See* Andrea Salcedo and Samantha Schmidt, "Trump Deports Hundreds to Third Countries, Leaving Them in Legal Limbo," *The Washington Post,* Feb. 21, 2025; Minority Committee communication with advocates, outside experts and current U.S. officials, July 2025 to Jan. 2026. State Department briefing to Committee Minority staff on July 9, 2025.

18 Current U.S. Official, communication with Committee Minority staff, Dec. 2025.

19 Committee Minority staff communication with advocates, outside experts and current U.S. officials, July 2025 to Jan. 2026. State Department briefing to Committee Minority staff on July 9, 2025.

The following are instances when the Trump Administration appears to have paid for unnecessary or wasteful third country deportations, and the associated costs, including double payments for flights:

- **Weeks after the Trump Administration sent a Jamaican national to Eswatini**—at an estimated cost of more than $181,000 per person—he was flown more than 7,000 miles back to Jamaica on a series of U.S.-funded flights.[20] This Jamaican national had been placed in a cell in ICE custody with other Jamaican nationals in the United States. All of the men were called to leave the cell except for this individual who was then placed on a flight with four men of different nationalities and sent to Eswatini despite his deportation orders to be sent to Jamaica.[21] Jamaican officials said it was not true that their country had been unwilling to take their national stating: "The Government has not refused the return of any of our nationals."[22]




© KrasseCheckerlicensed CC BY-SA 3.0), via Wikimedia Commons.

*King Mswati III International Airport in Eswatini.*

20 Natasha Booty, "Eswatini Says It Has Repatriated US Deportee to Jamaica," *BBC*, Sept. 23, 2025; Sarah Stillman, "Disappeared to a Foreign Prison," *The New Yorker*, Nov. 24, 2025. Use of U.S. funds according to Minority Committee staff communication with current U.S. officials and outside experts. Estimated round-trip cost for the flight to Eswatini via Djibouti carrying five individuals on or around July 15, 2025, is $906,868. *See supra* note 7 for further details on calculating estimated flight costs.

21 Unger Declaration at 1, 3.

22 Hon. Kamina J Smith, @kaminajsmith, "The Ministry of Foreign Affairs and Foreign Trade is aware of reports in the public domain, of the transfer of individuals purportedly including a Jamaican national, to Eswatini. The Ministry has initiated enquiries with the US authorities to ascertain the veracity of the reported inclusion of a Jamaican in the transfer. The Government has not refused the return of any of our nationals to Jamaica, and accordingly, if the reports are confirmed, will continue its engagements with the US on the arrangements necessary to facilitate the individual's return to Jamaica. We will keep the public updated as soon as further verified information is obtained," July 16, 2025, https://x.com/kaminajsmith/status/1945677928752148770.

- **During a visit to the eight third country nationals detained in South Sudan**, several of the men told Committee Minority staff that the U.S. Government either had not reached out to their home governments or had failed to provide sufficient time to their governments to process travel documents. For example, the Vietnamese national held in South Sudan said ICE officers had prepared his removal documents to Vietnam but were not given enough time to work with the Vietnamese Embassy before he was sent to South Sudan. In court filings, his lawyer reiterated this point claiming that the deportation officer for this case had not submitted a request to Vietnam for the individual to receive his travel documents when the Trump Administration instead put him on a plane to South Sudan.[23] The majority of deportees in South Sudan told Committee Minority staff they wanted to return to their home country.[24] The flights carrying these men to South Sudan cost an estimated $427,000 with another $307,000 to house them on a military base in Djibouti along the way.[25]



© US NAVY

*Camp Lemonnier is a U.S. Navy military base adjacent to the Djibouti-Ambouli International Airport. Eight third country nationals were held here en route to South Sudan at a cost of $307,000 (see infra* note 25*).*

- **Weeks after arriving in South Sudan, a Mexican national was flown back to Mexico.**[26] The Trump Administration paid an estimated $91,000 per person to fly him over 8,000 miles to South Sudan instead of returning him to Mexico.[27] Court filings state that prior to his removal to South Sudan: "There is no indication that ICE contacted any Mexican consulate in the United States to request travel documents for [the individual] or to arrange for his return to Mexico."[28] Mexican officials expressed concern over one of their nationals being sent to South Sudan, saying Mexico always accepts its nationals back.[29] Mexico's President Claudia Sheinbaum said her government was not informed of the deportation of the Mexican national.[30]

---

23 Nguyen Declaration at 9.

24 Committee Minority staff travel, Aug. 2025.

25 Senator Warren, Rep. Garamendi, Senator Booker, et al., *Draining Defense: Trump's Immigration Stunts Cost Billions at the Expense of Military Readiness, Morale, and National Security*, at 8 (Dec. 2025). *See supra* note 7 for further details on calculating estimated flight costs.

26 Isa Cardona and Max Saltman, "South Sudan Repatriates Mexican Man Deported From US," *CNN*, Sept. 7, 2025. His return flight was not funded by the U.S. Government.

27 This cost estimate takes into account the cost of the estimated round-trip flights to South Sudan and cost of housing the deportees on a military base in Djibouti, a temporary transit stop. Estimated round-trip costs for the flights carrying eight deportees to South Sudan is $427,008. The cost of housing deportees on a military base in Djibouti was $307,000 *See supra* notes 7, 25.

28 Decl. of Anwen Hughes at 1 (Sept. 13, 2025).

29 Committee Minority staff meeting with Mexican officials, Aug. 2025.

30 "Sheinbaum Addresses Case of Mexican Deported to Africa by US: Thursday's Mañanera Recapped," *Mexico News Daily*, May 22, 2025.

- **The Laos government was told it had less than 24 hours to prepare travel documents for a Lao national or he would be sent to Rwanda**.[31] Despite a willingness to produce the travel documents, Laos was unable to do so in time, and this individual was deported to Rwanda at an estimated cost of more than $85,000 per person.[32]

- **After paying an estimated $1.4 million to fly roughly 500 migrants to Panama and Costa Rica**, the Trump Administration then paid again for the majority of these individuals to fly to their home country or another third country—many of which were thousands of miles away.[33]

- **In the case of a Cambodian national sent to Eswatini**, his attorney states: "I know that ICE did not request a travel document from Cambodia but may have requested one from Thailand, where he is not a citizen or national."[34] He was sent to Eswatini at an estimated cost of more than $27,000 per person.[35]

- **An attorney for a Laotian national sent to Eswatini**—at an estimated cost of more than $181,000 per person—stated in court filings that the U.S. Government deported him despite having a travel document to repatriate him to Laos.[36] An officer at the Embassy of Laos in Washington, D.C. said he "was sure the Lao Government has agreed to accept him to Laos and his travel document was issued."[37]

---

31 Committee Minority staff meetings with advocates, Dec. 2025.

32 *Id*. Estimated round-trip cost of the flights carrying seven individuals to Rwanda is $601,864. Estimated round-trip cost of the flights carrying seven individuals to Rwanda is $601,864. *See supra* note 7 for information on calculating estimated flight costs.

33 *See* Andrea Salcedo and Samantha Schmidt, "Trump Deports Hundreds to Third Countries, Leaving Them in Legal Limbo," *The Washington Post,* Feb. 21, 2025; "Costa Rica Grants Special Status to 85 Migrants Deported From the US," *Reuters,* April 23, 2025; Annie Correal and Julie Turkewitz, "170 Migrants Deported From U.S. Agree to Return to Home Countries, Panama Says," Feb. 18, 2025; Human Rights Watch, "*The Strategy Is to Break Us:" The US Expulsion of Third-Country Nationals to Costa Rica*, May 22, 2025. State Department briefing to Minority Committee staff on July 9, 2025.

This represents the estimated cost for the five flights to Costa Rica and Panama, including three military planes (C-17 aircraft). *See supra* note 7 for information on calculating estimated flight costs.

34 Nguyen Declaration at 9.

35 The estimated round-trip cost of the flight carrying ten third country nationals to Eswatini on or around Oct. 6, 2025, is $278,304. *See* Footnote 6 for information on calculating estimated flight costs.

36 Nguyen Declaration at 9. Estimated round-trip cost for the flight to Eswatini via Djibouti carrying five individuals on or around July 15, 2025, is $906,868. *See supra* note 7 for details on flight cost estimations.

37 *Id*.

Rather than deploying an efficient, humane deportation strategy and conducting basic due diligence, the Trump Administration appears to be needlessly spending taxpayer funds—sending individuals across the world and then back again—largely to scare or threaten migrants that the same will happen to them. As Department of Homeland Security spokesperson Tricia McLaughlin stated in August 2025: "If you come to our country illegally and break our laws, you could end up in CECOT, Alligator Alcatraz, Guantanamo Bay, or South Sudan or another third country."[38] A current U.S. official familiar with third country deportation operations privately described the Trump Administration's use of third country deportations as a "scare tactic" and "hugely expensive deterrent" meant to keep migrants from coming to the United States, intimidate them into dropping asylum claims or encourage them to "self deport."[39]

*A current U.S. official familiar with third country deportation operations privately described the Trump Administration's use of third country deportations as a **"scare tactic"** and **"hugely expensive deterrent"** meant to keep migrants from coming to the United States, intimidate them into dropping asylum claims or encourage them to "self deport."*

One current U.S. official said the Trump Administration was intent on pursuing third country deportation deals with the island nation of Palau or the country of Eswatini to use as a threat to migrants, saying: "With countries like Palau or Eswatini, the point is that the Administration can threaten people that they will literally be dropped in the middle of nowhere. The point is to scare people."[40]

*"With countries like Palau or Eswatini, the point is that the Administration can threaten people that they will literally be dropped in the middle of nowhere. The point is to scare people."*

– Current U.S. Official, Communication to Committee

38 Kristina Cooke and Ted Hesson, "The US Said It Had No Choice But to Deport Them to a Third Country. Then It Sent Them Home," *Reuters*, Aug. 2, 2025, https://www.reuters.com/world/americas/us-said-it-had-no-choice-deport-them-third-country-then-it-sent-them-home-2025-08-02/.

39 Committee Minority staff communication with current U.S. officials, Oct. 2025.

40 Committee Minority staff communication with current U.S. officials, Dec. 2025.

# No Oversight of U.S Funds to Foreign Governments

Despite sending more than $32 million to five foreign governments for third country deportation deals, there is no evidence the State Department is conducting follow-up oversight on the use of taxpayer funds.[41]

In an unusual move, the Trump Administration has provided these funds directly to foreign governments, rather than through trusted third-party implementing partners who conduct regular monitoring and oversight, making it more challenging for the State Department to track the use of funds.[42] The State Department is also not using a third-party auditor to track the use of money; instead, the State Department appears to be relying on the foreign governments themselves (some with a clear history of corruption or mismanagement) to report on the use of U.S. Government funding.[43]

As mentioned, several of the governments receiving U.S. funds have well-documented records of corruption, human rights abuses and human trafficking. Without oversight, it is unknown whether U.S. funds are facilitating corruption or other abuses. These countries include the following:

41 *See supra* note 3 for details on costs.

42 *See* Data for Equatorial Guinea in Fiscal Year 2026. USASpending.gov; Press Release, Senator Shaheen, "Ranking Member Shaheen Calls for Answers from Secretary Rubio on $7.5 Million in Taxpayer Funds Sent to Equatorial Guinea for Third Country Removals," Nov. 10, 2025; Ephrat Livni, "Palau Agrees to Take Up to 75 Migrants from the U.S.," *The New York Times*, Dec. 24, 2025; Agreement Between the Government of the United States of America and the Government of El Salvador, March 2025, available at: https://democracyforward.org/wp-content/uploads/2025/09/Dkt-30-1-Ex-1-to-Withdrawal-of-MDD.pdf; Committee Minority staff briefings with State Department officials (Jan. 2026) and communication with current U.S. and foreign officials, Aug. through Nov. 2025.

43 Committee Minority staff also confirmed in communication with current U.S. officials, Nov. to Dec. 2025. In his testimony before the Senate Foreign Relations Committee at a nominations hearing on Dec. 11, 2025, Cart Weiland, the State Department official responsible for signing off on the payment to the El Salvador Government, stated, when asked regarding the tracking of the funds that: "[El Salvador] is under strict obligations to report on how they're using those funds." Committee Minority staff also confirmed in communication with current U.S. officials, Nov. 2025 to Dec. 2025.

# Equatorial Guinea

## Equatorial Guinea ranks 172 out of 182 countries for corruption according to Transparency International.[44]

The State Department's *2023 Human Rights Report* states that "the president and members of his inner circle continued to amass personal fortunes from the revenues associated with monopolies on all domestic commercial ventures" and that "corruption at all levels of government was a severe problem" in Equatorial Guinea.[45]

In 2011, the U.S. Department of Justice pursued a civil asset forfeiture case against Teodoro Nguema Obiang Mangue, the President's son, who currently serves as the Vice President of Equatorial Guinea, alleging that he amassed more than $300 million worth of assets through "corruption and money laundering in violation of both U.S. and Equatoguinean law" including through purchasing a jet, a Malibu mansion and Michael Jackson memorabilia.[46] In a settlement with the United States, Obiang Mangue was forced to relinquish assets worth approximately $30 million.[47] In its 2025 Freedom in the World Report, Freedom House assigned Equatorial Guinea 0 out of 4 for whether "safeguards against official corruption [are] strong and effective."[48]




44 Transparency International, *2025 Corruption Perceptions Index*, "Equatorial Guinea," (Feb. 2025), https://www.transparency.org/en/cpi/2025/index/gnq.

45 State Department, 2023 Country Reports on Human Rights Practices, "Equatorial Guinea," (April 2024).

46 Press Release, U.S. Department of Justice, "Department of Justice Seeks to Recover More Than $70.8 million in Proceeds of Corruption from Government Minister of Equatorial Guinea," Oct. 25, 2011.

47 Press Release, U.S. Department of Justice, "Second Vice President of Equatorial Guinea Agrees to Relinquish More than $30 Million of Assets Purchased with Corrupt Proceeds," Oct. 10, 2014.

48 Freedom House, "Equatorial Guinea," Freedom in the World 2025, (Feb. 26, 2025), https://freedomhouse.org/country/equatorial-guinea/freedom-world/2025.

There are also concerns about human trafficking in Equatorial Guinea. The State Department's own *2025 Trafficking in Persons Report* raises as a "significant concern" the "corruption and official complicity in trafficking crimes" by government officials in Equatorial Guinea.[49]

Despite this record, the Trump Administration sent $7.5 million to Equatorial Guinea to accept third country nationals—an amount that far exceeds all U.S. foreign assistance provided to the country over the last eight years combined.[50] The money was directly provided to the Equatorial Guinea government, which had never before been done, outside of the United States giving some limited medical supplies.[51] As of January 2026, Equatorial Guinea has received 29 third country nationals, the majority of whom it has quickly sent onward to their country of origin or intends to send onward.[52] This raises the question as to why the money was needed in the first place and what Equatorial Guinea is doing with it.

In November 2025, Ranking Member Shaheen wrote a public letter to Secretary of State Marco Rubio raising alarm over this third country deportation deal and asking how the State Department will ensure none of the money provided by the United States would be used to facilitate corruption or enable human trafficking. As of February 2026, the State Department has not responded.

---

49 State Department, *2025 Trafficking in Persons Report,* "Equatorial Guinea," (Sept. 2025).

50 Press Release, Senate Foreign Relations Committee, Ranking Member Shaheen Calls for Answers from Secretary Rubio on $7.5 Million in Taxpayer Funds Sent to Equatorial Guinea for Third Country Removals, Nov. 10, 2025. State Department briefing to Committee Minority staff, Jan. 2026.

51 Press Release, Senate Foreign Relations Committee, Ranking Member Shaheen Calls for Answers from Secretary Rubio on $7.5 Million in Taxpayer Funds Sent to Equatorial Guinea for Third Country Removals, Nov. 10, 2025. State Department briefing to Committee Minority staff, Jan. 2026.

52 Sheriff Bojang Jr., "Equatorial Guinea Sends Eight of Trump's Nine Deportees Home, Braces For New Arrivals," *The Africa Report,* Jan. 16, 2026, https://www.theafricareport.com/405291/equatorial-guinea-sends-eight-of-trumps-nine-deportees-home-braces-for-new-arrivals/; Committee Minority staff communication with advocates and deportees, Jan. 2026.

# El Salvador

## El Salvador has a documented history of corruption and lack of transparency in government spending.

According to Transparency International, El Salvador ranks 120 out of 182 countries for corruption.[53] In its 2025 Freedom in the World Report, Freedom House assigned El Salvador 0 out of 4 for whether "safeguards against official corruption [are] strong and effective." Salvadoran government officials also regularly withhold information on how they use funds.[54]

The Trump Administration provided at least $4.76 million to the Salvadoran government in connection with the detention of more than 250 Venezuelans deported from the United States to be used for associated detention costs.[55] The State Department has not made clear whether funds have been used to facilitate government corruption or to house Venezuelan detainees in CECOT—a maximum security prison—where there are credible reports detainees were tortured. [56]

When questioned before the Senate Foreign Relations Committee regarding the use of funds, Cart Weiland, a Trump Administration official responsible for approving the money to El Salvador stated: "The State Department is not in the business of deportations," referring the Committee instead to the Department of Homeland Security. He indicated the State Department is relying on the Salvadoran government to report on how these funds are used and could not definitively state whether any of the funds had been used to detain Venezuelans in the CECOT prison where they were reportedly tortured.[57]

The State Department's lack of financial oversight leaves Congress unable to determine whether U.S. funds were misused including whether they contributed to corruption or facilitated human rights abuses.

---

53 Transparency International, *2025 Corruption Perceptions Index*, "El Salvador," (Feb. 2025), https://www.transparency.org/en/countries/el-salvador.

54 Freedom House, "El Salvador," Freedom in the World 2025, (Feb. 26, 2025).

55 Agreement Between the Government of the United States of America and the Government of El Salvador, March 2025, available at: https://democracyforward.org/wp-content/uploads/2025/09/Dkt-30-1-Ex-1-to-Withdrawal-of-MDD.pdf.

56 Human Rights Watch, "You Have Arrived in Hell": Torture and Other Abuses Against Venezuelans in El Salvador's Mega Prison, (Nov. 12, 2025).

57 Testimony of Cart Weiland, Nominee to be Assistant Secretary of International Narcotics and Law Enforcement, Senate Foreign Relations Committee, Nomination Hearing, Dec. 11, 2025.

# Failure to Monitor and Enforce Agreements with Foreign Governments

The Trump Administration does not appear to be monitoring whether foreign governments are complying with their obligations under third country deportation agreements nor seeking to hold foreign governments accountable for violating agreement obligations.

Many of the third country deportation agreements include blanket language on upholding international human rights laws like ensuring migrants are not tortured, arbitrarily detained or sent to another country where they could be harmed or killed. When negotiating these deportation agreements, the State Department is responsible for assessing whether a foreign government's diplomatic assurances are "credible" that they will uphold these obligations.[58]

Yet the Trump Administration has provided no evidence of systematic monitoring, follow-up or enforcement, raising serious concerns that the assurances made by foreign governments exist only on paper and that the United States is turning a blind eye to what happens to migrants in third countries. This also undermines the credibility of the Administration's assessments of diplomatic assurances in future third country deportation agreements.



*In South Sudan, deportees were kept in a gated house with armed guards. U.S. Embassy officials had not visited the deportees.*

Several countries selected for third country deportations had well-known records of human rights abuses before agreements were signed. In El Salvador, for example, its CECOT prison, where more than 250 Venezuelans from the United States were later held, was known for its harsh conditions with reports of deaths, torture and enforced disappearances.[59] In South Sudan, the State Department's *2025 Human Rights Report* stated that the country had "significant human rights issues includ[ing] credible reports of arbitrary or unlawful

58 *See* ICE Memo, Third Country Removals Following the Supreme Court's Order in *Department of Homeland Security v. D.V.D.,* No. 24A1153 (U.S. June 23, 2025)," filed in *D.V.D. v. DHS*, No. 25-cv-10676, Doc. 190-1 (D. Mass. (July 15, 2025).

59 Press Release, United Nations Office of the High Commissioner for Human Rights, "UN experts alarmed at illegal deportations from the United States to El Salvador," April 30, 2025.

killings; disappearances; torture or cruel, inhuman, or degrading treatment or punishment [and] arbitrary arrest or detention."[60]

External reporting and court filings have documented human rights abuses occurring under third country agreements including claims of torture in a maximum-security prison in El Salvador, detainees held incommunicado in Eswatini and deportees removed to Ghana sent onward to countries where they are likely to face persecution or torture.[61]

Despite these concerns, the State Department is not monitoring what foreign governments do once third country nationals arrive in another country, appearing to rely solely on diplomatic assurances. When questioned before the Senate Foreign Relations Committee about allegations of torture against third country nationals in a Salvadoran prison, Cart Weiland, a Trump Administration official who helped establish the third country deportation agreement, could not articulate whether any oversight on their treatment had been conducted. Instead, he reiterated that "the agreement has a provision that explicitly mandates adherence to international human rights treaties and conventions.[62] While traveling, Committee Minority staff heard from U.S. officials in one country that had received third country nationals that they were instructed by Administration officials not to follow up on the treatment of deportees. In South Sudan, Committee Minority staff were the first people other than South Sudanese officials to visit third country nationals deported to the country.

Trump Administration officials have acknowledged that foreign governments are not upholding the assurances they provided to the United States and that the Administration is not taking steps to address these violations. In a U.S. federal court case regarding third country deportations to Ghana, a Trump Administration attorney agreed that it appeared Ghana was violating assurances it had provided the United States, including that it would comply with the Convention Against Torture, after sending a migrant onward to a country where they would likely be tortured.[63] The Federal District Court Judge required the Trump Administration to file a declaration describing its efforts to keep third country nationals from being sent to a country where they fear persecution or torture. In the Administration's September 2025

60 U.S. State Department, "South Sudan," 2024 Country Reports on Human Rights Practices, (Aug. 12, 2025).

61 *See* Human Rights Watch, "You Have Arrived in Hell": Torture and Other Abuses Against Venezuelans in El Salvador's Mega Prison, (Nov. 12, 2025), https://www.hrw.org/report/2025/11/12/you-have-arrived-in-hell/torture-and-other-abuses-against-venezuelans-in-el; Geral Imray, "3 deported by U.S. held in African prison despite completing sentences, lawyers say," Associated Press, Sept. 2, 2025, https://www.pbs.org/newshour/nation/3-deported-by-u-s-held-in-african-prison-despite-completing-sentences-lawyers-say; Edward Acquah, Wilson McMakin and Rebecca Santana, "Immigrants deported from U.S. to Ghana are sent home, where lawyers say some could face torture," Associated Press, Sept. 15, 2025, https://www.pbs.org/newshour/world/immigrants-deported-from-u-s-to-ghana-are-sent-home-where-lawyers-say-some-could-face-torture.

62 Testimony of Cart Weiland, Nominee to be Assistant Secretary of International Narcotics and Law Enforcement, Senate Foreign Relations Committee, Nomination Hearing, Dec. 11, 2025.

63 Mem. Op., *D.A. et al. v. Noem et al.*, No. 1:25-cv-03135 Doc. 41 at 3 (D.D.C. Sept. 15, 2025).

declaration, the then-acting head of the State Department's Africa Bureau said the Administration was not taking any action, stating:

> *"Prior to these removals, the U.S. government received diplomatic assurances from the Government of Ghana, communicated to the U.S. government by diplomatic note. As of the time of this filing, I am not aware that the Department of State, including through the U.S. Embassy in Ghana, has made any additional efforts to keep Plaintiffs from being removed from Ghana to their country of origin or other countries where they fear persecution or torture."*[64]

The Trump Administration's defense is that the United States "does not have the power to tell Ghana what to do."[65] The Administration has used similar claims regarding Venezuelans sent from the United States to El Salvador where there are credible reports that deportees were tortured.[66]

The Trump Administration's lack of oversight on agreements, as well as documented non-compliance with agreements by foreign governments, calls into question the State Department's assessment of credible diplomatic assurances related to future third country deportation agreements.

64 Decl. of Jonathan G. Pratt at 3, *D.A. et al. v. Noem et al.*, No. 1:25-cv-03135 (D.D.C. Sept. 13, 2025) (Pratt Declaration).

65 Mem. Op., *D.A. et al. v. Noem et al.*, No. 1:25-cv-03135, Doc. 41 at 3 (D.D.C. Sept. 15, 2025).

66 *See* Julie Turkewitz, Tibisay Romero, Sheyla Urdaneta and Isayen Herrera, "'You Are All Terrorists': Four Months in a Salvadoran Prison," *The New York Times*, Nov. 8, 2025; Human Rights Watch, "You Have Arrived in Hell": Torture and Other Abuses Against Venezuelans in El Salvador's Mega Prison, (Nov. 12, 2025), https://www.hrw.org/report/2025/11/12/you-have-arrived-in-hell/torture-and-other-abuses-against-venezuelans-in-el.

# Secret Deal-Making that Does Not Serve American Interests

In its effort to establish third country deportation agreements with dozens of countries, the Trump Administration has struck deals with or pressured foreign governments, with no transparency. Faced with increased tariffs, travel bans and cuts to U.S. foreign aid, some countries have been pressured into these deals. Other countries have sought to leverage negotiations for their own interests, that may not benefit the American people.[67] The Trump Administration is expending political capital in its bilateral relationships that could instead be used to advance more pressing U.S. national security interests, while not being transparent about the full extent of its deal-making including what is being offered to foreign governments.

***Countries With Third Country Deportation Agreements or That Have Received Third Country Nationals***




ANTIGUA & BARBUDA
BELIZE
CABO VERDE
CAMEROON
COSTA RICA
DOMINICA
ECUADOR
EL SALVADOR
EQUATORIAL GUINEA
ESWATINI
GHANA
GUATEMALA
GUYANA
HONDURAS
KOSOVO
LIBERIA
MEXICO
PALAU
PANAMA
PARAGUAY
RWANDA
SAINT KITTS & NEVIS
SOUTH SUDAN
UGANDA
UZBEKISTAN

*As of January 31, 2026.*

---

67 *See* Joseph Falzetta, "After Accepting US Deportees, South Sudan Wanted Sanctions Relief For Top Officials, Documents Show," *AP News*, Jan. 24, 2026; Committee Minority staff meetings with foreign government officials.

## One country the Trump Administration worked with was South Sudan, a war-torn country ranked 181 out of the 182 countries for government corruption by Transparency International.[68]

In exchange for taking in just eight third country nationals, South Sudan asked the United States to consider lifting targeted U.S. sanctions on government officials, support the prosecution of the leader of the president's political opposition and consider investing in South Sudanese oil, gas and mineral industries.[69]

In the case of Equatorial Guinea, the Trump Administration's payment to the government was a stark departure from prior U.S. foreign assistance provided to the country. Over the past two administrations, the U.S. Government has not provided more than $2 million annually in foreign assistance for Equatorial Guinea; the highest the first Trump Administration provided was $780,000. The provision of $7.5 million represents an increase of 275 percent and far exceeds the amount of U.S. foreign assistance provided over the last eight years combined.[70]

With the government of El Salvador, the Trump Administration's deal was not limited to money. The Administration also committed to providing an undisclosed amount of additional "in-kind and financial support to the Government of El Salvador."[71] At request of the El Salvador President, the Trump Administration also returned several high-profile MS-13 leaders who had been serving as U.S. informants, undermining a long-running federal investigation into MS-13 and its links to the government of the country.[72]

## Some countries have felt there is no choice but to enter into these deals.

According to former and current government officials for Panama and Costa Rica, their governments felt pressure from the Trump Administration to receive third country nationals.[73] At the time, both countries had recently seen President Trump threaten to impose tariffs on Colombia in retaliation for initially refusing to accept deportees from the U.S. arriving in shackles and expressed concern that the same

68 Transparency International, 2025 Corruption Perceptions Index, "South Sudan," (Feb. 2025), https://www.transparency.org/en/cpi/2025/index/ssd.

69 Felicia Schwartz and Myah Ward, "South Sudan took 8 migrants from the US. It wants something in return." Politico, July 30, 2025, https://www.politico.com/news/2025/07/30/south-sudan-might-take-more-us-migrant-deportees-it-has-a-few-asks-00482793.

70 Press Release, Senator Shaheen, "Ranking Member Shaheen Calls for Answers from Secretary Rubio on $7.5 Million in Taxpayer Funds Sent to Equatorial Guinea for Third Country Removals," Nov. 10, 2025.

71 Exchange of Diplomatic Notes Between the Government of the United States and the Government of El Salvador, Mar. 31, 2025, available through the State Department's FOIA Library on Qualifying Non-Binding Instruments, May 2025.

72 "Why Is Trump Returning MS-13 Leaders to El Salvador? 5 Takeaways From the Times Investigation," *The New York Times*, June 30, 2025.

73 Committee Minority staff meetings with current and former foreign government officials, Jun. to Nov. 2025. *See also* Gabe Gutierrez et al., "White House says Colombia agreed to Trump's deportation terms after tariff standoff," *NBC News*, Jan. 27, 2025.

could happen to their governments.[74] Panamanian officials also felt pressure over the Trump Administration's stated interest in seizing the Panama Canal.

In addition to directly paying foreign governments to receive third country nationals, the Trump Administration appears to be providing money to "cooperative" countries. Following a Memorandum of Understanding between Costa Rica and the Trump Administration in support of deportation efforts, the State Department provided Costa Rica with $9.5 million in deportation assistance.[75] State Department officials said Costa Rica's willingness to collaborate with the United States on deportation efforts, including on receiving third country nationals, was a factor in providing this support.[76]

In certain countries, citizens and governments have protested against these deals. After the United States made a third country deportation deal with Eswatini, civil society and opposition groups expressed outrage. When deportees arrived, Eswatini activists protested outside the U.S. embassy.[77] A coalition of civil society groups released a statement saying:

> *"This situation sets a dangerous precedent whereby powerful nations may use smaller, economically weaker states as dumping grounds for unwanted individuals…Eswatini's sovereignty and dignity must not be traded off for unclear deals or political expediency."* [78]

Eswatini's largest political opposition party said of the deal: "this is not diplomacy but human trafficking disguised as a deportation deal."[79] Eswatini human rights groups are mounting legal action, including the Southern African Litigation Centre, which calls the deal "executive over-reach" made without parliamentary consent.[80]

In December 2025, the Trump administration reached a third country deportation agreement with the Republic of Palau.[81] The United States has a unique and vital relationship with Palau through the Compacts of Free Association (COFA), demonstrated by the fact that Palauan citizens serve in the U.S. military. For years, Palau has supported U.S. strategic and national security interests across the region.

---

74 "Why Is Trump Returning MS-13 Leaders to El Salvador? 5 Takeaways From the Times Investigation," *The New York Times*, June 30, 2025.

75 Documents on file with the Democratic Staff of the Senate Foreign Relations Committee.

76 State Department briefing to Committee Minority staff, July 2025.

77 Savior Kakama and Pumza Fihlani, "Eswatini accepts 10 US deportees despite legal challenge," *BBC News*, Oct. 6, 2025, https://www.bbc.com/news/articles/cn5qdx260lzo.

78 Swaziland Multi-Stakeholder Forum, "Multi Stakeholder Forum Swaziland (MSF) Statement on the U.S. Deportation of Convicted Criminals to Eswatini," Facebook post, July 16, 2025.

79 Rachel Savage, "Eswatini Opposition Attacks US Deal As 'Human Trafficking Disguised as Deportation,'" *The Guardian,* July 23, 2025.

80 Savior Kakama and Pumza Fihlani, "Eswatini accepts 10 US deportees despite legal challenge," *BBC News*, Oct. 6, 2025.

81 Ephrat Livni, "Palau Agrees to Take Up to 75 Migrants From the U.S.," *The New York Times,* Dec. 24, 2025.

By pursuing a third country deportation agreement with Palau, the Administration risks undermining domestic support for the United States from a critical U.S. ally.[82]

In November 2025, the U.S. Embassy in Palau released a video of U.S. Deputy Secretary of State Chris Landau on the Administration's third country deportation proposal and calling on Palau to continue to consider the deal, saying:

> *"The U.S. helps Palau where we can, and Palau helps the U.S. where it can. One area where we've recently asked for Palau's help is immigration…Our administration would greatly appreciate Palau's help on this issue, even with respect to a very small number of people, and we look forward to continuing the conversation with the government of Palau and its people."'*
>
> – U.S. Deputy Secretary of State, Chris Landau, U.S. Embassy Koror Facebook Video, Nov. 17, 2025




## The Trump Administration's deportation deal-making also extends to U.S. adversaries, including Iran, a country with one of the worst human rights records in the world.

Last year, the Trump Administration reportedly struck a mass deportation deal with the Iranian regime to deport 400 Iranians over the coming months.[83] The Administration has sent at least three plane-loads of Iranians back to Iran, including Christian converts, ethnic minorities and political dissidents who could face persecution or torture. At least eight people from the first flight begged not to be sent to Iran because they were scared for their lives.[84] One man says he attempted suicide at a U.S. detention facility in an attempt to avoid being sent back to Iran but was still

82 *See* Bernadette Carreon, "A Country That Said No: Palauans Nix US Proposal to Send Deportees to Palau," *Pacific Island Times,* Nov. 9, 2025; Kristy Needham, "Palau Lawmakers Reject US Request to Accept Third Country Refugees," *Reuters,* July 28, 2025.

83 Farnaz Fassihi and Hamed Aleaziz, "U.S. Deports Planeload of Iranians After Deal with Tehran, Officials Say," *The New York Times,* Sept. 30, 2025.

84 Farnaz Fassihi, "U.S. Deports Second Planeload of Iranians, Officials Say," *The New York Times,* Dec. 7, 2025.

deported.[85] An Iranian official said some Iranians accepted deportation because the alternative would have been deportation to a country like Sudan or Somalia.[86] In January 2026, after thousands of Iranian protestors had been killed by the regime, the Trump Administration still moved forward with a deportation flight to Iran, including attempting to deport LGBTQI+ individuals who would be killed if returned.[87]

While the deal with Iran is distinct from the Administration's third country deportation agreements, it demonstrates that the Administration is willing to cut deals with any country, including U.S. adversaries, with no transparency about what the United States is offering foreign governments.

To date, the State Department has refused to brief Congress on the deal with Iran, despite requests. The State Department claims it had no role in working with Iran on this deal, however, public reporting contradicts these claims.[88]

85 Farnaz Fassihi and Hamed Aleaziz, "'It Feels Like I'm in a Nightmare': Inside the First Deportation Flight to Iran," *The New York Times,* Nov. 11, 2025.

86 Farnaz Fassihi and Hamed Aleaziz, "U.S. Deports Planeload of Iranians After Deal with Tehran, Officials Say," *The New York Times,* Sept. 30, 2025.

87 Jennifer Hansler, "Trump Admin Deports Iranians For First Time Since Brutal Crackdown on Protests," *CNN*, Jan. 26, 2026.

88 According to *The New York Times*, "the State Department approached Iran's interest section in Washington about three months ago about coordinating the deportation of Iranian migrants." *See* Farnaz Fassihi and Hamed Aleaziz, "U.S. Deports Planeload of Iranians After Deal with Tehran, Officials Say," *The New York Times,* Sept. 30, 2025.

# Circumventing U.S. Immigration Law

Since September 2025, the majority of migrants flown to third countries from the United States have had U.S. court-ordered protections, meaning the United States could not return them to their home country due to the likelihood they would be persecuted or tortured.[89]

> *These actions also appear to be part of a pattern and widespread effort to evade the government's legal obligations by doing indirectly what it cannot do directly."*
>
> – U.S. Federal District Judge Tanya S. Chutkan, U.S. District Court for the District of Columbia, *D.A. et al. v. Noem*, (Sept. 15, 2025).

Yet within days of arriving in third countries—specifically Ghana and Equatorial Guinea—many were sent back to their home countries. According to court filings, U.S. officials allegedly knew this was the plan when it came to Ghana.[90] A federal district judge said of these removals: "These actions also appear to be part of a pattern and widespread effort to evade the government's legal obligations by doing indirectly what it cannot do directly."[91]

According to court filings, U.S. officials told migrants headed to Ghana they would be sent onward to their home countries despite having protections.[92] One migrant with protective orders stated: "While at the fuel stop in the U.S. Virgin Islands, the apparent head ICE official on the plane . . . told me that those on the plane were being sent to Ghana and that Ghana would send us to our home countries."[93] Another migrant with protective orders said that when he told Ghanaian officials he wanted to stay in Ghana for his own safety, he was told that he would be sent to his home country "based on orders from ICE officials and his Ghanaian superiors."[94] Advocates say Ghanian authorities are not providing deportees an opportunity to seek protection in Ghana.[95] Instead, most individuals have been sent onward to their countries of origin where some are now in hiding.[96]

89 *See* Robbie Corey-Boulet and Emmanuel Bruce, "Ghana Took in Trump's Deported West Africans. Then It Forced Them Home," Reuters, Jan. 17, 2026; Human Rights First and Refugees International, *Banished by Bargain: Third Country Deportation Watch,* "Ghana," available at: https://www.thirdcountrydeportationwatch.org/ghana (last visited Feb. 9, 2026); Human Rights First and Refugees International, *Banished by Bargain: Third Country Deportation Watch,* "Equatorial Guinea," available at: https://www.thirdcountrydeportationwatch.org/equatorial-guinea, (last visited Feb. 9, 2026). Minority Committee staff communication with advocates, Nov. 2025 to Jan. 2026.

90 Plaintiffs' Emergency Motion for Interim Relief at 6, *D.A. et al. v. Noem et al.*, No. 1:25-cv-03135, Doc. 18 (D.D.C., Sept. 12, 2025).

91 Id. at 4.

92 Id. at 5, 6.

93 Id. at 12.

94 Id. at 8.

95 Committee Minority staff communication with advocates, Nov. 2025. *See also* Robbie Corey-Boulet and Emmanuel Bruce, "Ghana Took in Trump's Deported West Africans. Then It Forced Them Home," *Reuters*, Jan. 17, 2026

96 *See* Robbie Corey-Boulet and Emmanuel Bruce, "Ghana Took in Trump's Deported West Africans. Then It Forced Them Home," Reuters, Jan. 17, 2026; Tracee Wilkinds and Rick Yarborough, "Women Deported From Maryland Shown On Video Being Dragged in Ghana," *NBC News,* Nov. 24, 2025.

In public court filings, Trump Administration officials acknowledged that Ghana appeared to be violating its assurances against refoulement.[97] A State Department official later confirmed the U.S. Government had taken no corrective action.[98] The Trump Administration has continued to send third country nationals there, where Ghana has refouled many individuals.[99]

In Equatorial Guinea, Committee Minority staff understands from advocates that all twenty-nine third country nationals removed from the United States to Equatorial Guinea had U.S. court-ordered protections from being sent back to their home countries due to the likelihood they would be tortured or killed. However, upon arrival, deportees say they were discouraged by Equatorial Guinean officials from applying for asylum in the country and later were told they could not apply and would instead be sent to their home countries.[100] As of January 2026, at least eight individuals have been sent to their country of origin and virtually all have been told they will be sent back despite fear of return.[101] It appears the Trump Administration may have paid a highly corrupt foreign government $7.5 million to do what the United States could not legally do itself.

---

97 Mem. Op., *D.A. et al. v. Noem et al.*, No. 1:25-cv-03135 Doc. 41 at 3 (D.D.C. Sept. 15, 2025).

98 Mem. Op., *D.A. et al. v. Noem et al.,* No. 1:25-cv-03135-TSC Doc. 41 at 3 (D.D.C. Sept. 15, 2025); Pratt Declaration at 3.

99 Sarah Stillman, "Disappeared to a Foreign Prison," *The New Yorker,* Nov. 24, 2025.

100 Committee Minority staff communication with advocates and deportees, Dec. 2025 and Jan. 2026.

101 Sheriff Bojang Jr., "Equatorial Guinea Sends Eight of Trump's Nine Deportees Home, Braces For New Arrivals," *The Africa Report,* Jan. 16, 2026. Committee Minority staff communication with advocates and deportees, Jan. 2026.

# Conclusion

## The Trump Administration's use of third country deportations has been costly and ineffective, with no measurable impact toward its stated goals.

These deportation deals have transferred more than $32 million in taxpayer funds to foreign governments with credible histories of corruption, human rights abuses and mismanagement, without meaningful oversight or accountability. The Trump Administration's failure to monitor compliance with these agreements raises serious concerns that the United States may be indirectly facilitating torture, arbitrary detention or other human rights abuses. By bypassing standard U.S. immigration procedures and, in some cases, using third countries to circumvent U.S. laws, the Administration has wasted public resources while undermining basic principles of accountability and the rule of law.

Despite these factors, the State Department continues to pursue additional third country deportation agreements at an accelerated pace, with dozens of additional agreements expected in the coming months. As the Administration aggressively strips hundreds of thousands of migrants of legal status in the United States (through the ending of temporary protected status and humanitarian parole, among other avenues) more migrants will be at risk of being removed to a far-off country where they are not from. Without transparency, oversight or clear evidence of necessity and effectiveness, this approach amounts to an expensive and dangerous form of shadow diplomacy that prioritizes the appearance of toughness over the security of Americans, the responsible use of taxpayer funds and the integrity of U.S. foreign policy.

The Senate Foreign Relations Committee Democrats will continue to conduct rigorous oversight of these agreements, demand full transparency and accountability of the Administration and foreign governments and push for monitoring mechanisms on the use of funds and treatment of deportees. In the interim, the Trump Administration should cease its use of these third country deportation deals, which are putting millions of taxpayer dollars into the hands of foreign governments without oversight while turning a blind eye to the potential human cost.

ICE FLIGHTS

# Tracking All of Trump's Known Third-Country Removals

Trump's ICE has expelled an estimated 23,000 people to countries where they have no ties. Find out where they are going, what happens to them, and who profits.

**Gillian Brockell**
18 Jun 2026 — 32 min read

Share



A map of the world showing dozens of countries where third-country nationals have been forcefully expelled by the Trump administration. (MapChart)

This is a comprehensive list of all known third-country removals since President Trump's second term began on Jan. 20, 2025. Before then, third-country deportations were rare.

I am using the term "third-country removals" instead of "third-country deportations" here, because the latter is a legal process in which a migrant is resettled in a safe third country. What is actually happening, in nearly all cases, more closely resembles chain refoulement, rendition, or kidnapping – and may violate U.S. and international law. An estimated 23,000 people have been expelled from the US in this manner during Trump's second term so far, according to Refugees International and Human Rights First. Below I have included every known instance of US immigration authorities handing over migrants to a third country without the migrant's uncoerced consent.

When I first published this tracker in September 2025, it listed removal countries in reverse chronological order, but as more and more countries have joined these ranks, that system grew unwieldy. This update lists the countries alphabetically by region.

The Trump administration has reportedly signed third-country host agreements with a number of other countries, including Guyana and Palau; they are not listed here since removals to these countries are not known to have happened yet. Similarly, the attempted third-country removal to Libya on May 7, 2025, is not listed here since it was stopped by court order. I am also not including the 16+ flights deporting Venezuelans via Honduras between Feb. and Aug. 2025, because the migrants on these flights were not transferred to the custody of a third country. The flights landed at a US military base, where the migrants boarded Venezuelan planes for the last leg of their return to Venezuela.

Because the Trump administration rarely confirms third-country removals, information about them primarily comes from court filings, flight tracking, media reports, human rights groups, and information provided by host countries. It is probable that there are third-country removals not yet known to the public.

Subscribe Here

Send Me a One-Time Payment

Recently, RI/HRF have also started their own excellent website, Third-Country Deportation Watch. While much of the info on our sites overlap, there are some differences: Their site has more information on court challenges and the agreements between countries; mine has more information on the charter flights facilitating these removals. Their site includes countries that have signed agreements but have not yet taken any third-country nationals; mine includes only confirmed third-country removals. My site counts the transfers of Palestinians to Israel and stateless people to Bhutan as third-country removals; theirs does not.

If you notice any errors or missing information, or if you would like to share information about third-country removals, please email me at gbrockell at proton dot me or message me on Signal at gbrockell.44.

I believe these removals are legally and morally wrong, and I hope the information gathered here will someday be useful in bringing justice to the people who committed them and the people subjected to them.

*Last updated on Sept. 11, 2026 to update the entries for Cameroon, Costa Rica and Israel with new flight data.*

# AFRICA



Burundi, Cameroon, Central African Republic, Democratic Republic of Congo, Egypt, Equatorial Guinea, Eswatini, Ghana, Liberia, Rwanda, Sierra Leone, South Sudan, and Uganda. (MapChart)

## BURUNDI

**Date(s):** Aug. 27, 2026 (likely)

**Who:** Unknown.

**How:** Via a Boeing 767 (N703KW) operated by Eastern Airlines.

**Imprisoned?** Unknown.

**Deal:** Burundi made an agreement with the United States in April 2026 to begin accepting third-country nationals. A $129 million aid package agreed upon two months earlier may be related, according to RI/HRF.

**Now:** So far, little is known about how many people were transferred there and what conditions they face.

**More:** NYT: Trump Wants to Make Deportation Deals. Autocrats Are Ready to Listen.

## CAMEROON

**Date(s):** Jan. 15, 2026; Feb. 16, 2026; April 28, 2026; May 27, 2026; Aug. 6, 2026; Aug. 20, 2026; Sept. 11, 2026 (likely)

**Who:** Jan. 15: Nine men and women from Angola, Ghana, DRC, Morocco, and Zimbabwe, at least some of whom had withholding of removal orders, according to Refugees International/Human Rights First. Feb. 16: Eight people from the DRC, Ethiopia, Kenya, Senegal, and Sierra Leone. April 28: Eight or nine people, including three women from Ethiopia, one from Angola, two men and one woman from Ghana, and one man from Congo. Nearly all had protections against removal to their home countries due to persecution, including at least four LGBTQ people. Homosexuality is illegal in Cameroon. At least one man was put in a full-body straitjacket during the flight after expressing fear of being sent to Cameroon. May 27: Five men and two women from Ethiopia, two men from Zimbabwe, and one woman from from an unknown country. Aug. 6, and Aug. 20: Unknown.

**How:** Jan. 15: Via a Boeing 767 (N207AX) operated by Omni Air International. Feb. 16: Via a Boeing 767 (N225AX) operated by Omni. April 28: Via a Boeing 767 (N225AX) operated by Omni. May 27: Via a Boeing 767 (N703KW) operated by Eastern Airlines. Aug. 6: Via a Gulfstream V (N588TN) operated by Journey Aviation. Aug 20: Via a Boeing 767

(N700KW) operated by Eastern Airlines. On Sept. 11: Via a Gulfstream V (N120LW) operated by Talon Air.

**Imprisoned?** Yes. The first group told the New York Times they were being held at a government compound and pressured to return to their countries of origin. All subsequent groups have been sent to the same facility.

**Deal:** The US State Department withheld $30 million in aid until Cameroon agreed to a deal to take hundreds of third-country nationals, according to NYT. The US also did not criticize Cameroonian President Paul Biya's violent crackdown on protesters there while they were negotiating the deal.

**Now:** As of mid-February, two of the nine in the first group have returned to their countries of origin, including a queer woman who said her family threatened to kill her after she came out to them.

**More:** NYT: In Secret Deportation Deal, U.S. Leveraged Favors and Funds

NYT: US Deports Nine Migrants in Secret, Ignoring Legal Protections

DW: Donald Trump's Latest Visa Ban Hits African Countries Hard

## CENTRAL AFRICAN REPUBLIC

**Date(s):** June 12, 2026; July 30-31, 2026; Aug. 28, 2026

**Who:** June 12: Eighteen people from Afghanistan, Armenia, Cameroon, Egypt, Georgia, Iran, Iraq, Jordan, Kyrgyzstan, Tunisia, and Turkey, according to Human Rights Watch. Some or all were legal asylum-seekers without criminal records, including a women who fled persecution in Iran. July 30: Dozens of people from Afghanistan, Cuba, Ecuador, Honduras, Romania, Turkey, and Vietnam, according to multiple passengers on flight, including Aristides Fernandez Garcia, a Cuban national who spoke to Memo Torres at L.A. Taco. Plus, at least one man from Nepal, according to his attorney. On Aug. 28, up to 70 people, many of whom came from Afghanistan and Iran, including

Khalil, a 24-year-old relative of people who assisted the US military during the Global War on Terror, according to the New York Times.

**How:** On June 12, via a Boeing 767 (N207AX) operated by Omni Air International. July 30 and Aug 28: Via a Boeing 767 (N700KW) operated by Eastern Airlines.

**Imprisoned:** Yes, in a hotel.

**Deal:** Reuters reported on a deal between the Central African Republic and the Trump administration had been reached on May 18, but did not have any details of what CAR would receive in exchange for taking the migrants. CAR is one of the most impoverished countries on the planet and has endured years of civil unrest.

**Now:** The International Organization on Migration has said it will assist the new arrivals, as it has in other African countries that have taken third-c0untry nationals, with limited success. Fernandez Garcia told L.A. Taco he'd been given a 90-day visa but had no idea what he was going to do after it expired.

**More:** NYT: Relative of Afghans Who Helped U.S. Military Is Deported to Africa

L.A. Taco: Cuban Asylum Seeker Deported to Africa Without ID, Money or Cell Phone

NYT: Women who fled Iran are to be deported to Central African Republic, lawyers say

## DEMOCRATIC REPUBLIC OF CONGO

**Date(s):** April 17, 2026

**Who:** Fifteen men and women from Colombia, Peru, and Ecuador, at least some of whom were legal asylum-seekers, including Adriana Quirones Zapata, a Colombian woman with diabetes and other complex medical issues who had been tortured by Colombian national police.

**How:** Via a Boeing 767 (N207AX) operated by Omni Air International.

**Imprisoned:** They are being detained at a hotel near the airport, which they are technically free to leave but are encouraged not to, because it is not safe, according to NPR.

**Deal:** Details of the deal have not been made public, but a Congolese communications minister said the US will be paying all of their expenses.

**Now:** After DRC said it could not handle Zapata's medical issues, a US judge ordered her return. US authorities claimed they can't bring her back because of the ongoing Ebola outbreak there, and the judge has reversed his earlier decision.

**More:** The Guardian: White House pauses removal of detainees to the DRC as Ebola outbreak widens

NPR: 'We don't know what will happen to us': US deportees in limbo in DRC

Al Jazeera: South American migrants deported to DRC facing pressure to return home

Associated Press: About 15 Latin American people deported to Congo by the US

## EGYPT

**Date(s):** June 12, 2025; Aug. 26, 2025; Dec. 7, 2025; Jan. 25, 2026. Likely also Dec. 6, 2025, Feb. 11, 2026, and March 29, 2026.

**Who:** The confirmed flights all held Russian migrants, including dissidents and asylum-seekers. The Aug. 26 flight included dissident Artem Vovchenko. There is no information available about the migrants on the ICE flights on Dec. 6 or Feb. 11, but they were likely also third-country nationals.

**How:** On June 12, via a Boeing 767 (N486AX) operated by Omni. On Aug. 26, from the US to Egypt via a Boeing 777 (N846AX) operated by Omni; from Egypt to Russia likely via a Boeing 737 (SU-GED) operated by Egyptair. On Dec. 7, from the US to Egypt via a Boeing 767 (N207AX) operated by Omni; from Egypt to Russia via an Airbus A330 (SU-GDV)

operated by Egyptair. Jan. 25, from the US to Egypt via a Boeing 767 (N351AX) operated by Omni; from Egypt to Russia via an A330 (SU-GDT) operated by Egyptair. On Dec. 6 and Feb. 11, via Gulfstream V jets (N588AT and N588TN) operated by Journey Aviation. On March 29, from US to Egypt via a Boeing 787 (SU-GET) operated by Egyptair, from Egypt to Russia via a Boeing 737 (SU-GCZ) operated by Egyptair.

**Imprisoned?** Yes, for several hours by Egyptian authorities, who then physically forced them onto the plane to Russia.

**Deal:** Unknown.

**Now:** Upon arrival in Russia, at least two people, including Vovchenko, were taken into custody, according to witnesses, and are now missing.

**More:** TPM: Trump Admin Returns Russian Dissidents to Putin

NYT: He Fled Putin's War. The US Deported Him to a Russian Jail.

## EQUATORIAL GUINEA

**Date(s):** Nov. 24, 2025; Jan. 22, 2026; April 29, 2026; June 18, 2026; July 29-30, 2026; Aug. 20, 2026

**Who:** On Nov. 24, nine men from Angola, Ghana, Eritrea, Georgia and a Mauritanian named Diadie Camara. All had protection from removal to their home countries and no criminal convictions, according to a human-rights attorney with knowledge of the flight. On Jan. 22, 20 migrants from Eritrea, Ethiopia, Nigeria and other African countries. The Jan. 22 flight also included one Equatoguinean. On April 29, two Cameroonian women and one Egyptian man, Ahmed Soliman. On June 18, eight people, including two women from Jamaica, Natalie Holmes and Peta-Gaye Chambers, and citizens of the Democratic Republic of the Congo, Eritrea, Ethiopia, Senegal, Uganda and possibly one other country. On July 29: Approximately 10 people, according to AFP. On Aug. 20: Thirteen people, including three people from Cuba, and one each from Brazil and Cameroon.

**How:** On Nov. 24, via a Gulfstream V (N996GA) operated by Journey Aviation. On Jan. 22, via a Boeing 767 (N351AX) operated by Omni Air International. On April 29, via a Boeing 767 (N225AX) operated by Omni. On June 17, via a Boeing 767 (N207AX) operated by Omni. On July 30, via two Gulfstream Vs (N588AT and N588TN) operated by Journey. On Aug. 20, via a Boeing 767 (N703KW) operated by Eastern Airlines.

**Imprisoned?** Yes. They are held at Hotel Bamy in Malabo under armed guard and in unsanitary conditions and are pressured to return to their countries of origin. Migrants held there have contracted malaria and typhoid, according to their attorneys. On the night of July 31, Soliman, Holmes, and Chambers say they and two others were cuffed, beaten, and threatened at gunpoint by armed guards.

**Deal:** In early November, the AP reported a $7.5 million payment to Equatorial Guinea from State Department funds allotted for humanitarian crises. Sen. Jeanne Shaheen (D-N.H.) has questioned the legality of the payment.

**Now:** The migrants are pressured and/or forced by the Equatoguinean government to return to their countries of origin, including Camara, the Mauritanian man, was refouled through Morocco; he fears being returned to the chattel slavery system he escaped and is now in hiding, according to RI/HRF. In June 2026, an international consortium of attorneys sued Equatorial Guinea before the African Commission on Human and Peoples' Rights on behalf of 14 of the 40 migrants expelled there, including Camara.

**More:** Arizona Daily Star: U.S. Deportees Assaulted, Threatened in Equatorial Guinea

Arizona Daily Star: Arizona Man Languishes in African Hotel After Third-Country Deportation

Global Strategic Litigation Council: Lawsuit asks African Union human rights commission to stop Equatorial Guinea from forcibly returning refugees expelled from the US

The Guardian: US has sent $7.5m to Equatorial Guinea to accept noncitizen deportees

## ESWATINI

**Date(s):** July 15-16, 2025; Oct. 4-6, 2025; March 11-12, 2026; July 7-8, 2026; Aug. 27, 2026

**Who:** In July 2025, five men including Roberto Mosquera del Paral of Cuba, Orville Etoria of Jamaica, and three men from Laos, Vietnam and Yemen. All had completed prison sentences in the US, sometimes many years ago. DHS claimed their countries had refused to take them back, but attorneys for the men, and at least one of the countries, deny this. In October, a second group of 10 migrants including a Cambodian national named Pheap Rom, plus men from Chad, Congo, Cuba, Ethiopia, Haiti, the Philippines and Vietnam. In March, four people – one each from Tanzania and Sudan, plus two from Somalia. In July 2026, 11 people of from "mostly African countries," according to the Eswatini government, including Mauritania. In Aug. 2026, two people from Latin American countries.

**How:** In July 2025, from the US to Djibouti via a Gulfstream V (N588AT) operated by Journey Aviation. From Djibouti to Eswatini via an Air Force C-17 Globemaster (02-1107) flying with its transponder signal turned off. In Oct. 2025, via a Gulfstream IV (N352BH) operated by Journey Aviation. In March 2026, via a Gulfstream V (N59JE) operated by Talon Air. In July 2026, two Gulfstream Vs (N588AT and N588TN) operated by Journey. In Aug. 2026, via a Boeing 767 (N703KW) operated by Eastern Airlines.

**Imprisoned?** Yes, in a maximum-security prison used for political prisoners, who have previously reported beatings and denial of food. For the first few months, migrants were also subjected to solitary confinement until Mosquera held a 30-day hunger strike.

**Deal:** Eswatini received $5.1 million from the US to take up to 160 people, according to the Senate Foreign Relations Committee.

**Now:** Etoria was repatriated to Jamaica in September. Cambodian national Pheap Rom was repatriated on March 24, 2026. Three people were repatriated in Aug. 2026 – a man from Mauritania, a man from the Democratic Republic of Congo, and a man from Somalia. In April, Eswatini's highest court ruled the migrants were entitled to visits

from their local lawyer. An international consortium of attorneys are also suing Eswatini in the African Commission on Human and Peoples' Rights.

**More:** ICE's Eswatini flight went through US base in Djibouti; Americans stationed there are angry

Mother Jones: ICE Is Sending People to a Prison in Africa's Only Absolute Monarchy

NYT: U.S. Deportee Sent to Africa Is Repatriated by Jamaica

## GHANA

**Date(s):** Sept. 5-6, 2025; Sept. 10-11, 2025; Oct. 12-13, 2025, Nov. 6, 2025; May 27, 2026; June 9, 2026; July 31, 2026. There have have been more than a dozen additional ICE flights to Ghana in 2026 where the expulsion of third-country nationals has been neither confirmed nor ruled out.

**Who:** On Sept. 5, 14 men from Nigeria and the Gambia with credible fear orders preventing deportation to their countries of origin. A DHS official told me "some" had criminal records, but this cannot be independently verified. In a court filing, one man said he was "straitjacketed for several hours" during the trip after asking to speak to his attorneys. On Sept. 10, a second group of 14 migrants from Nigeria, Liberia, Togo and perhaps Mali, who also appear to have been asylum-seekers. At least two said they were green card holders who had completed prison sentences for fraud. On Oct. 12, a third group of 14 West Africans of unknown immigration statuses. On Nov. 6, 19 West Africans, including Rabbiatu Kuyateh, a 58-year-old grandmother from Sierra Leone who had been in the U.S. for more than 30 years, and M.M., a gay Gambian national, both of whom had withholding of removal orders because of persecution they faced in their countries of origin. On May 27: Unknown. On June 9: Seven people from Guinea, Liberia, Nigeria, and Sierra Leone, according to HRF. On July 31, about 30 people from West African countries, according to Mohamed Bayo, a Guinean passenger on the flight. Aug. 19: Unknown.

**How:** On Sept. 5 via a US Air Force C-17 Globemaster (03-3127) flying with its ADS-B signal turned off. On Sept. 10, Oct. 12, Nov. 5 via Boeing 767s (N486AX, N207AX and

N225AX) operated by Omni Air International. On May 27, via a Boeing 767 (N703KW) operated by Eastern Airlines. On June 9, via a Gulfstream V (N59JE) operated by Talon Air. On July 31, via a Boeing 767 (N700KW) operated by Eastern. On Aug. 19, via a Gulfstream V (N59JE) operated by Talon Air.

**Imprisoned?** The first group was imprisoned in an open-air military camp for several weeks. Subsequent groups were imprisoned at hotels and boardinghouses near the airport.

**Deal:** The Trump administration agreed to lift visa restrictions on Ghanaians, consider extending a trade deal and reevaluate its 15 percent tariff on Ghana.

**Now:** In most cases, the migrants are held for several hours or several days before being forced back to their countries of origin, despite nearly all having won court protections from chain refoulement. A smaller number have been forced across the border into Togo without any identification, rendering them effectively stateless. Kuyateh was beaten by Ghanaian soldiers while being forced back to Sierra Leone, where she escaped again and is now in hiding in a neighboring country. A coalition of human-rights groups, led by Ghanaian human-rights attorney Oliver Barker-Vormawor, have challenged the agreement in Ghana's Supreme Court and the regional ECOWAS Court of Justice.

**More:** The American Prospect: 'What America Did to Me Is Wrong': Inside One of the Largest Third-Country Removal Flights So Far

Rolling Stone: ICE Is Deporting People to Africa on Nearly Un-Trackable Military Flights

AP: Ghana says African immigrants deported by the US have returned home

ENCA: West Africans deported by US to Ghana dumped in Togo without papers

Ghana Web: 'React in two weeks' - Supreme Court orders AG in suit over US deportation to Ghana

## LIBERIA

**Date(s):** Aug. 19-20, 2026

**Who:** Fifteen people from Africa and Western Hemisphere countries, according to a statement from the Liberian government. Five migrants who refused to get off the plane were then flown to Equatorial Guinea, where they were forced off the plane, according to Reuters.

**How:** Via a Boeing 767 (N700KW) operated by Eastern Airlines.

**Imprisoned?** Unclear. Liberia says it will “shelter” the migrants but does not say if they will have freedom of movement.

**Deal:** In a statement, Liberia insisted there was no “quid pro quo” and that it did not ask for or received payment for taking the migrants. It did, however, say it would “receive support to help manage the program and strengthen its migration system more broadly.” It is unclear what exactly that means.

**Now:** Liberia said the migrants would be “received as guests” and have the chance to apply for asylum in Liberia.

**More:** The American Prospect: Liberia Joins Trump's 'Third-Country Deportation Network

## RWANDA

**Date(s):** April 3-4, 2025; Aug. 15-18, 2025; Aug. 20, 2026; Aug. 27, 2026

**Who:** Iraqi national Omar Ameen and seven unidentified migrants. Ameen came to the US with his family as a refugee and was later accused of a murder in Iraq. Though a US judge ruled Ameen could not have committed the murder and could not be deported to Iraq, the Biden administration continued with Ameen’s third-country deportation

process up until Trump took over in January. Aug 16, 2025: Seven people of unknown nationalities. Aug. 20 and Aug. 27, 2026: Unknown.

**How:** In April likely via a Gulfstream V (N176SM) operated by Aircraft Transport Service and an additional unknown aircraft. On Aug. 15-16, 2025, via two Gulfstream Vs (N588AT and N996GA) operated by Journey Aviation. On Aug. 20, 2026, via a Gulfstream V (N62FF) operated by Journey. On Aug. 27, via a Boeing 767 (N703KW) operated by Eastern Airlines.

**Imprisoned?** Unknown.

**Deal:** Rwanda $7.5 million from the US, according to the Senate Foreign Relations Committee.

**Now:** Ameen had many media contacts but has not been heard from publicly since his removal, suggesting he has been imprisoned. Of the second group, Rwanda told AP three wanted to return to their countries of origin, and four wanted to settle in Rwanda, but provided no information on whether they are being detained or have freedom of movement.

**More:** The Handbasket: US “relocates” Iraqi refugee to Rwanda via new diplomatic arrangement

AP: Rwanda says 7 deportees arrived from the US in August under agreement with Washington

## SIERRA LEONE

**Date(s):** May 19-20, 2026; June 18, 2026; July 30-31, 2026; Aug. 28, 2026

**Who:** While 25 West African nationals were expected on May 19, only nine arrived, according to the BBC – two women and seven men; five from Ghana, two from Guinea and one each from Nigeria and Senegal. They appeared to be “forlorn,” BBC said, and one had to be physically forced from the plane. On June 18, 12 West African nationals,

according to the Associated Press. On July 31: Approximately 10 people, per AFP. On Aug. 28: Unknown.

**How:** On May 19, via a Boeing 767 (N225AX) operated by Omni. On June 18, via a Boeing 767 (N207AX) operated by Omni. On July 30 and Aug. 28, via a Boeing 767 (N700KW) operated by Eastern Airlines.

**Imprisoned:** Unknown.

**Deal:** Sierra Leone has agreed to take 25 West Africans per month, with a maximum of 300 per year. The US is paying $1.5 million "cover the humanitarian and operational costs linked to this agreement," according to a document viewed by AFP.

**Now:** A local contractor told BBC they would house the migrants for two weeks before they were sent to their countries of origin. The migrants will be allowed to stay in Sierra Leone for 90 days, Foreign Minister Timothy Musa Kabba told AFP, and "can then return to their country of origin." He did not say if they will be forced to return.

**More:** BBC: Sierra Leone becomes latest African country to receive deportees from US

AFP: Plane with first migrants expelled from US lands in Sierra Leone

Reuters: Sierra Leone to take in hundreds of West Africans deported by US, minister says

## SOUTH SUDAN

**Date(s):** May 20 & July 4, 2025

**Who:** Seven men originally from Cuba (2), Laos, Mexico, Myanmar (2), and Vietnam. (An eighth man removed with this group is from South Sudan.) DHS said the men had been convicted of serious crimes in the US, had completed their sentences, and that their countries of origin had refused to accept their return. Several of the countries of origin disputed that claim. The men were held in a shipping container at a US base in Djibouti for seven weeks while their court case was heard.

**How:** US to Djibouti via a Gulfstream V (N588AT) operated by Journey Aviation. Djibouti to South Sudan via an unidentified US military KC-135 flying with no transponder signal.

**Imprisoned?** Yes. They are being held a government property in Juba. Read more about their imprisonment in Djibouti here.

**Deal:** The South Sudanese government asked the Trump administration for a number of concessions, though as of late July, none had been approved. In November, the US ended temporary protected status for South Sudanese citizens.

**Now:** The Supreme Court granted the Trump administration broad powers to expel migrants in early July, and the men were delivered to South Sudan soon afterward. Mexican national Jesus Munoz-Gutierrez was repatriated in September 2025. The South Sudanese man was released around the same time. Vietnamese national Thanh Tuan Phan was released and repatriated in June 2026.

**More:** It Could Happen Here podcast: Rendition by Private Jet

The Intercept: Trump Administration Expels Eight Men to War-Torn South Sudan

Al Jazeera: Mexico accepts return of man deported to South Sudan from US

Eye Radio: 'Joyful to return home': Vietnamese US deportee returns home after a year in South Sudan

## UGANDA

**Date(s):** April 2, 2026

**Who:** Twelve migrants of unknown nationalities, according to Reuters; eight migrants of African nationalities, according to a Uganda government statement. The reason for the discrepancy is unclear.

**How:** Via a Gulfstream V (N62FF) operated by Journey Aviation.

**Imprisoned:** Unknown.

**Deal:** The US and Uganda signed an agreement last July, with Uganda agreeing to accept migrants who do not have criminal records and with a preference for African migrants. It is unclear what Uganda is receiving in return.

**Now:** The Uganda Law Society told Reuters the migrants had been subjected to an "undignified, harrowing, and dehumanizing process," and it planned to challenge the legality of their removal in court.

**More:** Reuters: Twelve deportees from US arrive in Uganda, Law Society says

## THE AMERICAS



Belize, Costa Rica, Dominica, Ecuador, El Salvador, Guatemala, Guyana, Honduras, Mexico, Nicaragua, Panama, Paraguay, Saint Kitts and Nevis, Saint Lucia. (MapChart)

## BELIZE

**Dates(s):** July 10, 2026; July 30, 2026.

**Who:** On July 10, one Haitian national, and on July 30, four Haitian nationals and one person each from El Salvador, Honduras and Nicaragua, according to local media.

**How:** On July 10, via an Airbus A320 (N281GX) operated by GlobalX. On July 30, via an Airbus A321 (N570TA) operated by GlobalX.

**Imprisoned?** Unclear but unlikely.

**Deal:** Under the agreement signed last year, Belize agreed to take a maximum of 10 people per year from the Caribbean or Central America, excluding Guatemalans. It is unclear what Belize is getting in exchange; lawmakers there have suggested the Trump administration's threats to cut a development grant was connected to negotiations for the deal.

**Now:** Under the terms of the deal, the migrants should be able to apply for asylum in Belize, and officials in Belize told local media the first arrival will permanently resettle there.

**More:** Greater Belize: Belize Welcomes First Asylum Seeker Under US Deal

## COSTA RICA

**Date(s):** Feb. 20, 2025; April 11, 2026; April 17, 2026; April 24, 2026; May 15, 2026; May 21, 2026; May 28, 2026; June 4, 2026; June 11, 2026; June 18, 2026; June 25, 2026; July 2, 2026; July 9, 2026; July 16, 2026; July 23, 2026; July 30, 2026; Aug. 6, 2026; Aug. 13, 2026; Aug. 20, 2026; Aug. 28, 2026; Sept. 3, 2026; Sept. 10, 2026.

**Who:** Feb. 20: Approximately 200 migrants, including 81 children with their families, mostly from Central Asia. Many said they had entered the US from Mexico to legally seek asylum, had been detained, and were prevented from filing their claims before their removal. April 11: Twenty-five migrants – one from Albania, two men and two women from Cameroon, two men from China, five men and three women from Guatemala, two men and two women from Honduras, three men from India, one woman from Kenya, and two men from Morocco, according to El Observador. April 17: 22 people from Brazil (8), Romania (3), Uzbekistan (3), China (2), and one each from Belarus, India, Ireland, and Vietnam. The Irish man was described as "elderly." April 24: 25 people from Guatemala (5), Brazil (4), Honduras (5), China (3), India (3), and one each from Russia, Uzbekistan, Turkey, Bolivia and Romania, according to El Observador. May 15: Twelve people from Bolivia (2), Chile (1), China (6), France (1) and Madagascar (2), according to El Observador. May 21: Fifteen people from Colombia (6), China (3), Brazil (2), Uzbekistan (2), Senegal (1), and Kyrgystan (1), according to Teletica. May 28: 25 people – 18 men and seven women – from Colombia (9), Brazil (8), China (2), Senegal (2), and one each from Albania, Argentina, Mauritania, and Nepal, according to La Nación. June 4: 25 people – 13 men and 12 women – from Colombia (11), Brazil (5), Vietnam (4), Bolivia (2), China (2), and Azerbaijan (1). Since June 11: Unknown – local media appears to have stopped reporting on the weekly arrivals.

**How:** Feb. 20: Via an Airbus A320 (N630VA) operated by GlobalX. April 11: Via an Airbus A320 (N278GX) operated by GlobalX. April 17: Via an Airbus A321 (N570TA) operated by GlobalX. April 24: Via an Airbus A320 (N276GX) operated by GlobalX. May 15: Via an Airbus A321 (N570TA) operated by GlobalX. May 21: Via a Boeing 737 (N624XA) operated by Eastern Airlines. May 28: Via an Airbus A320 (N837VA) operated by GlobalX. June 4: Via Airbus A321 (N530FL) operated by GlobalX. June 11, 18, and 25: Via an Airbus A321 (N966AD) operated by GlobalX. July 2: Via an Airbus A320 (N642VA) operated by GlobalX. July 9: Via an Airbus A320 (N642VA) operated by GlobalX. July 16: Via an Airbus A320 (N281GX) operated by GlobalX. July 23: Via an Airbus A320 (N630VA) operated by GlobalX. July 30, Aug. 6, Aug. 13, and Aug. 20: Via an Airbus A321 (N530FL) operated by GlobalX. Aug. 28: Via an Airbus A321 (N570TA) operated by GlobalX. Sept. 3: Via an Airbus A320 (N281GX) operated by GlobalX. Sept. 10: Via an Airbus A319 (N316NV) operated by GlobalX.

**Imprisoned?** Feb. 20, 2025: Yes, in a former pencil factory, but released after a lawsuit. April 2026 onward: Expected to be accommodated in a hotel for one week, it is unclear if they will have freedom of movement.

**Deal:** The Trump administration agreed to pay for the migrants' housing, care, and repatriation.

**Now:** Feb. 20, 2025: Local attorneys say about 90 have returned to their countries of origin, at least two dozen are seeking asylum in Costa Rica, and six escaped and cannot be located. April 2026 onward: All of the migrants will have the opportunity to apply for humanitarian visas to resettle in Costa Rica or to be transported to their countries of origin if they so choose, according to Costa Rican officials. Costa Rica is expected to continue to take 25 third-country nationals per week under a new deal.

**More:** AP: Costa Rica takes in second group of migrants deported from the US

NYT: Costa Rica Tells Trump Deportees They Can Stay and Integrate, or Leave

Reuters: US plans to fund deportations from Costa Rica, document shows

## DOMINICA

**Date(s):** July 22, 2026

**Who:** Unknown.

**How:** Via a Bombardier CRJ-200 (N459AW) operated by Air Wisconsin.

**Imprisoned?** Unclear.

**Deal:** In March, Dominica's prime minister said under the deal, the Trump administration had agreed to pay expenses for logistics, accommodation and support services for a maximum of 28 third-country nationals per year.

**Now:** Unknown.

**More:** Miami Herald: Antigua, Dominica Cave to Washington's Third Country Demand

## ECUADOR

**Date(s):** Monthly since January 2026, including June 1, 2026

**Who:** An unknown number of migrants from Latin American and Caribbean countries, mostly Cuba and Venezuela, including Cuban national Rogelio Bolufé on June 1, one of the organizers of the hunger strike at Delaney Hall in New Jersey, acc0rding to The American Prospect.

**How:** ICE flights operated by GlobalX, Eastern Airlines, and Omni Air International regularly land in Ecuador. It is unclear so far which ones have carried third-country nationals. On June 1, via a Boeing 767 (N703KW) operated by Eastern Airlines.

**Imprisoned:** Unclear.

**Deal:** The program is part of a larger negotiations between Ecuador and the US, including a $20 million security assistance pledge, relief from tariffs, the deployment of the US Air Force for a joint military operation allegedly targeting drug traffickers.

**Now:** More than 4,700 asylum-seekers have been designated for removal to Ecuador, according to Third Country Deportation Watch.

**More:** Feds Deport ICE Detainee Organizer to Ecuador

CNN: US working with Ecuador on agreement to send asylum seekers to the country

## EL SALVADOR

**Date(s):** March 15-16, 2025; March 31, 2025

**Who:** 252 Venezuelans falsely claimed to be gang members and declared “alien enemies,” along with about 30 Salvadoran deportees, including Kilmar Abrego Garcia, who was deported by mistake. All of the flights appear to have violated a court order. Most of the migrants had entered the US legally; only six had been convicted of violent crimes.

**How:** On March 15-16, via three Airbus A320s (N278GX, N837VA, N630VA) operated by GlobalX. On March 31, via an unknown military aircraft.

**Imprisoned?** Yes, in the notorious Terrorism Confinement Center, or CECOT, where they were frog-marched and had their heads shaved for a perverse propaganda video.

**Deal:** The Salvadoran government received $4.76 million from the US, according to the Senate Foreign Relations Committee.

**Now:** The Venezuelans were freed and repatriated in a US prisoner exchange after four months and have begun telling their stories of the horrific conditions, beatings and sexual assaults they endured at CECOT. Abrego was sent back to the US, where he was detained on specious charges and is now being threatened with third-country removal to Uganda.

**More:** ProPublica: Who Are the Venezuelan Immigrants Trump Sent to CECOT?

The Bulwark: How a Makeup Artist Survived the World’s Worst Prison

AP: US seeks to deport Kilmar Abrego Garcia to Uganda, court filing shows

## GUATEMALA

**Date(s):** Oct. 10, 2025; ongoing

**Who:** Three Honduran nationals put on a flight with Guatemalan deportees, according to the Guatemalan government. It is unclear if any had court orders prohibiting their deportation to Honduras. There were two ICE flights to Honduras the same day.

**How:** Because there were three ICE flights to Guatemala that day, it is unclear which one held the Honduran nationals – a Boeing 737 (N803XT) operated by Avelo Airlines, the Airbus A321 (N966AD) or the Airbus A320 (N628VA) operated by GlobalX.

**Imprisoned?** Unlikely.

**Deal:** The US agreed to pay for the third-country nationals' return to their countries of origin.

**Now:** The Guatemalan government said they were transported to the border with Honduras and repatriated. More third-country nationals are expected.

**More:** Al Jazeera: First US flight with third-country deportees arrives in Guatemala

## GUYANA

**Date(s):** Sept. 4, 2026

**Who:** Four Cuban nationals and and two Afghan nationals between the ages of 20 and 36, according to the Guyana Times.

**How:** Via an Airbus A321 (N277GX) operated by GlobalX.

**Imprisoned?** Unknown.

**Deal:** The Guyana government said it was receiving "a limited, vetted number of skilled and non-criminal individuals through the International Organization for Migration (IOM) Assisted Voluntary Return Programme" – notable given that the migrants were involuntarily removed – and that the US and IOM would pay for their care. It was noncommital about if the migrants would be offered resettlement, or where they would go if they weren't.

**Now:** Unknown.

**More:** Guyana Times: 4 Cubans, 2 Afghans arrive after Guyana agrees to temporary accept “skilled”, “non-criminal” deportees from US

## HONDURAS

**Date(s):** Ongoing since June 2025, including June 4, 2026 and June 11, 2026

**Who:** An unknown number of migrants from other Central American countries.

**How:** Via flights also carrying deported Hondurans, mostly operated by GlobalX and Eastern Air Express. On June 4, via a C-17 (08-8196) operated by the US military. On June 11, via a C-130 (04-3143) operated by the US military.

**Imprisoned?** No.

**Deal:** Unknown

**Now:** DHS described a June agreement as a “safe third-country” agreement, where Central Americans can apply for asylum. Honduras has one of the highest crime rates in the world and is not safe for Hondurans, let alone vulnerable asylum-seekers.

**More:** AP: US says Guatemala and Honduras agree to take asylum-seekers

## MEXICO

**Date(s):** Ongoing since Jan. 20, 2025

**Who:** At least 16,000 people from Cuba, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, and Venezuela, according to Refugees International and Human Rights First.

**How:** Mostly by bus over the US-Mexico border and into southern Mexico.

**Imprisoned?** No.

**Deal:** There is no extant agreement. A version of this started under President Biden under limited circumstances. ICE appears to be manipulating and obfuscating detained migrants' circumstances to shoehorn them into these removals.

**Now:** Once in Mexico, third-country nationals who want to continue to their countries of origin are offered transportation to Mexico's southern border. Many plead asylum in Mexico, but the system is currently overwhelmed by the number of new applications. Local aid groups are struggling to care for the ones who remain.

**More:** Refugees International: Protection, Not Concession: Mexico's Responsibility to Third-Country Nationals Deported by the United States

## NICARAGUA

**Date(s):** March 20, 2025; May 9, 2025; other undetermined dates between January 2025 and June 2026

**Who:** 116 nationals from 16 countries, according to data from the Deportation Data Project analyzed by Confidencial Nicaragua. The countries of origin are: Honduras (22 people), Cuba (19), Ecuador (17), Guatemala (11), Colombia (11), Peru (7), Venezuela (6), El Salvador (6), Nigeria (5), and one or two each from Bangladesh, Costa Rica, Dominican Republic, India, Iran, and Mexico. Note: Because of numerous data-entry errors by US immigration officials, some of these records may not be accurate.

**How:** March 2025: Via an Airbus A320 (N276GX) operated by GlobalX. May 2025: Via an unknown flight. There are currently two weekly ICE removal flights to Nicaragua, but there is little information on which hold third-country nationals and which hold only Nicaraguan deportees.

**Imprisoned?** Unknown. Nicaraguan deportees have been subjected to "intensive surveillance" by the Ortega-Murillo regime, according to Confidencial, but there is little information on what happens to third-country nationals.

**Deal:** Nicaragua does not appear to have signed an agreement with the Trump administration but is taking the third-country nationals on an ad-hoc basis.

**Now:** Unknown

**More:** Confidencial Nicaragua: Nicaragua Receives More Than 100 Foreign Nationals Deported from the United States

## PANAMA

**Date(s):** Feb. 12-15, 2025

**Who:** Feb. 12-15: Approximately 300 people, including many families, mostly from Central and East Asian countries. Many said they had entered the US from Mexico to legally seek asylum, had been detained, and were prevented from filing their claims before their removal. This includes Iranian Christian families and at least one Afghan man who said he helped the US military during the war in Afghanistan.

**How:** Via US Air Force C-17 Globemasters (09-9210, 08-8200 twice)

**Imprisoned?** Yes, in a hotel and then a detention camp. Released after a lawsuit.

**Deal:** Unknown.

**Now:** Local attorneys say about 170 have returned to their home countries; the rest were freed from detention after a lawsuit. As of May, NYT reported about 50 remained in legal limbo and were living in a gymnasium shelter or hotel rooms provided by UNICEF.

**More:** Human Rights Watch: 'Nobody Cared, Nobody Listened'

NYT: Migrants Deported to Panama Ask: 'Where Am I Going to Go?'

NYT: U.S. Bill Named for Artemis Ghasemzadeh Aims to Shield Asylum Seekers

## PARAGUAY

**Date(s):** April 22-23, 2026; May 20, 2026; June 19, 2026; July 23, 2026; Aug. 20, 2026.

**Who:** April 22: 16 migrants from Bolivia, Colombia, the Dominican Republic, Ecuador, El Salvador, and Spain, according to RI/HRF. May 21: 10 migrants from Bolivia, Chile, and the Dominican Republic, according to ABC Paraguay. June 19: 12 migrants from Ecuador, Honduras, and Peru, according to the Paraguay government. July 23 and Aug. 20: Unknown.

**How:** April 22: Via an Airbus A320 (N278GX) operated by GlobalX. May 21: Via a Boeing 767 (N705KW) operated by Eastern Airlines. June 19: Via a Boeing 767 (N700KW) operated by Eastern. July 23: Via a Boeing 767 (N700KW) operated by Eastern. Aug. 20: Via a Boeing 767 (N771KW) operated by Eastern.

**Imprisoned:** Local media said they were "under the care of the International Organization on Migration" and would stay for several days at a hotel at US expense, but it is unclear if they had freedom of movement.

**Deal:** Paraguay and the State Department signed an agreement in August, made public in December. It is unknown if Paraguay is receiving payment, but Secretary of State Marco Rubio indicated it was at least getting economic concessions and military assistance.

**Now:** Under the terms of the agreement, all of the migrants should be eligible to apply for protection from removal from Paraguay. However, as of late June, none had successfully been granted asylum, according to RI/HRF. All have been returned to their countries of origin within days.

**More:** Reuters: Paraguay receives 16 third-country migrants deported from the US

## SAINT KITTS AND NEVIS

**Date(s):** May 19, 2026

**Who:** Three people from Jamaica and Belize, according to local media.

**How:** Via an Airbus A320 (N628VA) operated by GlobalX.

**Imprisoned:** No.

**Deal:** SKN has agreed to take any Caribbeans except Haitians and without a serious criminal record, according to an announcement in January. Third Country Deportation Watch notes the deal was signed at a time when the US was acting aggressively in the Caribbean, invading Venezuela and continuing to attack fishing boats.

**Now:** The migrants will be able to return to their countries of origin if they wish to but will not be forced to do so, according to a statement from the SKN government.

**More:** SKN News: St Kitts and Nevis Receives 3 CARICOM Nationals from USA Under Migration Agreement

## SAINT LUCIA

**Date(s):** Aug. 31, 2026

**Who:** Five men and one woman of unknown nationalities.

**How:** Via a Bombardier CRJ-200 (N413AW) operated by Air Wisconsin.

**Imprisoned?** Unknown.

**Deal:** The US and St. Lucia signed a memorandum of understanding in Jan. 2026, which St. Lucia's legislative body approved in Aug. 2026. Compensation has not been estimated but will be included, according to External Affairs Minister Alva Baptiste.

**Now:** Unknown. Baptiste said IOM would assist migrants with return to their countries of origin, and that staying in St. Lucia long term may be possible for some migrants.

**More:** HTS News4orce: Saint Lucia Receives First 6 Third-Country Nationals Transferred from the United States

## ASIA



Bhutan, Israel, Kuwait, Qatar, and Uzbekistan. (MapChart)

### BHUTAN

**Date(s):** Between March and July 2025, exact dates unclear

**Who:** At least 27 stateless refugees stripped of citizenship by Bhutan in the 1990s due to their ethnicity who legally resettled in the US. All who were recently detained and

removed appear to have had criminal records, ranging from traffic violations to juvenile offenses and assault, and had completed their sentences years ago. Because they are stateless and were re-expelled, I am including their removals to Bhutan as third-country removals.

**How:** Unclear. Because of the lack of details, I have not been able to identify the flights used for these removals. It is possible they were removed via commercial flights. Soon after their arrivals, all appear to have been taken by Bhutanese authorities to the Indian or Nepali borders and expelled again.

**Imprisoned?** Yes, briefly, in Bhutan. At least four were also detained in Nepal for illegal entry.

**Deal:** Unknown

**Now:** Some have returned to the same refugee camps in Nepal they left decades ago. Some are in hiding in India or Nepal, others are missing, according to family members in the US.

**More:** DW: Bhutanese deported from the US again face statelessness

NPR: A refugee deported to Bhutan by the U.S. is now stateless

## ISRAEL

**Dates(s):** Jan. 21, 2026; Feb. 1, 2026; June 9, 2026 (likely); Sept. 10, 2026 (likely)

**Who:** Jan. 21: Eight Palestinians, including 47-year-old Sameer Isam Aziz Zeidan and 24-year-old Maher Awad, according to the Guardian; Feb. 1 and June 9 and Sept. 10: Unknown.

**How:** On Jan. 21 and Feb. 1, via a Gulfstream IV (N352BH) operated by Journey Aviation. Journey leases the aircraft from Israeli-American billionaires who built luxury condos with Trump and was previously used to transfer third-country nationals to a prison in Eswatini, which I reported for Zeteo last October. On June 9, via a Boeing 767 (N378AX)

operated by Omni Air International. On Sept. 10, via a Gulfstream V (N62FF) operated by Journey Aviation.

**Imprisoned:** The migrants appear to have been shackled as they departed the aircraft, according to a photo obtained by Haaretz, an unusual move for an arrival country. Awad told the Guardian they were taken to a checkpoint in the occupied West Bank by Israeli authorities and dumped on the side of the road.

**Deal:** Unknown.

**Now:** The eight men in the first group contacted relatives and when they spoke to media were figuring out their next moves. Awad has a newborn son in the US he has never met.

**More:** Haaretz: U.S. Deports Eight Palestinians to West Bank Using Private Jet

Zeteo: This Family Made Billions on Trump-Branded Condos. Now Their Private Jet Is Taking Shackled Migrants to a Far-Flung African Prison.

## KUWAIT

**Date(s):** Dec. 7, 2025, Jan. 25, 2026

**Who:** Dec. 7: Approximately 55 Iranians, who had entered the US through the southern border and were detained until their asylum claims were denied, according to Iranian officials. Jan. 25: 40 Iranian asylum-seekers and other detained migrants, according to Iranian officials.

**How:** On Dec. 7, via a Boeing 767 (N207AX) operated by Omni Air International to Kuwait, and likely an Airbus A320 (9K-AKR) operated by Kuwait Airways to Tehran. On Jan. 25, via a Boeing 767 (N351AX) operated by Omni to Kuwait, and likely an Airbus A320 (9K-AKR) operated by Kuwait Airways to Tehran.

**Imprisoned?** Unknown, but like other transfer deportations in Qatar and Egypt, the migrants were likely forced onto the flight to Tehran by Kuwaiti authorities.

**Deal:** Unknown.

**Now:** About 2,000 Iranians may be deported via transfer through a third country, according to the New York Times.

**More:** NYT: US Deports Second Planeload of Iranians, Officials Say

## QATAR

**Date(s):** Sept. 30, 2025

**Who:** Approximately 55 Iranian nationals, at least one of whom was a Christian convert, another was a political dissident and ethnic minority who was forced onto the flight. Some had pending asylum hearings, others' asylum claims had been rejected. A DHS official said some had criminal convictions, an unverifiable claim DHS frequently makes, sometimes falsely.

**How:** From the US to Qatar via a Boeing 767 (N819AX) operated by Omni Air International. From Qatar to Iran via a Boeing 787 (A7-BCJ) operated by Qatar Airways.

**Imprisoned?** Briefly, by Qatari authorities, who beat and dragged them onto the Qatar Airways flight.

**Deal:** The Trump administration said the Iranian government had agreed not the harm the migrants upon their return, though there is no mechanism in place to ensure their safety.

**Now:** Many of the migrants told NYT they have been contacted by Iranian authorities for interrogation. Some say family members are being harassed. At least one has fled to a neighboring country and is in hiding.

**More:** 'It Feels Like I'm in a Nightmare': Inside the First Deportation Flight to Iran

NYT: U.S. Deports Planeload of Iranians After Deal With Tehran, Officials Say

## UZBEKISTAN

**Date(s):** April 30, 2025; March 10, 2026; June 9, 2026 (likely)

**Who:** In April 2025, 131 people were removed to Uzbekistan, among them an unknown number of Kazakh and Kyrgyzs nationals along with Uzbek deportees. In March 2026, six third-country nationals, according to HRF. On June 9: Unclear.

**How:** In April 2025, via a Boeing 787 (UK-78706) operated by Uzbekistan Airways; in March 2026, via a Boeing 767 (N423AX) operated by Omni Air International. On June 9, via a Boeing 767 (N378AX) operated by Omni.

**Imprisoned?** Unknown.

**Deal:** Unknown.

**Now:** The government of Uzbekistan agreed to return the Kazakh and Kyrgyz nationals to their countries under “humanitarian and legal principles” but has provided no information on if it achieved that goal. All three countries are authoritarian states with no free press. The fate of the six transported in March 2026 is unknown.

**More:** Radio Free Europe: US Deports Over 100 Central Asian Nationals With Uzbekistan’s Cooperation

ICE Flight Monitor on September flight to Uzbekistan

# EUROPE



Moldova and Poland. (MapChart)

## MOLDOVA

**Dates(s):** March 10, 2026; April 30, 2036; June 9, 2026 (likely); Aug. 4-6, 2026

**Who:** March 10: Sixteen migrants including 10 Russians plus others from Eastern European countries, according to Human Rights First. April 30 and June 9: Unknown but believed to mostly Russian. August: Eleven men and women, at least one of whom was from Belarus, according to court documents.

**How:** In March, April, and June: Via Boeing 767s (N423AX, N486AX, and N378AX, respectively) operated by Omni Air International. In August: Via a Gulfstream V (N59JE) operated by Talon Air.

**Imprisoned:** No.

**Deal:** Unknown.

**Now:** Some are trying to stay in Moldova, while others plan to return to their countries of origin, according to Russian dissident Telegram channel Agency News. A human rights worker told Agency News they were trying to obtain a French visa for one of them.

**More:** Why did this ICE flight turn around over the Atlantic Ocean?

Agency News: Russians expelled from the US disembark from deportation flight in Moldova

Human Rights First: March 2026 Monthly Report

## POLAND

**Date(s):** Nov. 17, 2025; March 16, 2026; April 29, 2026; June 29, 2026; Aug. 18, 2026

**Who:** Nov. 17: Fifty Ukrainian nationals, some of whom have lived in the US since they were children. Many feared being drafted into the Ukrainian military. Mar. 16, Apr. 29, June 29, Aug. 18: Unknown.

**How:** On Nov. 17, via a Boeing 767 (N423AX) operated by Omni Air International to Poland. From Poland to Ukraine via unknown ground transportation. On March 16, via two Gulfstream Vs (N588TN and N86MS) operated by Journey Aviation. On April 29, via a Boeing 767 (N486AX) operated by Omni. On June 29 and Aug. 18, via two Gulfstream Vs (N588AT and N588TN) operated by Journey.

**Imprisoned?** Unclear, possibly briefly.

**Deal:** Unclear.

**Now:** The migrants on the first flight were forcibly transferred by ground to Ukraine. The fate of the migrants in the proceeding groups is unclear. Domestic and

international law bars removal of migrants to active warzones.

**More:** NPR: U.S. deports dozens of migrants to Ukraine amid war

*Thank you for reading. I am a former Washington Post staff writer, and as far as I know, I'm the only journalist in America covering ICE flights full time. I am committed to keeping this reporting non-paywalled, but if you are able, please sign up for a paid subscription or send me a one-time tip, so I can continue this important work. –Gillian*

Subscribe

Tip Me

## Member discussion

0 comments

## Start the conversation

Become a paid member of **Gillian Brockell** to start commenting.

Sign up now

Already a member? **Sign in**

HRRC accepts NO funding from governments for our research or campaigns. At every step of the way, our impact is made possible because of people like YOU. Make your contribution now!

Donate



Human Rights Research Center · Jun 12 · 4 min read

# Rights Lawyers Challenge US-Linked Deportations from Equatorial Guinea Before African Human Rights Body

Author: Christine Savino
June 12, 2026

> *HRRC condemns third-country deportation arrangements that expose migrants, refugees, and asylum seekers to persecution, torture, arbitrary detention, or onward removal without access to lawyers or meaningful review. States must not evade non-refoulement obligations by transferring people through intermediary countries.*



*The Port of Malabo in Equatorial Guinea. Rights lawyers have challenged Equatorial Guinea's role in US-linked third-country deportations before the African Commission on Human and Peoples' Rights. [Image credit: Wikimedia Commons]*

Human rights groups filed a complaint on June 5, 2026, before the African Commission on Human and Peoples' Rights against Equatorial Guinea, alleging that the country violated international human rights law by accepting deportees from the United States and then sending some onward to countries where they face serious harm.

That risk is prohibited under non-refoulement in international human rights law, such that migrants cannot be directly or indirectly sent to countries where they face a real risk of persecution, torture, or other serious harm.

The complaint was filed on behalf of 14 African migrants deported from the US to Equatorial Guinea between November 2025 and April 2026. The filing parties were Asian Americans Advancing Justice, Global Strategic Litigation Council and EG Justice, together with the Institute for Human Rights and Development in Africa and the Pan African Lawyers Union.

All 14 migrants had previously obtained legal protection in the US against being returned to their countries of origin. Lawyers argue that these protections are being undermined through "third-country" deportations, where the US sends people to countries that are not their own.

Advocates say six deportees were forcibly repatriated from Equatorial Guinea within the last week. Three were reportedly returned to Equatorial Guinea after their home countries refused to admit them, while lawyers lost contact with three others. Eight deportees reportedly remain detained in Equatorial Guinea.

The filing asks the African Commission to intervene urgently by stopping further deportations or transfers, improving detention conditions, ensuring access to legal counsel, and providing compensation for people already returned. The complaint also highlights the risk of "chain refoulement," where a person is not directly sent by the US to danger, but is instead routed through another country that later sends them there.

The *Associated Press* reported that Bella Mosselmans, director of the Global Strategic Litigation Council, said some deportees had been "effectively rendered stateless" after their home countries refused to admit them, describing the process as "a cycle of hell."

The case comes amid broader litigation and scrutiny over US third-country deportations. In *D.V.D. v Department of Homeland Security*, a federal district court previously required notice and an opportunity to raise fear of torture before removal to a third country. The US Supreme Court later stayed that injunction, and, although the district court again ruled against the policy in February 2026, the First Circuit stayed that ruling in March 2026 while the appeal continues.

The complaint also follows warnings from UN human rights experts, who urged Equatorial Guinea to halt deportations of people at risk of persecution, torture, or other serious harm.

**UN Special Procedures**
@UN_SPExperts · **Follow**

#EquatorialGuinea: At least 9 individuals currently detained are at imminent risk of refoulement following deportation from the #US under a bilateral agreement. Experts urge Equatorial Guinea to uphold int'l obligations & halt returns of those at risk.
ohchr.org/es/press-relea...

2:23 AM · May 13, 2026

9 Reply Copy link

**Read more on X**

A US Senate Foreign Relations Committee minority report has also said the Trump administration provided millions of dollars to countries involved in third-country removal arrangements, including Equatorial Guinea.

Although the African Commission cannot enforce orders in the same way as a domestic court, its intervention could increase regional pressure on Equatorial Guinea and clarify the obligations of African states accepting deportees under unclear bilateral arrangements.

*Glossary*

- **African Charter on Human and Peoples' Rights** — The regional human rights treaty that establishes rights and duties for African states and provides the legal framework for the African Commission.
- **African Commission on Human and Peoples' Rights** — The African Union body responsible for promoting and protecting human and peoples' rights under the African Charter.
- **Arbitrary Detention** — Detention that is not just unlawful, but also unjust, unreasonable, disproportionate, discriminatory, or imposed without proper legal basis or due process.
- **Bilateral** — In international law, a bilateral agreement is an agreement between two countries.
- **Chain refoulement** — Indirect return to danger, where a person is sent to one country and then removed onward to another country where they face persecution, torture, or serious harm.
- **Convention Against Torture protection** — A form of protection from removal for people who fear torture if returned to a particular country.
- **Injunction** — A court order requiring someone to do something or stop doing something. It is an equitable remedy, often used where money damages would not be enough.
- **Litigation** — The process of resolving a legal dispute through the court system, usually by filing then defending a lawsuit.
- **Non-refoulement** — The legal principle that states must not return people to places where they face persecution, torture, or other serious harm.
- **Stateless** — A person is not legally recognised as a national or citizen by any country.
- **Third-country deportation** — Removal to a country that is not the person's country of nationality or usual residence, but that has agreed to receive the person.
- **Withholding of removal** — A US immigration protection that prevents removal to a country where a person's life or freedom would likely be threatened on protected grounds.

ite 300, Alexandria, VA 22314, USA

Email us:
info@humanrightsresearch.org

Tax exempt 501(c)(3)
EIN: 87-1306523

3. Department of Homeland Security v D.V.D., US Supreme Court clarification order, July 3rd, 2025
4. ICE memorandum on third-country removals following DHS v D.V.D., July 9th, 2025
5. UN experts' statement urging Equatorial Guinea to halt deportations, May 13th, 2026
6. US Senate Foreign Relations Committee minority report, "At What Cost: Inside the Trump Administration's Secret Deportation Deals"
7. Reuters: Rights groups file complaint against Equatorial Guinea over Trump deportations
8. Associated Press: Case filed against Equatorial Guinea for sending US deportees to nations where they face persecution
9. Centre for Human Rights, University of Pretoria: Statement on third-country deportations to the African Commission
10. Third Country Deportation Watch: Equatorial Guinea
11. USCRI Third Country Deportations Tracker

PRESS RELEASES | SPECIAL PROCEDURES

# Experts urge Equatorial Guinea to uphold international obligations and halt returns of those at risk

13 May 2026

Share

**GENEVA** —At least nine individuals currently detained in Malabo in Equatorial Guinea are at imminent risk of refoulement following deportation from the United States under a bilateral agreement, experts* warned today.

"We are deeply concerned by allegations that individuals in need of international protection have been subjected to transfer arrangements that place them at risk of irreparable harm," the experts said. "States must ensure that no one is returned, directly or indirectly, to a situation where their life, freedom or physical or mental integrity would be in danger."

The individuals detained in Malabo — including nationals of Angola, Eritrea, Ethiopia and Mauritania — are among a group of at least 29 people deported from the United States under a bilateral temporary transfer agreement. All had previously been granted protection by U.S. immigration judges, either through withholding of removal orders under the Immigration and Nationality Act (INA) or under the Convention Against Torture (CAT).

"We are also concerned that these developments appear to reflect broader trends of migration externalisation arrangements involving transfers of migrants, asylum seekers and persons in need of international protection to third countries, including African States, without sufficient human rights safeguards."

"We are particularly concerned by developments over the past five days indicating that government security officials have directly approached those detained, presenting them with documents in Spanish and requesting that they sign them in order to complete their removal," the experts said.

They warned that the removal of individuals to countries where they have a real risk of being subjected to persecution, torture or other serious rights violations, including sexual and gender-based violence, would place them at risk of irreparable harm and be unlawful under international law. They also expressed concern regarding reported restrictions on access to legal assistance, limitations on communication with counsel, the lack of

individualised assessments prior to deportation decisions and troubling reports about conditions of detention. They recalled that non-refoulement is absolute under international law, and that due process guarantees are essential. They further recalled that all persons deprived of their liberty must be treated with humanity and dignity.

“We call on the Government of Equatorial Guinea to immediately suspend any deportations of individuals at risk, ensure full respect for the principle of non-refoulement and guarantee prompt access to legal assistance and effective remedies,” the experts said.

“Authorities must carry out individualised and independent protection assessments, ensure that detention conditions meet international standards, including access to medical care and basic necessities, including sexual and reproductive health, and provide transparency regarding any migration transfer arrangements, reviewing them to ensure compliance with international law.”

“International cooperation on migration and asylum must not come at the expense of fundamental human rights,” they said. “We encourage the Government of Equatorial Guinea to collaborate with the relevant UN agencies including UNHCR and IOM for guidance and support to uphold their international obligations.”

The African Commission on Human and Peoples’ Rights, through Resolution ACHPR/Res.645 (LXXXV) 2025 on the externalisation of migration governance and extra-regional transfers of migrants and asylum seekers to African States, already warned against practices that may result in the outsourcing of international protection responsibilities in ways incompatible with international and regional human rights obligations.

The experts remain in contact with the Government.

*The Special Procedures experts:

- Gehad Madi**, Special Rapporteur on the human rights of migrants**
- Cecilia M Bailliet, **Independent Expert on human rights and international solidarity**
- Ashwini K.P., **Special Rapporteur on contemporary forms of racism, racial discrimination, xenophobia and related intolerance**
- Siobhán Mullally, **Special Rapporteur on trafficking in persons, especially women and children**
- Alice Jill Edwards, **Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment**
- Reem Alsalem, **Special Rapporteur on violence against women and girls, its causes and consequences**
- Claudia Flores(Chair), Ivana Krstić (Vice-Chair), Dorothy Estrada Tanck, Haina Lu, and Laura Nyirinkindi, **Working Group on discrimination against women and girls**
- Nazila Ghanea, **Special Rapporteur on freedom of religion or belief**

* African Commission on Human and People's Rights, Special Mechanism

- * Selma Sassi, **Special Rapporteur on refugees, asylum seekers, internally displaced persons and migrants in Africa**, African Commission on Human and Peoples' Rights.

The Special Rapporteurs, Independent Experts and Working Groups are part of what is known as the **Special Procedures** of the

Human Rights Council. Special Procedures, the largest body of independent experts in the UN Human Rights system, is the general name of the Council's independent fact-finding and monitoring mechanisms that address either specific country situations or thematic issues in all parts of the world. Special Procedures' experts work on a voluntary basis; they are not UN staff and do not receive a salary for their work. They are independent from any government or organisation and serve in their individual capacity.

UN Human Rights, country page – **Equatorial Guinea**

For inquiries and media requests, please contact: Michelle Erazo (**michelle.erazo@un.org**)

For media inquiries related to other UN independent experts, please contact Maya Derouaz (**maya.derouaz@un.org**) or Dharisha Indraguptha (**dharisha.indraguptha@un.org**)

Follow news related to the UN's independent human rights experts on X: **@UN_SPExperts**.

## Tags

Equatorial Guinea Migrants

## Related

PRESS RELEASES

USA: UN experts raise concerns over 24-hour workday for home care workers in New York City

# UN expert warns of expanding externalisation of migration governance, calls for renewed commitment to human rights

**22 June 2026**



---

**GENEVA** – The continued expansion of the externalisation of migrati governance is exposing migrants and asylum seekers to serious huma

rights risks and undermining fundamental principles of international human rights law, the Special Rapporteur on the human rights of migrants, Gehad Madi, warned today.

“Externalisation continues to expand despite longstanding human rights concerns,” Madi said, presenting his **latest report** to the Human Rights Council.

The report identifies recent developments in three forms of externalisation: measures aimed at preventing migrants from reaching destination States, the outsourcing of asylum procedures to third countries, and arrangements allowing the removal of migrants to third States, including countries with which they have no prior connection.

Madi expressed concern about the increasing reliance on “safe third country” concepts and the expansion of transfers to so-called “return hubs”, which may expose individuals to chain refoulement and other serious human rights violations.

According to the Special Rapporteur, externalisation practices create significant risks of human rights violations, including refoulement, arbitrary detention, ill-treatment, forced labour, denial of effective remedies, and interference with family life. The report also highlights the growing use of surveillance technologies, including biometric systems and border-monitoring tools, as part of externalisation arrangements.

Particular attention is devoted to the impact of externalisation on persons in vulnerable situations. The report highlights heightened risks faced by children, women and girls, persons of diverse sexual orientation, gender identity, gender expression and sex characteristics, and individuals exposed to intersecting forms of discrimination.

A recurring concern identified in the report is the lack of transparency surrounding migration cooperation arrangements. The Special Rapporteur called for the systematic use of human rights impact assessments, independent human rights monitoring mechanisms and accessible

complaint procedures to strengthen accountability and compliance with international human rights standards.

The Special Rapporteur urged States to ensure that migration cooperation fully complies with international human rights law, to refrain from measures leading to direct or indirect violations of the principle of non-refoulement, and to ensure transparency and effective independent monitoring of all externalisation measures.

“Rather than outsourcing responsibilities through arrangements that create significant human rights risks, States should prioritise rights-based, fair and sustainable migration and asylum systems,” Madi said. “Ultimately, the question raised by externalisation is not only how States manage migration, but also what kind of societies we aspire to be.”

**Gehad Madi** is the **Special Rapporteur on the human rights of migrants**

Special Rapporteurs/Independent Experts/Working Groups are independent human rights experts appointed by the United Nations Human Rights Council. Together, these experts are referred to as the **Special Procedures** of the Human Rights Council. Special Procedures experts work on a voluntary basis; they are not UN staff and do not receive a salary for their work. While the UN Human Rights office acts as the secretariat for Special Procedures, the experts serve in their individual capacity and are independent from any government or organization, including OHCHR and the UN. Any views or opinions presented are solely those of the author and do not necessarily represent those of the UN or OHCHR.

Country-specific observations and recommendations by the UN human rights mechanisms, including the special procedures, the

treaty bodies and the Universal Periodic Review, can be found on the Universal Human Rights Index **https://uhri.ohchr.org/en/**

For inquiries and media requests, please contact: Michelle Erazo (**michelle.erazo@un.org**)

For media inquiries related to other UN independent experts please contact Maya Derouaz (**maya.derouaz@un.org**) or Dharisha Indraguptha (**dharisha.indraguptha@un.org**)

Follow news related to the UN's independent human rights experts on X: **@UN_SPExperts**.

## Tags

Migrants

## Related

PRESS RELEASES

USA: UN experts raise concerns over 24-hour workday for home care workers in New York City

PRESS RELEASES

Chișinău Declaration risks weakening protections for migrants, undermines absolute prohibition of torture: UN experts

PRESS RELEASES

Experts urge Equatorial Guinea to uphold international obligations and halt returns of those at risk