**GREEN | EVANS-SCHROEDER, PLLC**
130 W. Cushing Street
Tucson, AZ 85718
Tel. (520) 882-8852
Fax (520) 882-8843

**Jesse Evans-Schroeder** | Arizona Bar No. 027434
Email: jesse@arizonaimmigration.net

**Matthew H. Green** | Arizona Bar No. 020827
Email: matt@arizonaimmigration.net

**Ami Hutchinson |** Arizona Bar No. 039150
Email: ami@arizonaimmigration.net

*Attorneys for Petitioner*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| A.M.A.S.,<br><br>Plaintiff,<br><br>vs.<br><br>Markwayne Mullin, *et al.*,<br><br>Defendants. | No. CV-26-06601-PHX-JCH<br><br>**PLAINTIFF'S STATUS REPORT** |

Plaintiff's are in receipt of Defendants' October 16, 2026 status report, and the declaration filed today, October 19, 2026, from an individual who appears to have no personal knowledge of the steps being taken to facilitate A.M.A.S.'s return to the United States pursuant to this Court's October 6, 2026 order. In any event, Plaintiff respectfully submits this status report.

Plaintiff's undersigned counsel have been in active communication with the USAO's office concerning Plaintiff's whereabouts and physical condition. The email exchanges were as follows:

1. Wednesday, October 7, 2026, undersigned counsel notified the USAO's office, via Derek Faraldo, that Plaintiff's counsel would "alert on any relevant updates."
2. On October 14, 2026, undersigned counsel sent Mr. Faraldo an urgent email because of information that A.M.A.S.'s health was rapidly deteriorating. Undersigned counsel also provided Mr. Faraldo with the contact information about a person operating or assisting with aid on the ground to those detained at Bamy. Although Plaintiff's counsel provided his full name and contact information to the government, Plaintiff's counsel will not name the person here for his or her safety.
3. On October 15, 2026, undersigned counsel notified Mr. Faraldo that A.M.A.S. was "exhibiting symptoms of a serious and worsening medical condition" and that "[i]mmediate intervention was required." Undersigned counsel also informed Mr. Faraldo that A.M.A.S. had been injured in a vehicle crash in a car driven by Equatorial Guinean officials, and that those injuries were ongoing and had not been treated.
4. Also on October 15, 2026, Plaintiff's counsel emailed the U.S. Embassy in Malabo: once in the morning to request assistance with obtaining medical attention for A.M.A.S.; and a second time that evening with updates and information that A.M.A.S.'s condition was rapidly deteriorating. To date, Plaintiff's counsel have not received a response.

5. On October 16, 2026, undersigned counsel notified Respondents, via an e-mail sent to Mr. Faraldo, that advocates in Equatorial Guinea attempted to reach A.M.A.S., but were prevented from doing so by armed guards at Bamy. Undersigned counsel also noted A.M.A.S.'s deteriorating health conditions, and requested that the government, in its status report, make clear whether it could secure prompt medical assistance or resolve the situation and "explain what obstacles remain."
6. Later that same day, undersigned counsel notified Mr. Faraldo that A.M.A.S. was apparently transported to a hospital in Malabo, believed to be Hospital de Sampaka.
7. On October 19, 2026, undersigned counsel updated the government that A.M.A.S.'s "medical wellbeing remain unchanged" and that he was back at the Hotel Bamy.
8. The U.S. consulate in Malabo did not respond to either email sent to them requesting medical care for A.M.A.S.

Today, October 19, 2026, and three days overdue, the government provides an affidavit from a Deportation Officer based in Imperial, California, who appears to have no personal knowledge of A.M.A.S., and does not even appear to have been his assigned D.O. during his time at the Imperial Detention Center. In any event, the government claims they do not know A.M.A.S.'s location and/or do not have access to him. This is belied by the extensive reporting concerning the agreement between the Equatorial Guinean government and the United States; and also, the direct communication between Stephen Miller and the Equatorial Guinean Vice President the day after A.M.A.S. was first arrested and moved to La Luna.

Importantly, and as attested in Exhibit A, there has been ample opportunity for the United States government to direct one of its planes, or a contract airline's plane, to land in Malabo. Indeed, DHS had access to at least six planes that traveled over or around Malabo last week. Furthermore, the government has been aware of A.M.A.S.'s worsening physical condition. Yet, Defendants have done nothing to secure him the appropriate medical care. Plaintiff also submits the most recent reporting from Emily Bregel concerning conditions in Equatorial Guinea, and the ongoing mistreatment of A.M.A.S. and others at the Hotel Bamy.

The fact that Defendants provide no real concrete steps that they have taken to comply with this court order and now, twelve days after this Court's order, request Plaintiff's counsel's information or phone numbers of those on the ground in Equatorial Guinea, demonstrates that Defendants are not complying with the Court's order. Defendants have Plaintiff's counsel's contact information, and Plaintiff's counsel have been affirmatively providing Defendants with updates. Moreover, as of October 13, 2026, Defendants also had the name and contact information of someone in Equatorial Guinea who could assist them. They apparently took no action with that information.

Plaintiff's counsel are concerned for their client's wellbeing. As part of this Court's order, Defendants were directed to restore A.M.A.S. to the position he would have occupied had these events not occurred; that surely includes medical treatment for the conditions he suffered because of his removal to Equatorial Guinea. Importantly, the United States unlawfully transferred A.M.A.S. to a country where CDC travel guidance recognizes a significant risk of diseases such as malaria, typhoid fever, and other serious

infectious illnesses; there is no evidence the United States provided him with the recommended vaccines before doing so. Plaintiffs respectfully assert that the government's paltry attempts to justify their delay should not be accepted. The government plainly already has the information requested in today's status report, and apparently has taken no action with it. Continued delay could be catastrophic for A.M.A.S.

Dated: October 19, 2026

Respectfully Submitted,

/s/*Jesse Evans-Schroeder*
Attorney for Petitioner

# TAB A

**State of Maryland**

**County of Prince George's**

## AFFIDAVIT

I, Gillian Brockell, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Affidavit.

2. I am a full-time contractor journalist at the magazine The American Prospect, where I report on third-country removals and Immigration and Customs Enforcement flights ("ICE").

3. In the course of my reporting, I have had contact with Petitioner's counsel and interviewed Petitioner over the phone on September 6, 2026, and September 8, 2026.

4. The Department of Homeland Security ("DHS") and ICE subcontracts immigrant removal flights on charter airlines through the ICE Air Operations ("IAO") office headquartered in Mesa, Arizona.

5. DHS has a contract with a flight broker, CSI Aviation ("CSI"). Under the contract, IAO makes flight requests to CSI, and CSI assigns those flight requests to specific charter airlines in the IAO network. (See USA Spending: https://www.usaspending.gov/award/CONT_AWD_70CDCR26FC0000001_7012_70CDCR24A00000001_7012)

6. This network currently includes at least six charter airlines with access to about 100 aircraft, which currently operate an average of about 70 flights per day transporting immigrants in ICE custody. (See Human Rights First, ICE Flight Monitor Dashboard showing 2,082 ICE flights in September 2026, https://www.humanrightsfirst.org/ice-flight-monitor-interactive-dashboard)

7. Nearly all civilian aircraft broadcast a signal, called Automatic Dependent Surveillance-Broadcast ("ADS-B"), that constantly transmits information including the aircraft's tail number, location, speed, and altitude.

8. This information is publicly available on websites like Flightradar24, FlightAware, ADS-B Exchange, and Airplanes.live.

9. Using these websites, I have been tracking and recording ICE charter flights since May 2025.

10. In this time, I have observed and recorded four charter airlines operating ICE charter flights to the continent of Africa: Eastern Airlines ("Eastern"), Journey Aviation ("Journey"), Omni Air International ("Omni") and Talon Air ("Talon").

11. For example, Petitioner was transported from Alexandria, Louisiana, to Equatorial Guinea on April 28-29, 2026, via a Boeing 767 with the tail number N225AX operated by Omni. This aircraft also made stops in Dakar, Senegal; Lagos, Nigeria; Accra, Ghana; and Yaounde, Cameroon. (See Attachment 1)

12. Since this Court ordered Respondent to return Petitioner to the United States, I have observed four aircraft chartered by ICE flying past Equatorial Guinea without landing at least eight times:

a) On the morning of Oct. 8, 2026, a Gulfstream V with registration number N588AT operated by Journey and using an ICE callsign (TYSON33) left Alexandria, Louisiana. Over the next three days, it made stops at Guantanamo Bay, Cuba; San Juan, Puerto Rico; Dakar, Senegal; and Nairobi, Kenya; and then made return flights to Dakar, Senegal, and Alexandria, Louisiana. **Flight data shows the aircraft passed by Malabo, Equatorial Guinea, within approximately 250 miles twice on Oct. 9, 2026, at 12:25 a.m. Greenwich Mean Time and 11:20 p.m. GMT.** (See Attachment 2, Example A)
b) On the evening of Oct. 12, 2026, a Boeing 767 with registration number N700KW operated by Eastern and using an in-house callsign for ICE flights (EAL8260) left Alexandria, Louisiana. Over the next three days, it made stops in Dakar, Senegal; Freetown, Sierra Leone; Accra, Ghana; Yaounde, Cameroon; and Monrovia, Liberia; and then made return flights to Dakar, Senegal, and Alexandria, Louisiana. **Flight data shows the aircraft passed by Malabo, Equatorial Guinea, twice on Oct. 13, 2026, within approximately 30 miles at 6:30 p.m. GMT and within approximately 15 miles at 10:55 p.m. GMT.** (See Attachment 2, Example B)
c) On the evening of Oct. 13, 2026, a Gulfstream V with registration number N62FF operated by Journey and using an ICE callsign (TYSON34) left Harlingen, Texas. Over the next four days, it made stops in Dakar, Senegal; Luanda, Angola; Lusaka, Zambia; Bangui, Central African Republic; and Accra, Ghana; and then made return flights to Dakar, Senegal, and Harlingen, Texas. **Flight data shows the aircraft passed by Malabo, Equatorial Guinea, twice on Oct. 14, 2026, within approximately 500 miles at 6:24 a.m. GMT, and within approximately 120 miles at 8:05 p.m. GMT.** (See Attachment 2, Example C)

d) On the morning of Oct. 15, 2026, a Gulfstream IV with registration number N352BH operated by Journey and using an ICE callsign (TYSON37) left Mesa, Arizona. Over the next four days, it made stops in San Juan, Puerto Rico; Dakar, Senegal; Nairobi Kenya; and Addis Ababa, Ethiopia; and then made return flights to Nairobi, Kenya; Dakar; Senegal; San Juan, Puerto Rico; and Mesa, Arizona. **Flight data shows the aircraft passed by Malabo, Equatorial Guinea, twice within approximately 200 miles, at 1:50 a.m. GMT on Oct. 16, 2026, and at 7:25 a.m. GMT on Oct. 17, 2026.** (See Attachment 2, Example D)

13. It is my belief that any of these four charter aircraft could have been used on short notice by Respondent to return Petitioner to the United States.

14. In addition to the above, flight data shows two other ICE-chartered aircraft – N120LW and N50JE, both operated by Talon – traveled to Dakar, Senegal, on Oct. 8, 2026, and Oct. 14, 2026. It is my belief these two aircraft also could have been directed on short notice by Respondent to return Petitioner to the United States. (See Attachment 2, Examples E and F)

15. Since all ICE charter flights have a flight nurse onboard, I believe it may still have been possible to return Petitioner to the United States despite his current illness.

16. DHS also currently owns at least 10 other aircraft it has claimed in media are intended as a "deportation fleet," with tail numbers counting up from N471US to N480US. (See New York Times, "Homeland Security Paid $464 Million for Airplanes. Then It Parked Them." Aug. 13, 2026, https://www.nytimes.com/2026/08/13/us/politics/homeland-security-parked-airplanes.html)

17. These aircraft were previously called into service on short notice in March 2026, when the US State Department used three of them (N473US, N474US, and N475US) to evacuate Americans who became stuck in Persian Gulf countries after hostilities with Iran began. (See Attachment 3)

18. Charter airline Eastern Air Express currently holds a contract to crew and operate seven of these aircraft for DHS. (See System for Award Management: https://sam.gov/workspace/contract/award/view/70CDCR26C00000021?agencyID=7012&modNumber=0&transactionNumber=0&refIdvPiid=null&idvAgencyID=null&contractType=AWARD)

19. Flight data shows that since this Court ordered Petitioner returned to the United States, all but two of these aircraft (N472US and N473US) have sat idle.

20. It is my belief that Respondent could have also used any of these 10 aircraft to return Petitioner to the United States.

19. Based on all of this information together, it is my belief that Respondent has had multiple opportunities to facilitate the return of Petitioner to the United States as ordered, and has failed to do so, despite the extreme and ongoing harms Petitioner faces as the result of Respondent's unlawful actions.

Signature: ______________

Date: 10/19/2026

Notary Public: ______________

Commission Expires: 07/14/2030

SKYLA B. JEREMIAH
Notary Public - Maryland
Prince George's County
My Commission Expires
07/14/2030

State of Maryland County of Prince Georges
Subscribed and sworn to (or affirmed) before me
on this 19 day of October, 2026
by Gillian Marie Holmes Brockell,
proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

______________
Notary Public Signature

ATTACHMENT 1

*Note: Due to differences in the sources of flight data, ADS-B Exchange shows aircraft tail numbers but does not have coverage over Cuba and large parts of the African continent, while FlightRadar24 often hides tail numbers but has excellent coverage over Cuba and the African continent. By using both data sources together and matching aircraft type and location, it is possible to track ICE charter aircraft wherever they go.* ***In the below example showing the aircraft that removed Petitioner to Equatorial Guinea, I have provided both ADS-B Exchange and FlightRadar24 flight data for April 29, 2026.***

Dates: April 28 and 29, 2026
Aircraft: N225AX, Omni Air International
Route: Alexandria, Louisiana; Dakar, Senegal; Lagos, Nigeria; Accra, Ghana; Malabo, Equatorial Guinea; Yaounde, Cameroon; Dakar, Senegal.

Day 1: April 28, 2026
https://globe.adsbexchange.com/?icao=a1f3aa&lat=14.644&lon=-43.715&zoom=3.2&showTrace=2026-04-28



Day 2: April 29, 2026
https://globe.adsbexchange.com/?icao=a1f3aa&lat=12.120&lon=3.882&zoom=4.2&showTrace=2026-04-29










flightradar24
BENIN
Parakou
TOGO
Kaduna
Lagos
N/A B762
© Flightradar24
N/A
NOT AVAILABLE
N/A
NOT AVAILABLE
BAROMETRIC ALT.
35,000 ft
GROUND SPEED
474 kts
Departed N/A ago
Arriving in N/A
Boeing 767-224(ER)
REG. N/A
DATE
SPEED
200x
Wed, Apr 29, 2026
13:24 UTC
13:10 13:20 13:30 13:40 13:50


flightradar24
Banyo
Bamenda
Bafoussam
CAMEROON
Aba
Port-Harcourt
Nkongsamba
Kumba
Douala
Malabo
Edea
Yaounde
Ebolwa
EQUATORIAL GUINEA
N/A B762
© Flightradar24
N/A
NOT AVAILABLE
N/A
NOT AVAILABLE
BAROMETRIC ALT.
23,025 ft
GROUND SPEED
417 kts
Departed N/A ago
Arriving in N/A
Boeing 767-224(ER)
REG. N/A
Wed, Apr 29, 2026
16:56 UTC
16:40 16:50 17:00 17:10 17:20


flightradar24
S A H A R A
N/A B762
© Flightradar24
N/A
NOT AVAILABLE
N/A
NOT AVAILABLE
BAROMETRIC ALT.
38,025 ft
GROUND SPEED
473 kts
Departed N/A ago
Arriving in N/A
Boeing 767-224(ER)
REG. N/A
Wed, Apr 29, 2026
21:55 UTC
21:40 21:50 22:00 22:10 22:20

ATTACHMENT 2

*Note: Due to differences in the sources of flight data, ADS-B Exchange shows aircraft tail numbers but does not have coverage over Cuba and large parts of the African continent, while FlightRadar24 often hides tail numbers but has excellent coverage over Cuba and the African continent. By using both data sources together and matching aircraft type and location, it is possible to track ICE charter aircraft wherever they go. Due to ADS-B Exchange's coverage gaps, not every landing reported below will be evident on the ADS-B Exchange maps included. In those cases, the other landings have been previously identified using FlightRadar24 but are not shown here.* ***For the precise times aircraft have passed by Malabo, Equatorial Guinea, FlightRadar24 maps have been included.***

EXAMPLE A
Dates: Oct. 8, 2026 through Oct. 10, 2026,
Aircraft: N588AT, Journey Aviation
Route: Alexandria, Louisiana; Guantanamo Bay, Cuba; San Juan, Puerto Rico; Dakar, Senegal; Nairobi, Kenya; Dakar, Senegal; Alexandria, Louisiana.

Day 1, Oct. 8, 2026:
https://globe.adsbexchange.com/?icao=a793b2&lat=10.202&lon=-45.481&zoom=3.3&showTrace=2026-10-08&timestamp=1791499820



Day 2, Oct. 9, 2026:
https://globe.adsbexchange.com/?icao=a793b2&lat=-2.560&lon=20.786&zoom=4.3&showTrace=2026-10-09









Day 3, Oct. 10, 2026
https://globe.adsbexchange.com/?icao=a793b2&lat=14.436&lon=-53.154&zoom=3.3&showTrace=2026-10-10




EXAMPLE B
Date: Oct. 12, 2026 through Oct. 14, 2026
Aircraft: N700KW, Eastern Airlines
Route: Alexandria, Louisiana; Dakar, Senegal; Freetown, Sierra Leone; Accra, Ghana; Yaounde, Cameroon; Monrovia, Liberia; Dakar, Senegal; Alexandria, Louisiana.

Day 1, Oct. 12, 2026
https://globe.adsbexchange.com/?icao=a95584&lat=30.026&lon=-57.912&zoom=3.3&showTrace=2026-10-12&leg=2



Day 2, Oct. 13, 2026
https://globe.adsbexchange.com/?icao=a95584&lat=17.007&lon=-29.608&zoom=3.1&showTrace=2026-10-13









Day 3, Oct. 14, 2026
https://globe.adsbexchange.com/?icao=a95584&lat=18.064&lon=-53.133&zoom=3.1&showTrace=2026-10-14&leg=2




EXAMPLE C
Dates: Oct. 13, 2026, through Oct. 16, 2026
Aircraft: N62FF, Journey Aviation
Route: Harlingen, Texas; San Juan, Dakar, Senegal; Luanda, Angola; Lusaka, Zambia; Bangui, Central African Republic; Accra, Ghana; Dakar, Senegal; Harlingen, Texas.

Day 1, Oct. 13, 2026
https://globe.adsbexchange.com/?icao=a81467&lat=18.064&lon=-53.133&zoom=3.1&showTrace=2026-10-13



Day 2, Oct. 14, 2026
https://globe.adsbexchange.com/?icao=a81467&lat=-0.641&lon=7.054&zoom=3.7&showTrace=2026-10-14&timestamp=1792019454









Day 3, Oct. 15, 2026
https://globe.adsbexchange.com/?icao=a81467&lat=14.124&lon=-46.550&zoom=3.0&showTrace=2026-10-15&timestamp=1792108790




Day 4, Oct. 16, 2026
https://globe.adsbexchange.com/?icao=a81467&lat=28.661&lon=-75.761&zoom=3.6&showTrace=2026-10-16&leg=1



EXAMPLE D
Dates: Oct. 15, 2026, through Oct. 18, 2026
Aircraft: N352BH, Journey Aviation
Route: Mesa, Arizona; San Juan, Puerto Rico; Dakar, Senegal; Nairobi, Kenya; Addis Ababa, Ethiopia; Nairobi, Kenya; Dakar, Senegal; San Juan, Puerto Rico; Mesa, Arizona.

Day 1, Oct. 15, 2026
https://globe.adsbexchange.com/?icao=a3ec5c&lat=15.447&lon=-42.681&zoom=2.6&showTrace=2026-10-15




Day 2, Oct. 16, 2026
https://globe.adsbexchange.com/?icao=a3ec5c&lat=-2.066&lon=36.280&zoom=5.6&showTrace=2026-10-16






Day 3, Oct. 17, 2026

https://globe.adsbexchange.com/?icao=a3ec5c&lat=10.330&lon=-28.943&zoom=2.6&showTrace=2026-10-17






Day 4, Oct. 18, 2026
https://globe.adsbexchange.com/?icao=a3ec5c&lat=29.504&lon=-97.837&zoom=4.6&showTrace=2026-10-18



EXAMPLE E
Date: Oct. 8, 2026
Aircraft: N120LW, Talon Air
https://globe.adsbexchange.com/?icao=a054c1&lat=16.475&lon=-33.243&zoom=3.1&showTrace=2026-10-08&timestamp=1791471239




EXAMPLE F
Date: Oct. 14, 2026
Aircraft: N50JE, Talon Air
https://globe.adsbexchange.com/?icao=a63864&lat=16.475&lon=-46.100&zoom=3.1&showTrace=2026-10-14



ATTACHMENT 3

*Note: This ADS-B Exchange flight data shows DHS-owned aircraft being called into service for an emergency – the evacuation of Americans stuck in Persian Gulf countries after hostilities with Iran began. Due to signal-jamming related to the hostilities, more precise landing countries is not available.*

Aircraft: N473US
March 5, 2026




March 6, 2026



March 7, 2026




Aircraft: N474US
March 5, 2026



March 6, 2026




March 7, 2026



Aircraft: N475US

March 7, 2026




March 8, 2026



March 9, 2026


N475US
Hex: A5D580 Copy Link
adsbexchange.com
Reg.: N475US
United States
Airline: n/a
DB flags: LADD
Type: B737
2004 BOEING 737-700
DEPARTMENT OF HOMELAND SECURITY
Type Desc.: L2J
Squawk: 4132
FULL DETAILS
FLIGHT ACTIVITY
History
UTC day:
2026-03-09
Deutschland
Česko
Slovensko
Magyarország
Zagreb
România
Hrvatska
Србија
București
България
Italia
Istanbul
Ελλάς
İzmir
Türkiye
Antalya
Azərbaycan
Türkmenistan
Aşgabat
Oʻzbekiston
Қазақстан
Бишкек
Тоҷикистон
Київ
Україна
Chișinău
Tripoli
Libya
Niger
Tchad
Kano
N'Djaména
Eritrea
Ahmedabad
Jaipur
Surat
Mumbai
ALTITUDE (ft)
500 1 000 2 000 4 000 6 000 8 000 10 000 20 000 30 000
500 NM

# TAB B

https://tucson.com/news/local/border/article_f8d92d82-328f-4251-974e-51782732240c.html

ALERT TOP STORY TOPICAL

# Ariz. man 'unlawfully' deported to Africa hospitalized; DHS moving slowly to return him

**Emily Bregel**

Oct 17, 2026

Prefer us on Google

An Arizona man has been hospitalized in Equatorial Guinea for the second time with an unknown serious illness, his attorneys said Friday, as U.S. officials have moved slowly to comply with a federal judge's demand that the man be returned to the U.S.

Ahmed Soliman, who grew up in Phoenix, was hospitalized Friday in the Central African nation, and his lawyers said they fear for his life.

"Our understanding is he's seriously ill," said Kate O'Donnell, attorney with Tucson-based Green Evans-Schroeder, the firm representing Soliman.

Yet attorneys say U.S. Department of Homeland Security officials are dragging their feet on complying with a **federal judge's order** that demanded the agency facilitate Soliman's return, after what the judge described as Soliman's "unlawful" deportation in late April.

---

**People are also reading...**

1. **Woman on electric scooter struck, killed in Tucson crash**
2. **Popular sourdough-focused bakery opens in Tucson**
3. **$20 million in luxury listings hit the Tucson market**
4. **Saguaro falls on Arizona hiker**

---

After learning of Soliman's hospitalization and fragile health, Soliman's attorneys are pleading with U.S. officials to take seriously the U.S. District Court judge's Oct. 6 order to return Soliman to the U.S.

District Judge John C. Hinderaker's order cited the irreparable harm Soliman has suffered since his illegal deportation. Soliman, who is gay, was put on a flight to Africa without the required notice or opportunity to express his fear of deportation to a country where homosexuality is de facto criminalized, which the judge said violated Soliman's constitutional right to due process and U.S. law.

A local lawyer tried to visit Soliman Friday at the Hotel Bamy, where he has been imprisoned in Equatorial Guinea, but armed police at the hotel would not let him enter. Attorneys later learned Soliman had been hospitalized that day.

Soliman was also hospitalized last month — likely with malaria, but he was not given a diagnosis — while he was arbitrarily jailed without charge. His attorneys have been unable to confirm if he's received any medical care since then, "or even a basic medical evaluation after being incarcerated for a month in squalid conditions," O'Donnell said.

"To our knowledge, Ahmed has not received any outside humanitarian or medical aid," until now, O'Donnell said.

Typhoid fever and malaria are among the most common communicable diseases in Equatorial Guinea, but attorneys have not been informed of Soliman's current diagnosis.



Ahmed Soliman, who grew up in Phoenix, has been hospitalized for the second time in Equatorial Guinea, lawyers learned Oct. 16. In this screenshot from a Sept. 5 video shared with the Arizona Daily Star, Soliman is seen on his knees as a police officer aims a firearm at him, inside a the hotel in Equatorial Guinea where Soliman was detained.

Emily Bregel

## Status reports: No progress

Judge Hinderaker also ordered the U.S. government to provide regular status reports on their efforts to return Soliman. But DHS's first two reports have been scant on detail, and show officials have made no progress since Oct. 6.

The defendants in Soliman's Sept. 15 **civil complaint**, which resulted in the federal judge's Oct. 6 return order, include DHS and the U.S. State Department.

The lack of urgency in U.S. officials' efforts to return Soliman home is disturbing, and dangerous, O'Donnell said.

Multiple U.S. deportation flights have passed through the region since the judge's return order was issued; Soliman could have been returned home on any one of those flights, O'Donnell said.

"We're flummoxed, quite honestly, about why we are 10 days in, and this is the second basically empty status report that we've got," she said.

The government's Oct. 16 status report — signed by Arizona U.S. Attorney Timothy Courchaine and an assistant U.S. attorney — echoes the agency's first update to the judge, one week prior.

"Currently, Respondents are attempting to confirm Petitioner's exact location and custody status with personnel in Equatorial Guinea," Courchaine said. "The Department of Homeland Security is preparing a declaration with additional details on return efforts that will be filed on Monday as a follow-up status report."

O'Donnell said attorneys already provided the Arizona U.S. Attorney's Office with Soliman's location more than a week ago, when he was **released** from detention in jail and returned to Hotel Bamy, in Malabo, the former capital of Equatorial Guinea.

In recent days, lawyers for Soliman have repeatedly tried to contact the U.S. ambassador in Equatorial Guinea, inquiring about Soliman's health since his release from jail, O'Donnell said.

"We've sent increasingly urgent emails to the ambassador in Equatorial Guinea asking him for a medical evaluation and for immediate assistance of evacuating him (Soliman) or bringing him back to the United States," O'Donnell said.

The response from U.S. Ambassador Stanley L. Brown has been "radio silence," she said.

# Lawyers: 'Irreparable' harm ongoing

Soliman, who grew up in Phoenix after his family moved from Egypt when he was 4, has no ties to Equatorial Guinea. In 2025, an immigration judge granted him protection against return to his home country.

Since his April deportation to Equatorial Guinea, Soliman and others the U.S. has sent there have been confined against their will in a decommissioned hotel, despite having committed no crime in Equatorial Guinea.

The deportees have faced **increasingly dangerous** conditions while imprisoned at the hotel, where they've been physically assaulted, verbally abused and threatened at gunpoint, and deprived of basic necessities like hygiene products and sufficient food, multiple deportees have told the Star.

The main goal of Equatorial Guinea authorities is to pressure deportees to return to their home countries, the deportees told the Star. That's despite U.S. immigration judges having granting nearly all of them protection against return to their home countries, agreeing they'd face persecution or death there.

Soliman's accounts have drawn international attention since the Star **began reporting** on his case in August.

All U.S. deportees' phones were confiscated by armed men at Hotel Bamy in early September, as local authorities cracked down on the deportees' communications with attorneys and journalists.

During his arrest on Sept. 11, Soliman was hooded and beaten, and then arbitrarily detained in a squalid jail for weeks without charge. His lawyers said the arrest was **retaliation** for Soliman's determination to speak out about the abusive conditions experienced by U.S. deportees in Equatorial Guinea.

Last month Amnesty International issued an "urgent" call to action, saying Soliman and another man violently arrested at the hotel were at "**risk of torture**."

DHS has maintained in court and in media statements that Soliman and others deported to Equatorial Guinea are "safe," citing the "diplomatic assurances" provided by the Equatorial Guinea government that U.S. deportees would be treated humanely.

By now it's clear those assurances were false, and Soliman's life is in danger due to the actions of the U.S. government, O'Donnell said.

"If something fatal happens to Ahmed before he’s brought home due to (U.S. government) inaction, or slow action, all diplomatic assurances and court orders will be meaningless," she said.



Soliman

Provided

---

Contact reporter Emily Bregel at **ebregel@tucson.com**. On X, formerly Twitter: @EmilyBregel

**By Emily Bregel**

**Border reporter**