**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

A.M.A.S.,

Plaintiff,

v.

Markwayne Mullin, et al.,

Defendants.

No. CV-26-06601-PHX-JCH

**ORDER**

On October 6, 2026, the Court entered judgment in favor of Plaintiff and ordered Defendants to facilitate Plaintiff's release from custody in Equatorial Guinea and his return to the United States, and to "take all reasonable steps within their control to do so," including, at a minimum, the five steps enumerated in paragraph 5(a)-(e) of that Order. (Doc. 14 at 20-21; Doc. 15.) The Court further ordered weekly, then daily, status reports, and has twice found Defendants' reporting deficient and ordered more frequent and more specific reports. (Docs. 14, 22, 26.)

On October 26, 2026, twenty days after judgment, Defendants filed their fifth status report. (Doc. 28.) It reports that Significant Public Benefit Parole request SPBP11540 was approved that day under § 212(d)(5)(A) of the Immigration and Nationality Act (8 U.S.C. § 1182(d)(5)(A)). The authorization is effective from October 26, 2026, through November 11, 2026, and the issuing post is Malabo. ERO has located the approved Form I-512 in the Parole Case Tracking System. (Doc. 28-1 ¶¶ 8–10.) The Court acknowledges this progress. Parole authorization is the first step that Defendants report as complete toward Plaintiff's

return.

The report also reflects that, as of October 26, no commercial flight itinerary, travel date, route, carrier, or United States port of entry has been finalized. (*Id.* ¶ 13.) It does not state where Plaintiff is, what his physical condition is, or whether any United States official has spoken with him.

The parole authorization changes the posture of this case in one important respect: it fixes a deadline. The authorization expires on November 11, 2026, sixteen days after it issued. Every step that remains must be completed in time for Plaintiff to travel within the authorized parole period. (*See id.* ¶ 9.)

In their October 26, 2026 status report, Defendants ask to file status reports every other business day "[g]iven the demonstrated significant movement in efforts to effectuate [Plaintiff's] return." (Doc. 28 at 1.) The Court will deny that request. With a fixed expiration date approaching and eleven steps still outstanding, the need for daily reporting has increased, not diminished.

**I. Continuing Jurisdiction and Applicable Standard**

Absent a stay—and none has been obtained from the Ninth Circuit—this Court retains jurisdiction to enforce its judgment while Defendants' appeal is pending. (Doc. 22; Doc. 14 ¶ 14.) The judgment requires Defendants to take "all reasonable steps within their control" to facilitate Plaintiff's return. (Doc. 14 at 20–21.)

A party that fails to take all reasonable steps within its power to comply with a specific and definite order is subject to civil contempt. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Substantial compliance is a defense only where the party has taken *all reasonable steps*. *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986). A party asserting inability to comply "must show categorically and in detail why he is unable to comply." *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1241 (9th Cir. 1999) (cleaned up). It must further show that the inability was not self-induced. *See United States v. Santee Sioux Tribe of Nebraska*, 254 F.3d 728, 736 (8th Cir. 2001).

The Court does not, at this time, require Defendants to show cause why they should not be held in contempt. The Court sets out these standards so that Defendants understand what the Court will expect if it becomes necessary to revisit the question.

## II. Matters as to Which Defendants' Efforts May Have Taken Longer than Was Reasonable and Other Observations

The Court makes the following observations. They are not findings of contempt, and the Court does not require Defendants to show cause as to them at this time. They identify steps that, on this record, appear to have taken longer than was reasonable, or that have not been completed at all.

The pattern reflected in the record is that each discrete step Defendants have taken has followed, rather than preceded, an order from this Court directing them to address that step. With the limited parole period now running, that pattern cannot continue without jeopardizing Plaintiff's return and defeating the Court's October 6, 2026 Order.

1. Parole authorization issued twenty days after judgment, and the request was not submitted until fifteen days after judgment. ICE received notice of the Order on or about October 7, 2026. (Doc. 24-1 ¶ 7.) The request was not submitted until October 21, 2026, the same day the Court ordered daily reporting and demanded "specific acts." It was submitted as a regular request subject to a thirty-day adjudication window. (Doc. 24-1 ¶¶ 13, 15–16; Doc. 22.) Expedited adjudication was not requested until October 23, 2026, the day the Court directed Defendants to address whether it was available. (Doc. 27-1 ¶ 8; Doc. 26 ¶ 4.) A supervisory official in the Joint Parole Operations Division had authority to adjudicate and expedite the request at all relevant times. (Doc. 27-1 ¶ 8.) Once expedited, the request was approved within three days. (Doc. 28-1 ¶ 8.) Nothing in the record suggests the same result could not have been achieved in mid-October had the request been submitted and expedited when the Order issued.
2. Steps that did not depend on parole adjudication were deferred rather than

pursued in parallel. Defendants' own policy defines facilitating return to include issuing a boarding letter permitting travel and, if warranted, paroling the person into the United States at a port of entry. (Doc. 14 at 18 & n.3 (citing ICE Policy Directive 11061.1 § 3.1).) On October 22, the Embassy told ERO specifically what the ICE authorization memorandum must contain. (Doc. 24-1 ¶¶ 21–24.) Every element except the port of entry and the parole validity period was then already in Defendants' possession, and the validity period is now fixed. (Doc. 28-1 ¶ 9.) The port of entry requires nothing from any foreign government and is wholly within Defendants' control, yet it still has not been designated. (*Id.* ¶ 13.) Neither of Defendants' last two submissions states whether the memorandum has been drafted or transmitted. Neither states whether the security review the Embassy identified (Doc. 24-1 ¶ 22) has been initiated. Had these steps proceeded alongside the parole request, they would not now have to be compressed into the parole validity period.

3. A DHS-contracted aircraft landed in Malabo and departed without Plaintiff, for reasons that relate to the delays described above. On October 22, Defendants represented that the anticipated third-country removal mission to Equatorial Guinea had been cancelled and was not available to transport Plaintiff. (Doc. 24-1 ¶ 28.) The next day, aircraft N703KW landed in Malabo and departed two hours later. (Doc. 27-1 ¶ 10.) Defendants state that Plaintiff could not board that aircraft because the parole request had not been adjudicated and the transportation letter had not issued, and the aircraft could not wait. (Doc. 27-1 ¶ 9.) At that point the parole request had been pending for two days on a routine track, and work on the transportation letter had barely begun. The record also does not explain when Defendants learned of the Malabo stop or what inquiry preceded the October 22 representation, although the itinerary was known outside the government by October 21.

(Doc. 20, Ex. A.)

4. Other apparently available transportation has not been addressed. Plaintiff's evidence identifies at least six ICE-chartered aircraft that passed in the immediate vicinity of Malabo on eight occasions between October 8 and October 17 without landing. It also identifies ten DHS-owned aircraft, all but two of which have sat idle since the Order issued. (Doc. 20, Ex. A ¶¶ 12-20.) Defendants' reports have not mentioned any of these aircraft. The October 26 declaration now describes efforts to identify and arrange a commercial itinerary. (Doc. 28-1 ¶¶ 12–13.) It does not explain why that option was not pursued earlier, or whether government aircraft have been considered.

5. No United States official is reported to have made contact with Plaintiff. Plaintiff's counsel supplied Plaintiff's location on October 6 and confirmed it repeatedly thereafter. (Doc. 20 at 2–3.) After a single request to the ERO Attaché on October 9, the record discloses no further independent effort to locate or reach Plaintiff through October 22. (Doc. 18-1 ¶¶ 8–10.) The October 22 declaration represented that an Embassy official had spoken with Plaintiff by telephone, and that representation was withdrawn the next day. (Doc. 24-1 ¶ 27; Doc. 27-1 ¶ 11.) Persons attempting to assist Plaintiff were twice turned away from the Embassy. (Doc. 23 at 43.) The October 26 declaration describes no contact. (*See generally* Doc. 28-1.) Defendants will presumably need to reach Plaintiff to obtain his photographs and to provide him with travel instructions and documentation. (Doc. 24-1 ¶¶ 21–24; Doc. 28-1 ¶ 12.)

6. Nothing in the record reflects any request to the Government of Equatorial Guinea for Plaintiff's release. Paragraph 5(a) of the Order requires Defendants to take "all available steps to facilitate Plaintiff's release from custody in Equatorial Guinea." (Doc. 14 at 20.) Across five status reports and four declarations, every described communication runs from ICE to the ERO

Attaché to the U.S. Embassy. None describes a request to Equatorial Guinean authorities that Plaintiff be released, permitted to travel to the Embassy, or permitted to depart the country. That gap persists notwithstanding the agreement between the two governments on which Plaintiff's transfer rested and the Court's finding that Equatorial Guinean officials have repeatedly directed deportees to leave. (Doc. 14 at 16.) Without Equatorial Guinean authorization, the parole and travel documents cannot be used.

7. Plaintiff's physical condition still has not been reported. Paragraph 10(a) of the Order and paragraph (1) of the October 21 Order require it. Counsel notified Defendants on October 14, 15, 16, 19, and 20 that Plaintiff's health was deteriorating and that he had been hospitalized. Counsel also reported that he had been injured in a vehicle collision during a transfer by Equatorial Guinean officials. (Doc. 20 at 2–3.) None of the submissions filed since the Court reiterated the requirement addresses his condition, any medical evaluation, or his fitness to travel. That question is more pressing now that Defendants are pursuing commercial travel, which, unlike an ICE charter, does not carry a flight nurse. (*See* Doc. 20, Ex. A ¶ 15.)

8. Coordination with Plaintiff's counsel has improved. Defendants' counsel now reports daily check-ins and meetings with Plaintiff's counsel. (Doc. 28 at 1.) The Court notes the improvement. Paragraph 5(e) of the Order, however, requires coordination as to each remaining step, not merely communication between counsel. (Doc. 14 at 20.)

## III. Steps Completed and Those Remaining

Defendants report one step complete: approval of Significant Public Benefit Parole request SPBP11540, effective October 26, 2026, through November 11, 2026. (Doc. 28-1 ¶¶ 8–10.)

Based on Defendants' own submissions, the following tasks remain apparently outstanding and the Court believes each must be completed in time for Plaintiff to travel

within the authorized parole period:

1. Designation of the United States port of entry. (Doc. 28-1 ¶ 13.)
2. Preparation and transmittal to the Consular Section, U.S. Embassy Malabo, of the ICE authorization memorandum containing the elements specified at Doc. 24-1 ¶¶ 21–23, including the now-established parole validity period. This includes transmittal of the approved Form I-512 to the extent the Embassy requires it.
3. Completion of any required security review and resolution of any derogatory information. If that review was completed in connection with the parole adjudication, Defendants must confirm the same.
4. Establishing contact between a United States consular or ERO official and Plaintiff. This includes obtaining three passport-sized photographs from Plaintiff and arranging his physical access to the Embassy, or Embassy delivery to him. It also includes any request to Equatorial Guinean authorities for safe passage or escort.
5. Issuance by the Embassy of the transportation letter and accompanying sealed envelopes. (Doc. 24-1 ¶ 26.)
6. Securing Equatorial Guinean authorization for Plaintiff's release and departure. This includes any exit documentation and resolution of any residual legal process arising from his September 11, 2026 arrest.
7. Identification and booking of transportation at Defendants' expense, by commercial carrier, ICE charter, or DHS-owned aircraft, on a date certain within the authorized parole period. (Doc. 28-1 ¶¶ 12–13.)
8. Arrangement of a medical evaluation, fitness-to-travel clearance, and any required in-flight medical support or escort.
9. Coordination with U.S. Customs and Border Protection for Plaintiff's admission or parole at the designated port of entry.
10. Confirmation that the immigration judge's grant of deferral of removal to

Egypt remains in effect. Defendants must also confirm that all custody and removal determinations will be made as though the April 28, 2026 removal had not occurred.

11. Contemporaneous coordination with Plaintiff's counsel as to each of the foregoing.

Upon review of Defendants' subsequent reports and any response from Plaintiff, the Court will determine whether further proceedings, including an order to show cause, are warranted.

**IT IS THEREFORE ORDERED** that Defendants' request to file status reports every other business day (Doc. 28 at 1) is **DENIED**. The daily status reports required by the Court's October 21, 2026 Order must continue.

**IT IS FURTHER ORDERED** that Defendants' status report due on October 27, 2026 must address each of the eleven steps set out in Part III. For each step, Defendants must state:

1. its current status, including every act taken toward it since the October 26, 2026 declaration was executed, identifying the individual who took it by name and title and the date on which it was taken;
2. the date by which Defendants expect to complete it;
3. the name, title, and component of the official responsible for completing or authorizing it; and
4. if Defendants contend the step cannot be completed in time for Plaintiff to travel within the authorized parole period, the specific impediment, the person or entity imposing it, and what Defendants are doing to remove it.

. . . .

. . . .

. . . .

**IT IS FURTHER ORDERED** that the October 27, 2026 status report must also state:

1. the projected date of Plaintiff's departure from Malabo and arrival at the designated port of entry; and
2. Plaintiff's current location and physical condition, as required by paragraph 10(a) of the Order and paragraph (1) of the October 21, 2026 Order, and how that information was obtained and verified.

**IT IS FURTHER ORDERED** that each subsequent daily status report must update the timeframes reported for each remaining step, specifically identifying any date that has changed since the prior report and explaining why it changed.

**IT IS FURTHER ORDERED** that each status report must be supported by a declaration made under penalty of perjury by an individual with personal knowledge of the matters stated. *See* Fed. R. Evid. 602; 28 U.S.C. § 1746. Where information is obtained from another official, the report must identify that official by name and title.

**IT IS FINALLY ORDERED** that Plaintiff must file a response to any daily status report within two days of filing.

**IT IS SO ORDERED.**

Dated this 27th day of October, 2026.

John C. Hinderaker
United States District Judge