**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

A.M.A.S., Plaintiff,

v.

Markwayne Mullin, et al., Defendants.

No. CV-26-06601-PHX-JCH

**ORDER**

On October 27, 2026, the Court ordered that Defendants' status report due that day address each of the eleven steps in Part III of the Court's Order. For each step, Defendants were to state:

(1) its current status, including every act taken since the October 26 declaration, identifying who took it and when;

(2) the expected completion date;

(3) the name and title of the responsible official; and

(4) any impediment Defendants contend will prevent completion within the parole period, who is imposing it, and what Defendants are doing to remove it. (Doc. 29 at 8.)

The report was also required to state the projected dates of Plaintiff's departure from Malabo and arrival at the port of entry. It was also required to state Plaintiff's current location and physical condition, and how that information was obtained and verified. (*Id.* at 9.) Defendants filed Status Update #6 that day, supported by the declaration of ICE ERO

Deportation Officer Andrea Chiriboga Villacis. (Docs. 30, 30-1.)

On October 28, Plaintiff filed a response to Status Update #6. (Doc. 31.) Defendants then filed Status Update #7, supported by a further declaration of Officer Chiriboga Villacis. (Docs. 34, 34-1.) This Order addresses all three filings and specifies what Defendants' October 29, 2026 status report must contain.

## I. Progress Reported

The Court acknowledges the following progress.

(1) Plaintiff's travel has been ticketed. On October 27, Deportation Officer Jose L. Rosiles entered a tentative reservation through the ICE ERO Travel Portal for travel on November 4, 2026. (Doc. 30-1 ¶ 5.)

(2) Defendants have identified Dulles as the port of entry, subject to issuance of a travel letter. (Doc. 30-1 ¶ 4; Doc. 34-1 ¶¶ 4, 17.)

(3) Defendants have identified what is required for travel on the ticketed itinerary. On October 28, Joshua Coster of ICE ERO Headquarters Commercial Air advised that transit through Casablanca requires a copy of the Omega-generated itinerary and the transportation letter. He also advised that ICE ERO must provide Royal Air Maroc with a boarding-notification form and the transportation letter before travel. (Doc. 34-1 ¶¶ 19-20.) Officer Rosiles will submit the boarding-notification form when he receives the transportation letter. (*Id.* ¶ 21.) This responds in part to Plaintiff's concern about transit through a third country. (Doc. 31 at 5.)

(4) Defendants have identified an official who can issue the travel letter. On October 27, Deputy Chief of Mission Kristen K. Grauer advised that the Embassy can issue a travel letter for Plaintiff. (Doc. 34-1 ¶ 22.)

(5) Officer Rosiles has made a request concerning Plaintiff's arrival. If the required documentation is completed in time, he has asked that ICE ERO coordinate with CBP and ICE personnel at Dulles to meet Plaintiff plane-side. (*Id.* ¶ 17.)

(6) Status Update #6 reported, for the first time, a concrete way to reach Plaintiff. A Department of State Bureau of Population, Refugees, and Migration (PRM) delegation is expected to visit the location where Plaintiff is held. The Embassy has also identified Regional Security Officer Jim Ritter as an official who may be able to obtain Plaintiff's photograph. (Doc. 30-1 ¶¶ 16, 19.)

(7) Status Update #6 is organized around the eleven steps. Both declarations identify by name and title several officials who have acted or may act. The Court notes the improvement.

## II. Deficiencies Applicable to Both Reports

The Court agrees with Plaintiff that Status Update #6 does not comply with the October 27 Order in the respects described below. (*See* Doc. 31.) Status Update #7 does not cure those deficiencies.

### A. Omitted Steps

Status Update #7 is shorter than its predecessor. It has no section addressing four of the eleven steps:

(1) Equatorial Guinean authorization;

(2) medical evaluation and fitness to travel;

(3) deferral of removal and future determinations; and

(4) coordination with Plaintiff's counsel.

### B. Expected Completion Dates and Responsible Officials

Status Update #7 names the officials handling transportation, Officer Rosiles and Mr. Coster. It also identifies Deputy Chief of Mission Grauer as able to issue the travel letter. (Doc. 34-1 ¶¶ 5, 19–22.) For the remaining steps, neither declaration identifies a responsible official. Status Update #6 refers instead to "appropriate personnel," "appropriate channels," and "appropriate authorities." (*E.g.*, Doc. 30-1 ¶¶ 20, 37, 47, 49.) Status Update #7 refers to "Embassy personnel" and "appropriate authorities." (Doc. 34-1 ¶¶ 9, 14.) The only dates offered across both reports are:

(1) the intended October 28 transmittal of the Form I-512 and itinerary (Doc. 30-1 ¶ 11), which Status Update #7 does not confirm;

(2) the November 4 flight (Doc. 34-1 ¶ 5); and

(3) an expectation that contact-related steps will be completed before that flight (Doc. 30-1 ¶ 18).

No date is given for the travel letter. By Defendants' account, every remaining transportation step depends on it.

**C. Acts Taken**

The Order required Defendants to identify every act taken since the October 26 declaration, by whom, and when. Status Update #7 identifies acts by Officer Rosiles, Mr. Coster, and Deputy Chief of Mission Grauer. Apart from those acts and the advice reported in Status Update #6, the declarant describes her own work only as "coordinating," "actively coordinating," or continuing "to coordinate." (Doc. 30-1 ¶¶ 9-10, 12, 17, 19-20, 33, 37, 47, 49-50; Doc. 34-1 ¶¶ 9, 12, 24.) Neither declaration identifies any communication she sent, its recipient, or its date.

**D. Impediments**

Both declarations make completion contingent on Embassy procedures, local requirements, and Plaintiff's custodial circumstances. (Doc. 30-1 ¶¶ 12, 18, 20, 37; Doc. 34-1 ¶¶ 14, 24.) Status Update #7 lists the remaining contingencies (Doc. 34-1 ¶ 24):

(1) issuance of the travel letter;

(2) the Royal Air Maroc boarding-notification process;

(3) steps involving Equatorial Guinean authorities; and

(4) final coordination with CBP and ICE personnel at Dulles.

Neither declaration identifies any specific impediment, the person or entity imposing it, or what Defendants are doing to remove it. (Doc. 29 at 8.) Defendants do not contend that any step cannot be completed in time. The Court therefore understands both declarations to represent that each remaining step can be completed before the November 4 departure.

**E. Plaintiff's Location and Physical Condition**

Both declarations state only that Plaintiff "remains in immigration holding in Equatorial Guinea" and is available for travel. (Doc. 30-1 ¶ 3; Doc. 34-1 ¶ 3.) The Court has now ordered this information three times. (Doc. 14 ¶ 10(a); Doc. 22 ¶ 1; Doc. 29 at 9.) Neither declaration:

(1) identifies the facility or locality where Plaintiff is held;

(2) describes his physical condition; or

(3) states how either fact was obtained or verified.

The assertion that Plaintiff is available for travel has no stated basis. It is difficult to reconcile with two facts. No United States official is reported to have had contact with Plaintiff. And counsel has reported that he was hospitalized and injured in a vehicle collision. (Doc. 29 at 6.) Status Update #6 refers to a PRM visit to "the location where Petitioner is being held." (Doc. 30-1 ¶ 16.) That reference indicates that the Embassy knows where that location is.

**F. Lack of Personal Knowledge Supporting Declarations**

The Court required a declaration on personal knowledge. It also required Defendants to identify by name and title any official from whom information was obtained. (Doc. 29 at 9.) Both declarations rest on "personal knowledge, belief, reasonable inquiry," agency records, and information from unnamed DHS employees. Neither says which source applies to which statement. (Doc. 30-1 ¶ 1; Doc. 34-1 ¶ 1.) Status Update #7 attributes more of its statements to named officials, which the Court notes. Status Update #6, however, identified a Consular Section official only as "Consular Officer Anna." (Doc. 30-1 ¶¶ 10, 15–16, 19.)

Plaintiff argues that the declarations do not satisfy the personal-knowledge requirement. Plaintiff asks the Court to require declarations from the officials with firsthand knowledge of the facts the declarant relays. (Doc. 31 at 7–8, 11.) The Court need not decide whether the declarant's position gives her personal knowledge of the matters reported. The October 27 Order requires each declaration to disclose the basis for each

statement, and these declarations do not. The Court will not at this point require a separate declaration from every official on whom the declarant relies. It will, however, require one on the question of government aircraft, which Plaintiff has now raised twice with evidence of specific flights. (Doc. 31 at 6–7 & Ex. A; *id.*, Ex. B ¶¶ 4–7; *see* Doc. 29 at 5.)

**G. Omitted Paragraphs**

The numbering of the Status Update #6 declaration skips paragraphs 21–31, 34–35, 38–40, 43–46, 53–55, and 58–59. The Court cannot determine whether this reflects a drafting error or material removed before filing. Defendants must explain the omission in their October 29 report.

**H. Status of Remaining Steps**

Defendants report none of the eleven steps as complete. The most advanced step is the ticketed itinerary, and it remains contingent on the travel letter and on the other steps. (Doc. 34-1 ¶¶ 6, 16, 24.)

1. <u>Designation of the port of entry</u>

Status Update #6 reported that Dulles had been tentatively identified, "subject to issuance of a travel letter." (Doc. 30-1 ¶¶ 4, 6.) Status Update #7 reports that Dulles remains the port of entry for November 4 travel. That designation is still subject to the travel letter and to completion of all required travel arrangements. (Doc. 34-1 ¶¶ 4, 17.)

The Court previously observed that designating the port of entry requires nothing from any foreign government; it is wholly within Defendants' control. (Doc. 29 at 4.) Neither declaration explains why designation must await the travel letter. By Defendants' own account, the port of entry is one of the elements the Embassy requires in the ICE authorization memorandum, on which the travel letter depends. (*Id.*) No responsible official or completion date is identified.

2. <u>ICE authorization memorandum and Form I-512</u>

Both declarations list the authorization memorandum in a section heading. Neither mentions it in the body or states whether it has been drafted or transmitted. This is now the fourth consecutive submission to omit that information. (*See* Doc. 29 at 4.)

The Form I-512 was approved and located in the Parole Case Tracking System on October 26. (Doc. 28-1 ¶¶ 8–10.) Status Update #6 stated that the declarant intended to transmit the approved Form I-512 and tentative itinerary to the Consular Section on October 28. (Doc. 30-1 ¶¶ 10–11.) Status Update #7 is dated October 28 but does not state whether that transmittal occurred. It states only that the declarant is coordinating with Embassy personnel to provide "any additional required information or documentation." (Doc. 34-1 ¶ 9.)

3. <u>Security review</u>

Both declarations state only that parole was approved. (Doc. 30-1 ¶ 13; Doc. 34-1 ¶ 10.) Neither confirms that any required security review was completed as part of the parole adjudication, as the Court directed. (Doc. 29 at 7.) Neither states whether the Embassy's review (Doc. 24-1 ¶ 22) has been initiated, or whether any derogatory information exists.

4. <u>Contact with Plaintiff, photographs, Embassy access, and safe passage</u>

No United States official is reported to have spoken with or seen Plaintiff. That remains true more than three weeks after Plaintiff's counsel supplied his location. (Doc. 29 at 5.)

Status Update #6 presented the photograph requirement as advised on October 27. (Doc. 30-1 ¶¶ 10, 15.) The need for photographs, however, was identified in Defendants' October 22 declaration. (Doc. 24-1 ¶¶ 21–24; Doc. 29 at 5.) Status Update #7 reports no further progress on contact or the photograph. It again states that Plaintiff's custodial status and local requirements may affect the timing and manner of delivering travel documents. (Doc. 34-1 ¶ 14.) Neither declaration answers several practical questions:

No date is given for the PRM visit. Neither declaration says whether anyone has asked the delegation to see Plaintiff, photograph him, or assess his condition.

Neither declaration says whose approval Regional Security Officer Ritter requires. (Doc. 30-1 ¶¶ 16, 19.)

Neither declaration indicates whether Defendants have asked for a photograph from Plaintiff's counsel or from the persons who previously sought to assist Plaintiff at the

Embassy (Doc. 23 at 43).

Both declarations acknowledge that Plaintiff's custodial circumstances may prevent him from reaching the Embassy. (Doc. 30-1 ¶ 14; Doc. 34-1 ¶ 11.) Neither describes any request to Equatorial Guinean authorities for safe passage or escort.

Neither declaration describes how Plaintiff will be moved from immigration holding to the airport for a 5:45 a.m. departure.

5. Travel letter

The travel letter has not issued. (Doc. 30-1 ¶¶ 32-33; Doc. 34-1 ¶¶ 15, 23.) Deputy Chief of Mission Grauer advised on October 27 that the Embassy can issue it. (Doc. 34-1 ¶ 22.) Neither declaration gives an expected issuance date or states what the Embassy still requires before issuing it.

By Defendants' account, the remaining transportation steps now depend on the travel letter (*id.* ¶¶ 4, 17, 19-21):

(1) the boarding notification to Royal Air Maroc;

(2) the Casablanca transit;

(3) coordination with CBP; and

(4) final designation of the port of entry.

Status Update #7 refers both to a "travel letter" from the Department of State and to a "transportation letter." (*Compare id.* ¶¶ 15, 22-23, *with id.* ¶¶ 19-21.) It does not say whether they are the same document. Neither declaration addresses the sealed envelopes described in Doc. 24-1 ¶ 26.

6. Equatorial Guinean authorization

In Status Update #6, the declarant reported that she had "not received confirmation" that Equatorial Guinean authorities had completed local procedures. She stated that the required action is outside ICE ERO's direct control and that she was coordinating "through appropriate channels." (Doc. 30-1 ¶¶ 36-37.) Status Update #7 has no section on this step. It lists steps involving Equatorial Guinean authorities among the contingencies for travel. (Doc. 34-1 ¶ 24.)

As before, the record reflects no request to Equatorial Guinean authorities for Plaintiff's release or departure. (Doc. 29 at 5-6.) Nor does it identify who would make such a request, to whom, or when. Neither declaration addresses any residual legal process arising from Plaintiff's September 11, 2026 arrest. A party asserting inability to comply must show categorically and in detail why it cannot comply. *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1241 (9th Cir. 1999). A statement that an action lies outside one individual's direct control does not make that showing. The Court is especially concerned with the apparent lack of progress and transparency on this point.

7. <u>Transportation</u>

The itinerary has been ticketed. (Doc. 34-1 ¶¶ 5, 16, 18.) Both requirements Mr. Coster identified depend on the transportation letter: the boarding notification and the Casablanca transit documents. (*Id.* ¶¶ 19-21.) The declaration does not say whether the Omega-generated itinerary required for the Casablanca transit has been generated. (*Id.* ¶ 19.) Neither declaration addresses the DHS-owned aircraft identified in Plaintiff's evidence. (Doc. 20, Ex. A ¶¶ 12-20; Doc. 29 at 5.) The aircraft identified in Plaintiff's response is addressed in Part IV.

8. <u>Medical evaluation, fitness to travel, and escort</u>

Status Update #6 reported, in four paragraphs, that the declarant was coordinating with unnamed personnel. The purpose was to determine whether any medical evaluation, clearance, support, or escort is required. (Doc. 30-1 ¶¶ 47-50.) No determination was reported, no official was identified, and no date was given beyond "as expeditiously as possible." (*Id.*) Status Update #7 does not address this step at all.

Counsel first reported Plaintiff's deteriorating health on October 14. (Doc. 29 at 6.) The ticketed itinerary consists of two commercial flights and a layover of more than five hours, without medical personnel on board. Status Update #7 reports that the ticket is coded "DEPU" but does not explain the code. (Doc. 34-1 ¶¶ 5, 18, 20.) Neither declaration states whether Plaintiff will travel unescorted.

. . . .

9. Coordination with CBP

Status Update #6 deferred coordination with CBP until the travel letter issues and the itinerary is final. (Doc. 30-1 ¶¶ 51-52.) Status Update #7 reports Officer Rosiles's request about plane-side reception at Dulles. (Doc. 34-1 ¶ 17.) That is the first reported step toward this requirement. But the request is conditional, and the declaration does not say when it was made or to whom. No CBP official is identified.

The itinerary to Dulles has now been ticketed. The declaration does not explain why coordination with CBP at Dulles cannot begin now. Deferring this step until the end repeats the sequential approach the Court has already noted. (Doc. 29 at 3–4.)

10. Deferral of removal and future determinations

Status Update #6 stated that an Immigration Judge granted deferral of removal to Egypt on October 2, 2025. (Doc. 30-1 ¶ 56.) It did not confirm that the grant remains in effect. It stated that future custody and removal determinations will be made "consistent with the Court's direction and based on the applicable case status." (*Id.* ¶ 57.) That is not the confirmation the Court required. The Court required confirmation that all such determinations will be made as though the April 28, 2026 removal had not occurred. (Doc. 29 at 7–8.) The phrase "applicable case status" could be read to incorporate the effects of that removal. Status Update #7 does not address this step.

11. Coordination with Plaintiff's counsel

Status Update #6 reported that Defendants' counsel was engaged in daily check-ins and meetings with Plaintiff's counsel. (Doc. 30 at 1.) The Court noted that representation in its October 27 Order. (Doc. 29 at 6.) Plaintiff now disputes it.

Plaintiff relies on the declaration of counsel Dana M. Camilleri. According to that declaration, the last direct contact between counsel occurred on October 23, after Plaintiff's counsel informed Defendants' counsel that a DHS-contracted aircraft had landed in Malabo. There have been no communications since. (Doc. 31 at 9–10; *id.*, Ex. B ¶¶ 4-8.) Status Update #7 does not repeat the representation. It states only that counsel is working to assist with coordination. (Doc. 34 at 1.)

The section of Status Update #6 on this step does not mention Plaintiff's counsel. (Doc. 30-1 ¶ 60.) Neither report says whether Defendants have shared the ticketed itinerary with Plaintiff's counsel. Nor does either report say whether Defendants have sought counsel's help with photographs, location verification, or medical information. Paragraph 5(e) of the Order requires coordination as to each remaining step. (Doc. 14 at 20; Doc. 29 at 6.)

November 4 is six days from the date of this Order. Both declarations treat the remaining steps as a sequence, and Status Update #7 makes the sequence explicit. The boarding notification, the Casablanca transit, CBP coordination, and final designation of the port of entry all await the travel letter. The travel letter, in turn, awaits documents and a photograph that Defendants have not reported transmitting or obtaining. Several steps do not depend on the travel letter or on one another and can proceed now:

(1) finalizing the port of entry;

(2) preparing and transmitting the authorization memorandum;

(3) confirming the security review;

(4) requesting Equatorial Guinean authorization for Plaintiff's release, departure, and escort to the airport;

(5) obtaining a photograph through the PRM delegation, Regional Security Officer Ritter, or Plaintiff's counsel;

(6) arranging a medical evaluation; and

(7) beginning coordination with CBP at Dulles.

12. Government Aircraft

Status Update #6 reported advice from ERO Attaché Andrea Lichtenstein on October 27. She advised that no ICE charter is planned and that any charter would likely occur after November 11. (Doc. 30-1 ¶ 41.)

In contrast, Plaintiff represents that a government-contracted aircraft departed Mesa Gateway Airport in Mesa, Arizona, on October 28. According to Plaintiff, the aircraft is registered as N50JE and operated by Talon Air under the callsign VELUX13. It flew to

San Juan, Puerto Rico, with onward travel to Conakry, Guinea. Plaintiff represents that "VELUX" is an ICE callsign. (Doc. 31 at 6-7.)

The FlightAware printout attached to the response reflects a Gulfstream V flight designated VELUX13. The flight was scheduled to depart San Juan at 5:12 p.m. AST on October 28 and to arrive in Conakry at 7:27 a.m. GMT on October 29. (*Id.*, Ex. A.) Plaintiff previously presented evidence that a DHS-contracted aircraft landed in Malabo on October 23. (*Id.*, Ex. B ¶ 4; see Doc. 29 at 5.)

The Court makes no finding about this flight. Conakry is not Malabo, and the record does not show whether the aircraft could have carried Plaintiff. Defendants, however, are able to answer these questions. Status Update #7 was filed after Plaintiff's response and does not address them.

The Court has identified transportation by commercial carrier, ICE charter, or DHS-owned aircraft as a required step. (Doc. 29 at 5, 7.) The Attaché's advice, as reported, concerned only whether an ICE charter was planned. It does not indicate whether that advice encompassed contracted aircraft of the kind Plaintiff identifies, or DHS-owned aircraft.

13. <u>Compliance With the Court's Orders</u>

The Court acknowledges the progress described in Part I. Plaintiff's travel has been ticketed. The requirements for that travel have been identified. Several responsible officials have now been named. Nearly all of that progress is dated on or after the day of the Court's October 27 Order.

Despite that progress, Defendants appear to bristle at their obligation to follow the Court's explicit orders. But the Court reminds Defendants that the Court ordered Plaintiff's return on October 6, 2026. (Doc. 14.) Twenty-three days later, Defendants still have not done the following, each of which lies exclusively within their own control:

(1) stated where Plaintiff is held, what his physical condition is, and how they know, or stated that they do not know, despite three orders to do so (Doc. 14 ¶ 10(a); Doc. 22 ¶ 1; Doc. 29 at 9);

(2) stated whether the ICE authorization memorandum has been prepared, despite four consecutive submissions that address that step by heading only (see Doc. 29 at 4);

(3) finally designated a port of entry, a step that requires nothing from any foreign government (*id.*);

(4) confirmed whether any required security review was completed (*id.* at 7);

(5) given the confirmation the Court required regarding deferral of removal and future custody and removal determinations (*id.* at 7-8);

(6) reported any contact with CBP; or

(7) provided the step-by-step information the October 27 Order required, including for the four steps Status Update #7 omits entirely (*id.* at 8-9).

Critically, Defendants have not contended—much less demonstrated—that any of these steps cannot be completed in time. Nor have they identified an impediment to any of them.

The Court does not take threats of contempt or sanctions lightly. Contempt is a serious remedy, and a court must use the least possible power adequate to secure compliance. *Spallone v. United States*, 493 U.S. 265, 276 (1990). But courts have inherent power to enforce compliance with their lawful orders. *Shillitani v. United States*, 384 U.S. 364, 370 (1966). That power ensures that the Judiciary can vindicate its own authority without depending entirely on the other branches. *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 796 (1987).

A party that violates a specific and definite order bears the burden of showing why it was unable to comply. *Affordable Media*, 179 F.3d at 1239. The Court's orders here are specific and definite. (*See* Doc. 29 at 8-9.) Defendants have appeared to hesitate to effectuate the relief the Court has ordered.

. . . .

. . . .

## III. Order

Accordingly,

**IT IS THEREFORE ORDERED** that Plaintiff's requests (Doc. 31 at 10–11) are **granted** to the extent set forth in this Order.

**IT IS FURTHER ORDERED** extending the deadline for Defendants' status report due October 29, 2026 to **9:00 PM.**

**IT IS FURTHER ORDERED** that the status report **must address each of the eleven steps in Part III of the Court's October 27 Order** in the manner that Order requires. (Doc. 29 at 8–9.) For each step that is not complete, the report must give an expected completion date. It must also give the name and title of the responsible official. A statement that Defendants are "coordinating" with unnamed personnel or through "appropriate channels" does not satisfy this requirement.

**IT IS FURTHER ORDERED** the status report also specifically state the following:

### A. Plaintiff's Location and Condition

(1) The facility or locality where Plaintiff is held.

(2) His current physical condition, including the status of any injury from the vehicle collision and any hospitalization.

(3) The name and title of the person from whom each fact was obtained, and how and when each fact was verified.

(4) If Defendants do not know any of these facts, the report must say so. It must then state what has been done to learn them, by whom, and when.

### B. Contact and Photograph

(1) Whether any United States official has seen or spoken with Plaintiff and, if so, who and when.

(2) Whether the PRM delegation's visit has occurred or been scheduled, and on what date.

(3) Whether anyone has asked the delegation or Regional Security Officer

Ritter to see Plaintiff, photograph him, or assess his condition. If so, the report must state who made the request and when.

(4) Whose approval Mr. Ritter requires, and whether it has been sought.

(5) Whether Defendants have asked Plaintiff's counsel for a photograph.

(6) The full name and title of the official identified as "Consular Officer Anna" (Doc. 30-1 ¶¶ 10, 15-16, 19).

**C. Travel Letter and Transit Documents**

(1) The date by which the Embassy will issue the travel letter, and the name and title of the official who will issue it.

(2) Each item the Embassy still requires before issuance, and the status of each.

(3) Whether the "transportation letter" referred to in Doc. 34-1 ¶¶ 19-21 is the travel letter.

(4) Whether the Omega-generated itinerary required for transit through Casablanca (Doc. 34-1 ¶ 19) has been generated. If not, who will generate it and when.

(5) The status of the sealed envelopes (Doc. 24-1 ¶ 26).

**D. Authorization Memorandum, Form I-512, and Security Review**

(1) Whether the ICE authorization memorandum has been prepared and transmitted, by whom, to whom, and when.

(2) Whether the Form I-512 and itinerary were transmitted to the Consular Section on October 28 as stated (Doc. 30-1 ¶ 11), by whom, and to whom.

(3) Whether any required security review was completed as part of the parole adjudication.

(4) Whether the Embassy's review (Doc. 24-1 ¶ 22) has been initiated or completed.

(5) Whether any derogatory information exists.

. . . .

**E. Equatorial Guinean Authorization and Transfer to the Airport**

(1) Each request made to Equatorial Guinean authorities for Plaintiff's release, departure, Embassy access, or escort, stating who made it, to whom, when, and the response.

(2) If no request has been made, who will make it and when.

(3) Whether any legal process arising from Plaintiff's September 11, 2026 arrest remains pending.

(4) Who will transport Plaintiff from immigration holding to the airport for the 5:45 a.m. departure on November 4, and how.

**F. Medical Fitness and Escort**

(1) Whether Plaintiff has been or will be medically evaluated before travel, by whom, and when.

(2) Whether he has been found fit to travel on the ticketed itinerary.

(3) What the "DEPU" coding signifies (Doc. 34-1 ¶¶ 5, 18, 20). If it designates Plaintiff as a deportee or as unescorted, the report must explain why that coding is appropriate for a person returning to the United States under parole pursuant to this Court's Order.

(4) Whether Plaintiff will travel with an escort or medical support.

(5) The plan if Plaintiff is not fit for commercial travel.

**G. Port of Entry and CBP**

(1) Whether Dulles has been finally designated as the port of entry. If not, who will designate it, when, and why designation must await the travel letter.

(2) When and to whom Officer Rosiles made the request described in Doc. 34-1 ¶ 17.

(3) Whether CBP has been contacted.

(4) The name and title of the CBP official responsible for Plaintiff's arrival at Dulles.

**H. Deferral of Removal and Future Determinations**

(1) Confirmation that the October 2, 2025 grant of deferral of removal to Egypt remains in effect.

(2) Confirmation that all future custody and removal determinations will be made as though the April 28, 2026 removal had not occurred.

(3) If Defendants cannot give either confirmation, the report must say so and explain why.

**I. Coordination with Plaintiff's Counsel**

(1) Each communication between counsel for the parties since October 23, 2026, by date, participants, and means.

(2) Whether the representation of daily check-ins and meetings (Doc. 30 at 1) was accurate and, if not, a correction.

(3) Whether the ticketed itinerary has been shared with Plaintiff's counsel.

(4) What assistance, if any, Defendants have requested from Plaintiff's counsel regarding photographs, location verification, or medical information.

**J. Omitted paragraphs**

(1) An explanation for the gaps in the paragraph numbering of Doc. 30-1.

**IT IS FURTHER ORDERED** that the information required by paragraph E must be supported by a declaration made under penalty of perjury. The declarant must be an official with personal knowledge of efforts to coordinate with Equatorial Guinean officials, identified by name and title.

**IT IS FURTHER ORDERED** that the declaration supporting the October 29 report must state, for each factual assertion, whether it rests on the declarant's personal knowledge or on information from another official. Where information is obtained from another official, the declaration must identify that official by name and title.

**IT IS FURTHER ORDERED setting** a hearing for **Monday, November 2, 2026**, at **2:00 PM** in Courtroom 5C at the Evo Deconcini Courthouse 405 W Washington St.

#1500, Tucson, AZ 85701. Defense counsel and declarant Andreas Chiriboga Villacis must be physically present at the hearing. The Court will vacate the hearing if Defendant can produce evidence by 12:00 PM on Monday, November 2, 2026, that reasonably satisfies the Court that Plaintiff **will be** aboard the Royal Air Maroc Flight 262 scheduled to depart Malabo at 5:45 am., followed by the Royal Air Maroc Flight 218 scheduled to depart Casablanca at 3:25 p.m., with arrival in Washington Dulles International Airport at 7:05 p.m.

**IT IS SO ORDERED.**

Dated this 29th day of October, 2026.

John C. Hinderaker
United States District Judge