**FOR PUBLICATION**

FILED

NOV 20 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

A. M. A. S.,

Plaintiff - Appellee,

v.

MARKWAYNE MULLIN, Secretary, Department of Homeland Security, in official capacity; et al.,

Defendants - Appellants.

No. 26-6950

D.C. No.
2:26-cv-06601-JCH
District of Arizona,
Phoenix

**ORDER**

Before: GRABER, BENNETT, and H.A. THOMAS, Circuit Judges.

PER CURIAM:
Dissent by Judge GRABER

Defendants-Appellants (collectively, the "government") move for an emergency stay pending appeal pursuant to Circuit Rule 27-3 (Dkt. No. 9). As the party requesting a stay, the government "bears the burden of showing that the circumstances justify" a stay pending appeal. *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). In determining whether to exercise our discretion to grant a stay, we must consider the factors set forth by the Supreme Court in *Nken*: "(1) whether the Government has made a strong showing of the likelihood of success on the merits; (2) whether

the appellants will be irreparably injured absent a stay; (3) whether a stay will substantially injure other parties; and (4) where the public interest lies." *Doe #1*, 957 F.3d at 1058. Having considered the *Nken* factors, we find that they support the issuance of a stay. The government's motion for a stay pending appeal is therefore **GRANTED**.

FILED

NOV 20 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

A.M.A.S. v. Mullin, No. 26-6950
GRABER, Circuit Judge, dissenting in large part from the order granting a stay

Plaintiff A.M.A.S. is from Egypt and was held to be removable from the United States to Egypt. But because he likely would face torture in Egypt, he received deferral of removal under the Convention Against Torture. He was then removed not to Egypt but, instead, to Equatorial Guinea, which the government has paid to take deportees like him. Plaintiff had no opportunity to challenge the choice to send him to that country. Since his arrival in Equatorial Guinea, he has been arrested, held incommunicado, repeatedly beaten by guards, deprived of food and water, and threatened with death at gunpoint. He does not contest his removability. Rather, he objects to the lack of due process afforded him with respect to the place of removal. The district court found a constitutional violation and ordered that Plaintiff be returned to the United States so that he can dispute the destination to which he is removed—a remedy that the Supreme Court expressly approved in Noem v. Abrego Garcia, 145 S. Ct. 1017 (2025). Without explanation, the per curiam order grants the government's motion to stay the district court's order. Because the government has failed to meet the standards that we must apply to a motion for a stay pending appeal, I dissent. I would grant a stay only to the extent that the district court's orders exceed the remedy described in Abrego Garcia. I otherwise would deny the stay and allow the district court to

order the government to facilitate Plaintiff's return to this country pending the outcome of this appeal.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff was admitted to the United States in 1998 and became a lawful permanent resident in 2021. A.M.A.S. v. Mullin, No. 26-06601-PHX-JCH, 2026 WL 3026123, at *1 (D. Ariz. Oct. 6, 2026). In January 2024, following a conviction for aggravated assault and possession of a synthetic narcotic, the government sought to remove him to Egypt. Id. In 2025, an immigration judge ordered him removed to Egypt but, upon determining that he faced a clear probability of torture in Egypt, the immigration judge granted deferral of removal under the Convention Against Torture. Id. The government did not appeal that decision but continued to detain Plaintiff. Id.

On April 28, 2026, the government removed Plaintiff to Equatorial Guinea. Id. The government notified Plaintiff that he was being removed to Equatorial Guinea shortly before the flight and, when he asked for a reasonable-fear interview, he was told it was too late, and he was carried onto the plane. Id.

Equatorial Guinean officials held Plaintiff with other deportees under armed guard at a decommissioned hotel. Id. at *2. While imprisoned at the hotel from April to September 2026, Plaintiff and the other deportees frequently were subject to verbal abuse, beatings, and death threats. Id. Equatorial Guinean officials also

threatened to return deportees involuntarily to the countries from which they had been granted protection from removal; they followed through on those threats by refouling[1] a group of Ethiopian citizens to their home country. Id.

In August 2026, Plaintiff reported to his lawyer that he and other detainees were dragged, handcuffed, and assaulted at gunpoint for speaking to the press about their detention. Id. Equatorial Guinean officials warned that the country did not want the deportees and that, if they did not return to their home countries, it would be "easy" to "kill [them] and bury [them] in a field." On September 5, Plaintiff's lawyer received a video and text message from Plaintiff and another detainee. The video showed officers aiming guns at Plaintiff and another detainee who was trying to shield Plaintiff, while another officer commanded them to shoot. Id. After the press reported about the incident and published the video, Equatorial Guinean officials confiscated the detainees' phones. Id. On September 11, Plaintiff's lawyer was informed that Plaintiff and another detainee had been arrested and were being held incommunicado at an unknown location, reportedly without food or water. Witnesses later reported that Plaintiff and the other detainee had been bound with rope, hooded, and beaten. Id. As of September 15, Plaintiff's lawyer did not know her client's whereabouts or condition.

[1] "Refoulement" refers to forcing refugees back to a place where they face persecution. "Refoulement," Merriam-Webster Online Dictionary, (last visited Nov. 20, 2026), https://www.merriam-webster.com/dictionary/refoulement [https://perma.cc/6VA3-5G36].

On September 15, Plaintiff filed this action against the government, alleging that his removal to Equatorial Guinea violated his right to procedural due process under the Fifth Amendment and constituted an unlawful agency action under the Administrative Procedure Act ("APA"). He sought a judicial declaration that his removal to Equatorial Guinea was unlawful; mandamus relief requiring the government to facilitate his return to the United States; and further equitable relief.

On October 6, the district court entered an order fully resolving the case. The district court expressly declined to reach Plaintiff's APA claim and, instead, ruled solely on the constitutional claim. Id. at *7. The district court held that Plaintiff's removal to Equatorial Guinea without notice of the country of removal and a meaningful opportunity to raise a country-specific fear-based claim violated Plaintiff's right to procedural due process under the Fifth Amendment. Id. at *6–*7. The district court issued declaratory and equitable relief, ordering the government to "facilitate" Plaintiff's return to the United States. Id. at *11. In the weeks that followed, the court issued increasingly specific orders mandating that the government take particular actions.

The government timely appeals. A motions panel of this court granted an administrative stay that remains in effect, and the motions panel referred the government's motion for a stay pending appeal to the merits panel.

DISCUSSION

In Abrego Garcia, the Supreme Court approved an order that required the government to "facilitate" the return of a person who had been removed to El Salvador unlawfully and imprisoned there. 145 S. Ct. at 1018. The Court also noted that "the Government should be prepared to share what it can concerning the steps it has taken and the prospect of further steps." Id. But the Court required the district court, on remand, to clarify its directive that the government "effectuate" the plaintiff's return. Id. The Court directed the district court to give appropriate deference to the executive branch in the area of foreign affairs. Id.

The district court's original order appears to have applied Abrego Garcia faithfully, requiring the government to "facilitate" Plaintiff's return and requiring periodic status reports. But the government is likely correct that the court's later orders overstepped, micromanaging the government's efforts and impinging on the government's authority to conduct foreign affairs. For that reason, I would grant a stay of any order that exceeds the remedy authorized in Abrego Garcia. But the government's request for a stay is not nuanced. The government seeks a full stay of all aspects of all orders issued by the district court, even those orders that are fully consistent with Abrego Garcia. I confine my analysis below to that issue.

A stay pending appeal is an "extraordinary remedy." United States v. Mitchell, 971 F.3d 993, 999 (9th Cir. 2020) (per curiam). In determining whether

to grant a stay to the government, we must consider four factors: "(1) whether [the government] has made a strong showing that [it] is likely to succeed on the merits; (2) whether [the government] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Nken v. Holder, 556 U.S. 418, 426 (2009). In my view, none of the factors supports a stay.

A. Irreparable Harm

I begin the analysis with the second factor, both because it is dispositive and because it is clearly not met. "Nken instructed 'that if the petition has not made a certain threshold showing regarding irreparable harm then a stay may not issue, regardless of the [movant's] proof regarding the other stay factors.'" Doe #1 v. Trump, 957 F.3d 1050, 1058 (9th Cir. 2020) (ellipsis omitted) (quoting Leiva-Perez v. Holder, 640 F.3d 962, 965 (9th Cir. 2011) (per curiam)).

The government's assertions of irreparable harm are wholly unpersuasive. The district court's order requires the government to facilitate the return of a single individual from a single country. The Supreme Court in Abrego Garcia blessed precisely this remedy in precisely this context. There is no possible irreparable harm here from permitting Plaintiff's return to safety while his legal challenges are resolved.

The government does not offer any arguments particularized to Plaintiff or to this case. Instead, the government points to the Supreme Court's issuance of a stay in a related case, Department of Homeland Security v. D.V.D., No. 26-426, 2026 WL 2917860 (U.S. Sep. 29, 2026). The government argues that the issuance of the stay in D.V.D. "squarely controls" our assessment of the Nken factors here. The government reasons that, because the Court found irreparable harm in D.V.D., irreparable harm necessarily will result here. I strenuously disagree. Particularly when assessing irreparable harm to the government, the government's equivalence of this case and D.V.D. strains credulity.

In D.V.D., several named plaintiffs brought a class action seeking to prevent the government from following formal "Guidance" issued by the Department of Homeland Security. D.V.D. v. U.S. DHS, 821 F. Supp. 3d 102, 119–20 (D. Mass. 2026). That Guidance authorizes third-country removal for a person, like Plaintiff here, who cannot be removed to the person's country of origin. Id. Ruling solely on the plaintiffs' APA claims, the district court in D.V.D. held that the challenged Guidance was unlawful, and the court set aside the Guidance pursuant to 5 U.S.C. § 706(2). Id. at 165, 167–68. In essence, the district court's order ended the third-country removal program and required the government to unwind thousands of removals.

The First Circuit granted a stay pending appeal but, after affirming on the merits, the First Circuit abruptly dissolved the stay, thus reinstating the district court's order. D.V.D. v. U.S. DHS, 192 F.4th 74 (1st Cir. 2026). The government then sought emergency relief before the Supreme Court, which the Court granted without explanation. DHS v. D.V.D., 2026 WL 2917860. The Court also treated the application as a petition for writ of certiorari; granted certiorari; and ordered the parties to file supplemental briefs. Id. at *1.

Although the Court did not explain its stay order in D.V.D., it is easy to see why the Court saw irreparable harm. The district court's order effectively ended the entire third-country removal program and required the government to unwind actions affecting thousands of persons and many different countries. Crediting the government's application in that case, the failure to issue a stay would: affect "thousands" of persons removed to third countries; "upend international agreements"; disturb the government's ability to carry out third-country removals of "all aliens, anywhere in the country—indefinitely"; create an "unworkable morass"; "impos[e] massive operational burdens" on the immigration agencies; "impose[] massive costs on the government"; and "require[] new rounds of diplomatic engagement" with many other countries. U.S. DHS v. D.V.D., Application for a Stay, No. 26A406, 2026 WL 2884581, at *38–40 (U.S. Sept. 2026). The government pointed out, as the "tip of the iceberg," the disruptions

caused in just the few short days during which the district court's order in D.V.D. had been reinstated: cancellation of "a flight to three countries with 70 criminal aliens," "pull[ing] nearly 150 aliens from removal flights to at least four different countries," and the likely cancellation of an upcoming "flight to four countries carrying 58 aliens." Id. at *40.

Nothing of the sort is true here. The district court required the government to facilitate the return of a single individual. Whatever harm could result from arranging a flight for one passenger, none of the harms described in D.V.D. is present. Denying a stay here would not affect thousands of persons; upend international agreements; indefinitely disturb all third-country removals; create an unworkable morass; impose massive operational burdens; impose massive costs on the government; require new rounds of diplomatic engagement; or affect any current or future flight involving other deportees. Instead, a stay would require merely the facilitation of the return of a single person from a single country. As noted, the Supreme Court in Abrego Garcia blessed precisely this remedy in precisely this context. There is no possible irreparable harm here. In my view, it is not even a close call.

In sum, the government has not shown irreparable harm. The motion for a stay should be denied for this reason alone. Doe #1, 957 F.3d at 1058. But the other factors, too, fail to support the government's position.

B. Likelihood of Success

The first Nken factor—likelihood of success—has five separate components here.

1. The government argues that Rule 23 bars this action. I see little chance of success on that issue. The district court reasoned correctly that we have held that, in situations like this one, a district court has discretion to choose, or to choose not, to exercise jurisdiction. A.M.A.S., 2026 WL 3026123, at *4; see Pride v. Correa, 719 F.3d 1130, 1137 (9th Cir. 2013); Crawford v. Bell, 599 F.2d 890, 892–93 (9th Cir. 1979). This case is analogous to the situation in Pride, where the district court considered an individual prisoner's medical claim even though there was a pending class action against the whole prisoner medical system. 719 F.3d at 1137–38. The government is unlikely to show an abuse of discretion when the underlying facts here (unrebutted evidence of abuse and torture) are so different from the facts in D.V.D. (assurances of no plausible chance of harm). The situation here is akin to the situation in Pride: specific medical needs vs. generalized challenge to the system. But even if this case is dissimilar to Pride in some ways, the district court still retained discretion to hear the case under our binding precedents. There is little or no chance of showing an abuse of discretion.

2. The government also argues that res judicata (claim preclusion) bars this action. But this argument fails for several reasons, including that there is no final

judgment (or even an existing order) in D.V.D.. A final judgment on the merits is one requirement for res judicata to apply. W. Radio Servs. Co. v. Glickman, 123 F.3d 1189, 1192 (9th Cir. 1997).

3. Next, the government argues that the district court lacked jurisdiction. But the government then immediately admits that we rejected exactly the same arguments in Ibarra-Perez v. United States, 154 F.4th 989 (9th Cir. 2025). The government points out that the Supreme Court may decide that issue differently in D.V.D.. But until then, we are bound by Ibarra-Perez. The Supreme Court might agree with the government, but it might not, or it might not reach the issue at all for some other reason, such as a lack of authority to bring an APA claim or a class action. The government has not made a strong showing of a likelihood of success simply on the hope that our binding precedent will be overturned on this precise issue.

4. The government argues, without much elaboration, that it will prevail on the merits because it may remove a person, without any notice or opportunity for a reasonable-fear interview, to any country at all. The district court's opinion in this case is persuasive on this point. A.M.A.S., 2026 WL 3026123, at *6–7; see also D.V.D., 821 F. Supp. 3d at 148–65 (discussing due process in the context of the APA claim). At a minimum, there is no strong showing of a likelihood of success.

5. Finally, the government argues that the district court lacked authority for the specific remedy it chose. But, with the caveat I noted at the outset, the Supreme Court approved the same remedy in Abrego Garcia, 145 S. Ct. 1017. The district court clearly had authority to require the government to "facilitate" Plaintiff's return and to file periodic progress reports. See id. at 1018 (authorizing those remedies).

So why did the Supreme Court conclude that the government is likely to succeed in D.V.D.? The district court, in essence, set side an entire removal program, reached only the APA claims, and entered classwide relief. Those factors appear to matter to the Court. The government's motion emphasized the vast reach of the district court's order, and one of the issues specified by the Court for supplemental briefing in D.V.D. is "[w]hether the district court had authority to enter classwide declaratory relief and APA vacatur." DHS v. D.V.D., 2026 WL 2917860, at *1.

This case differs from D.V.D. in those critical ways. Whereas the district court in D.V.D. granted relief solely on the APA claims, the district court here expressly declined to reach the APA claims and, instead, granted relief on Plaintiff's constitutional claim. Whatever issues related to the APA may concern the Court, those concerns do not arise here.

Unlike the setting aside of the agency's Guidance and removal program in D.V.D., Plaintiff's claim here does not challenge the Guidance. Indeed, Plaintiff's claim and the district court's order remain the same whether the Guidance exists, does not exist, remains the same, or is changed. Whatever legality, or illegality, the Guidance may have in general, the district court here assessed only the process that Plaintiff, in his particular circumstances, is due.

Finally, unlike the class action and classwide relief in D.V.D., the claims here and the relief granted are individualized. Indeed, it is easy to imagine that the Court in D.V.D. would hold that classwide relief is inappropriate, vacate the district court's order in full, and remand for reconsideration of any individual claims. The Court only recently banned nationwide injunctions, Trump v. CASA, Inc., 606 U.S. 831 (2025), and some members of the Court warned district courts against using classwide relief as a workaround to the ruling, see id. at 866–68 (Alito, J., concurring, joined by Thomas, J.); id. at 869 (Kavanaugh, J., concurring); see also id. at 849–50 (majority opinion) (noting the interplay between nationwide injunctions and classwide relief). Notably, the Court recently granted certiorari in a different case on the propriety of classwide relief in the immigration context. See Mullin v. Refugee & Immigrant Ctr. for Educ. & Legal Servs., No. 26-239, 2026 WL 3453847 (U.S. Nov. 13, 2026) (misc. order)

(granting certiorari on whether an immigration provision "bars the classwide relief entered by the district court" and on another question).

For all of those reasons, the guidance that we can glean from the Court's stay in D.V.D. is vague at best. And it falls far short of demonstrating a strong showing of a likelihood of success with respect to the specific, individualized claims and relief at issue here. Because the government has not shown a likelihood of success, this factor strongly disfavors issuing a stay.

C. Weighing of the Equities

We reach the final two factors, which require a weighing of the equities, only if the government has shown a likelihood of success and irreparable harm. Al Otro Lado v. Wolf, 952 F.3d 999, 1007 (9th Cir. 2020). As described above, the government has done neither. But even assuming that it has met the first two factors, the equities here strongly disfavor a stay. Plaintiff's continued sojourn in Equatorial Guinea has caused, and likely will continue to cause, considerable personal harm to him. Whatever equities support the government's continued execution of its third-country removal program in general, those equities are tiny with respect to a single individual. And those equities pale in comparison to the benefit of removing Plaintiff from a gravely dangerous and torturous situation. The equities strongly disfavor a stay.

As with the first two factors, the Supreme Court's conclusion that the equities favored a stay in D.V.D. has little persuasive value here. The facts in D.V.D. are not particularized to any person's experiences, and the government assured the Court that the vast majority of the plaintiffs faced no "realistic risk" of harm in the foreign countries of removal. Application for a Stay, 2026 WL 2884581, at *42. By contrast, the individualized facts here are egregious: "It is unrebutted that [Plaintiff has] been held under armed guard; threatened at gunpoint; and arrested, beaten, and held incommunicado by Equatorial Guinean authorities." A.M.A.S., 2026 WL 3026123, at *1. The video eventually published by the press is horrific: "police aimed rifles at Plaintiff while he knelt with his hands raised, and a plainclothes officer shouted, 'shoot him!'" Id. at *2. The weighing of the equities plainly differs from the weighing of the equities in D.V.D..

## CONCLUSION

No irreparable harm results from the district court's order, the government has not made a strong showing of a likelihood of success on appeal, and the equities strongly disfavor a stay. I would deny, in the main, the motion for a stay. I would grant a stay only to the extent that the district court's orders have exceeded the remedy applied in Abrego Garcia. In all other respects, I dissent.